**Volume 2**

**Pages 221 - 382**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )        **NO. CR 21-00429-YGR**
                               )
RAY J. GARCIA,                 )
                               )
          Defendant.           )
_____)

Oakland, California
Monday, November 28, 2022

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        **STEPHANIE M. HINDS**
                        United States Attorney
                        1301 Clay Street, Suite 340S
                        Oakland, CA  94612
                BY:  **MOLLY PRIEDEMAN**
                     **ANDREW PAULSON**
                     **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                        SUMMIT DEFENSE, APLC
                        4040 Civic Center Drive, Suite 200
                        San Rafael, CA  94903
                BY:  **JAMES T. REILLY, ESQUIRE**

Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
              Official Reporter

# I N D E X

Monday, November 28, 2022 - Volume 2

|                                      | **PAGE** | **VOL.** |
|--------------------------------------|----------|----------|
| Opening Statement by Mr. Paulson     | 240      | 2        |
| Opening Statement by Mr. Reilly      | 251      | 2        |

| **GOVERNMENT'S WITNESSES**           | **PAGE** | **VOL.** |
|--------------------------------------|----------|----------|
| **H., MELISSA**                      |          |          |
| (SWORN)                              | 256      | 2        |
| Direct Examination by Ms. Priedeman  | 256      | 2        |
| Cross-Examination by Mr. Reilly      | 330      | 2        |

# E X H I B I T S

| **GOVERNMENT'S EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---------------------------|----------|----------|----------|
| 7                         |          | 289      | 2        |
| 29                        |          | 277      | 2        |
| 35                        |          | 299      | 2        |
| 37                        |          | 298      | 2        |
| 38                        |          | 276      | 2        |
| 39                        |          | 275      | 2        |
| 40                        |          | 303      | 2        |
| 42                        |          | 303      | 2        |
| 44                        |          | 303      | 2        |
| 46                        |          | 274      | 2        |
| 50                        |          | 261      | 2        |
| 51                        |          | 295      | 2        |
| 52                        |          | 293      | 2        |

# I N D E X

## E X H I B I T S

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 53 | | 293 | 2 |
| 54 | | 293 | 2 |
| 55 | | 292 | 2 |
| 56 | | 294 | 2 |
| 127 | | 283 | 2 |
| 217 | | 258 | 2 |
| 240 | | 279 | 2 |
| 241 | | 279 | 2 |
| 242 | | 279 | 2 |
| 288 | | 285 | 2 |
| 295 | | 286 | 2 |
| 314 | | 259 | 2 |
| 321 | | 320 | 2 |

<u>**Monday - November 28, 2022**</u>                    **8:00 a.m.**

P R O C E E D I N G S

---oOo---

(Proceedings were heard out of presence of the jury:)

**THE CLERK:**  Calling Criminal Case 21-429-YGR, USA vs. Ray J. Garcia.

Counsel, please state your appearances.

**MS. PRIEDEMAN:**  Good morning, Your Honor.  Molly Priedeman and Andrew Paulson for the United States.

**THE COURT:**  Good morning.

**MR. REILLY:**  Good morning, Your Honor.  James Reilly, Summit Defense, appearing on behalf of Mr. Garcia, who is also present in court.

**THE COURT:**  Good morning.  Okay.

In terms of -- well, let's just -- let's see what, if anything, has happened.  Are there things that you need to chat about this morning?

From the Government?

**MR. PAULSON:**  No, Your Honor.  I just want to let the Court know there are two instances in the opening when we would request that the gallery monitors be turned off.  And I can signal to the courtroom deputy.

**THE COURT:**  So you're going to have to -- it's -- it is not something that we can do here.  So the gallery -- and, Kelly, remind me if I'm wrong.  The flat screens are tied to --

```
 1   they're on the same circuit, I thought, with the jury monitors.
 2           THE CLERK:  That was my understanding, but counsel
 3   said that they tested with Aris.
 4           MR. PAULSON:  Yes, Your Honor.  We tested it last
 5   week, and he was able to turn off just those monitors in the
 6   back.
 7           THE COURT:  Okay.
 8           THE CLERK:  Which I will try.
 9           THE COURT:  Okay.  Do you want to text him?
10       We'll try to figure that out.
11       The only other alternative is that before you show it,
12   just go turn off manually the screen.  And you can try to do
13   that right now.  Because you know when it's coming, and we can
14   do it that way.
15           MR. PAULSON:  Yes, Your Honor.
16           THE COURT:  Okay.  Anything else?
17           MS. PRIEDEMAN:  No, Your Honor.
18           MR. REILLY:  Nothing on behalf of Mr. Garcia.
19           THE COURT:  Okay.
20       Do we have witnesses to swear in?
21           MS. PRIEDEMAN:  Yes, Your Honor.  We thought we'd
22   start with the out-of-custody witness first.
23           THE COURT:  Okay.  I see a lot of people in the
24   courtroom.  Witnesses are excluded.  So is any -- is there any
25   witness in the courtroom?
```

1          **MS. PRIEDEMAN:**  No, Your Honor.

2          **THE COURT:**  All right.  And I don't know who the

3     witnesses are, so you are going to have to make sure that -- we

4     have the sign out, right, "Witnesses are excluded," out there?

5          **MS. PRIEDEMAN:**  I believe it's out there, Your Honor.

6          **THE COURT:**  Okay.  We should double check.

7               (Whereupon the transcript was sealed.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25







```
1    (The following proceedings were heard in open court, out of the
2     presence of the jury:)
3              THE COURT:  Anything else?
4              MS. PRIEDEMAN:  Nothing from the Government, Your
5    Honor.
6              THE COURT:  All right.  Mr. Reilly?
7              MR. REILLY:  I have nothing, Your Honor.  Thank you.
8              THE COURT:  We will stand in recess until the jury is
9    here.
10                   (Recess taken at 8:08 a.m.)
11                   (Proceedings resumed at 8:33 a.m.)
12        (Proceedings were heard out of presence of the jury:)
13              THE COURT:  Our jury is here.  You may be seated.
14        If the courtroom deputy will bring in the jurors.
15        (Proceedings were heard in the presence of the jury:)
16              THE COURT:  Ladies and Gentlemen, Members of the Jury,
17    welcome back.  I hope you had a wonderful few days of
18    Thanksgiving.
19        I have been struggling with a long-term cold.  It is not
20    COVID.  I've been testing repeatedly.  So if you see me
21    sneezing up here, don't worry, I'm not -- I don't have COVID,
22    but I will try to sneeze when I don't have a mic on.
23        In any event, I do want to welcome you back.
24        You are now the jury in this case, and I want to take a
25    few minutes to tell you about your duties as jurors and to give
```

1    you some preliminary instructions.  At the end of the trial, I

2    will give you more detailed instructions, and you will actually

3    have a copy of them with you in the jury room as you

4    deliberate.

5         Most importantly, you are to perform your duties fairly

6    and impartially.  You should not be influenced by any person's

7    race, color, religious beliefs, national ancestry, sexual

8    orientation, gender identity, gender, or economic

9    circumstances.  Also, do not allow yourselves to be influenced

10   by personal likes or dislikes, sympathy, prejudice, fear,

11   public opinion, biases, including unconscious biases.

12        Unconscious biases are those stereotypes and attitudes or

13   preferences that people may consciously reject but may be

14   expressed without conscious awareness, control, or intention.

15   Like conscious bias, unconscious bias may affect how we

16   evaluate information and make decisions.

17        As I've mentioned before, this is a criminal case brought

18   by the United States government.  The Government charges

19   Defendant Ray J. Garcia with three counts of sexual abuse of

20   prison ward, four counts of abusive sexual conduct, and one

21   count of false statements to a governmental agency.

22        The charges against the defendant are contained in an

23   indictment, but an indictment simply describes the charges that

24   the Government brings against the defendant.  It's not evidence

25   and does not prove anything.

The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the Government proves the defendant guilty beyond a reasonable doubt.  In addition, the defendant has the right to remain silent and never -- never -- has to prove innocence or to present any evidence.

The evidence you are to consider in deciding what the facts are include:  One, the sworn testimony of any witness; two, the exhibits that are received into evidence; and, three, any facts to which the parties have agreed.  And you will receive some of those facts -- we'll just tell them to you as we go through the trial.

The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case: The statements and arguments of the attorneys are not evidence; questions and objections by attorneys are not evidence; any testimony I tell you to disregard is not evidence; anything you may see or hear when court is not in session, even if what you see or hear is done or said by one of the parties or one of the witnesses, it's not evidence.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or personally did or heard. Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which you could find some other fact.

You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact, and the law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give any evidence.

So let me give you an example of circumstantial evidence.  If you wake up in the morning and you see that the sidewalk is wet, you could find from that fact -- that fact being that the sidewalk is wet -- you could find that it may have rained that night.  However, there may be other evidence, such as a turned-on garden hose, that could provide an explanation for the water on the sidewalk.  Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidence in light of reason, experience, and common sense.

There are rules of evidence that control what can be received into evidence, and when a lawyer asks a question or offers an exhibit and the other lawyer on the other side thinks it may not be permitted by the rules of evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received; if I sustain the objection, the question cannot be answered or the exhibit cannot be received.

Whenever I sustain an objection to a question, you must ignore the question and must not guess what that answer might

have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence. That means that in deciding this case, you must only consider the evidence that is admitted and not consider the evidence that I told you to disregard.

In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe. You are entitled to believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account: One, the witness' opportunity and ability to see or hear or know the things about which they are testifying; the witness' memory; the witness' manner while testifying; the witness' interest in the outcome of the case, if any; the witness' bias or prejudice, if any; whether other evidence contradicted the witness' testimony; the reasonableness of the witness' testimony in light of all of the other evidence; and any other factor that bears on believability.

You must avoid bias, conscious or unconscious, based on a witness' race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about

it.  What is important is how believable the witnesses are and how much weight you think their testimony deserves.

At the end of the trial, you'll have to make your decision based upon what you recall from the evidence.  You will not have a written transcript, and I urge you to pay close attention to the testimony as it is given.

We've given you binders to take notes, if you wish.  How many of you remember everything I said to you last Monday? Right?  You may remember some.  You may remember -- but not necessarily all, and you're not going to have a transcript. Just remember that.

If you wish, you can take notes to help you remember.  If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case.  Do not let note-taking distract you from being attentive.

When you leave the court for recesses, your notes should be left in the jury room.  That jury room will be secure.  No one will read your notes.

Whether or not you take notes, you should rely on your own memory of the evidence.  Notes are just there to help you -- assist with your memory.  You should not be overly influenced by your notes or those of other jurors.

During the trial, a language other than English will be used for some of the evidence.  When a witness testifies in another language, the witness will do so through an official

court interpreter.  The evidence you are to consider and on which you must base your decision is only the English-language interpretation provided through the official court interpreters.

Although some of you may know the non-English language used, you must disregard any meaning of the non-English words that differ from the official interpretation.

You must not make any assumptions about a witness or party based solely on the use of an interpreter to assist that party or witness.

During the trial, I may need to take up legal matters with the attorneys privately by calling a recess.  Please understand that while you are waiting, we are working.  The purpose of these conferences is not to keep relevant information from you but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

It is pretty rare that I have to do this, because I work with the lawyers before you arrive and after you leave so that we don't interrupt the trial.  But once in a while, it is necessary.

Of course, I will do what I can to keep the number and length of these conferences to a minimum, and I don't always even grant an attorney's request.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.

1       The next phase of the trial will begin shortly.  As I've

2   said, it's important that you keep an open mind during this

3   trial and do not decide what your verdict should be until you

4   and your fellow jurors have completed your deliberations at the

5   end of the case.

6       You must decide this case solely on the evidence received

7   and on my instructions as to the law that applies.  As I said

8   to you last week, it's critically important not to be exposed

9   to any information about the case or the issues involved in it

10  during your -- the course of your jury duty other than what

11  happens here in the courtroom.  Thus, until the end of this

12  case or until I tell you otherwise -- and I will remind you

13  periodically -- do not communicate with anyone in any way and

14  do not let anyone communicate with you in any way about the

15  merits of this case or anything to do with it.

16      This restriction includes discussing the case in person;

17  in writing; by phone, tablet, or computer; or any means, via

18  email, text messaging, or Internet chat room, blog, website, or

19  application, including, but not limited to, Facebook, YouTube,

20  Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other

21  forms of social media.

22      This restriction also applies to communicating with your

23  fellow jurors until I give you the case for deliberation, the

24  media, the press, the people involved in this case, although,

25  again, you can notify your family and employers that you've

been seated in the jury and tell them how long you expect the trial to last.

If you're approached in any way or asked in any way about your jury service or anything to do with this case, you must respond that you have been ordered not to discuss the matter, and please report the contact to me.

Because you will receive all the evidence and legal instruction you may properly consider to reach a verdict, do not read or watch or listen to any news or media accounts or commentary about the case or anything to do with it.

Do not research, such as consulting dictionaries, searching the Internet, or using reference materials.  Do not make any investigation or in any way try to learn about the case on your own.

Do not visit or view any place discussed in this case.  Do not use the Internet or any research to search for or view any place discussed in this case.

Do not do any research about the case, the law, or the people involved, including the parties, the witnesses, the lawyers, until you have been excused as jurors.

If you happen to read or hear anything touching on this case in the media, turn away, and, again, just report it to me.

These rules protect each party's right to have the case decided solely on the evidence that has been presented here in court, that all of you see the same evidence.

1    Witnesses here in court take an oath to tell the truth,

2    and the accuracy of their testimony is tested through the trial

3    process.  If you do any research or investigation outside the

4    courtroom or gain any information through improper

5    communications, then your verdict could be influenced by

6    inaccurate, incomplete, or misleading information that was not

7    tested through the trial process.

8    Each of the parties is entitled to a fair trial by an

9    impartial jury, and if you decide the case based on information

10   not presented in court, you will have denied the parties a fair

11   trial.

12   Remember, you have taken an oath to follow the rules, and

13   it is very important that you follow these rules.  A juror who

14   violates these restrictions jeopardizes the fairness of these

15   proceedings.

16   So where do we go from here?  First, each side is entitled

17   to make an opening statement.  Opening statements are not

18   evidence; it's simply an outline to help you understand what

19   each side believes the evidence will show.  A party doesn't

20   even have to make an opening statement.

21   The Government will then present evidence and counsel for

22   the Defense may cross-examine.  If the defendant chooses to

23   offer evidence, then counsel for the Government may

24   cross-examine.

25   After evidence is presented, I'll instruct you on the law

1    that applies, and the attorneys will make their closing

2    arguments.  After that, you will go into the jury room to

3    deliberate on your verdict.

4         I like to explain to jurors that -- kind of think about

5    trials as a puzzle.  I like jigsaw puzzles.  What you're about

6    to hear from the lawyers is their opening statement.  They're

7    going to tell you what that box looks like from their

8    perspective, that's all.

9         We have no evidence, so you'll hear what they have to say,

10   but the pieces of the puzzle are the evidence that we listen to

11   and receive during the trial.  And at the end of this case,

12   you'll put those pieces together and you'll decide what that

13   puzzle box really looks like.  It's kind of what it's all

14   about.  That's why we have to wait until the end, because you

15   need all the pieces before you can figure out what happened in

16   terms of the facts of this case.  Okay?

17        All right.  We'll start with the Government.

18        Ms. Priedeman or Mr. Paulson.

19             **MR. PAULSON:**  Yes, Your Honor.

20             **THE COURT:**  You may proceed.

21                        OPENING STATEMENT

22             **MR. PAULSON:**  For more than two years, the defendant

23   served as the associate warden and then warden at an

24   all-women's prison, where he had nearly total control over the

25   hundreds of women who could not leave its walls.

1    He controlled when and where they ate, slept, and worked.

2 He had the power to search them or their rooms at any time.   He

3 had the power to put them in solitary confinement, and as

4 warden, he even had the power to set them free.

5    And over the course of those two years, the defendant used

6 that power to manipulate and sexually abuse multiple women

7 under his charge.   Ladies and Gentlemen, this is an abuse of

8 power of the most profound sort.

9    You're going to hear from three of the defendant's former

10 prisoners -- Melissa, Maria, and Rachel -- who will tell you

11 about the sexual abuse they suffered at the hands of the

12 defendant, abuse that followed a pattern, abuse that began with

13 compliments and flattery.   He told them they were beautiful.

14 He said he wanted to be with them when they got out of prison.

15    Eventually, the discussions turned sexual.   He showed them

16 pictures of his penis on his work phone.

17    And he also did things that only a warden could do.   He

18 made them promises about transfers to lower-security camps.   He

19 made promises about granting compassionate release and setting

20 them free.

21    Eventually, things became physical.   Melissa will tell you

22 about four instances of sexual abuse, maria will tell you about

23 two, and Rachel will tell you about one.   And those form the

24 basis of Counts I through VII, because, as you'll hear, as the

25 warden, any sexual touching of the defendant's prisoners was a

1   crime because they could not legally consent.

2        And he knew that.  He knew that because he had been

3   trained on it year after year after year of his career.  He

4   knew that because he took steps to avoid detection.  He tried

5   to get Melissa, Maria, and Rachel -- he tried to deter them

6   from ever coming forward.

7        And he knew it was a crime because when he got caught in

8   July of 2021, he lied to the FBI.  He denied ever touching any

9   of his prisoners inappropriately, and he denied ever

10  instructing any of them to be naked for him at particular

11  times.

12       Those lies form the basis of Count VIII, because, as

13  you'll hear, in addition to touching Melissa, Maria, and

14  Rachel, he also told them to be naked for him when he did his

15  rounds around the prison.

16       And it wasn't just them.  You'll hear from Katrina and

17  Monica, two more of the defendant's prisoners, that he told to

18  be naked for him at specific times.

19       But you're not just going to hear about it in testimony.

20  There are photos.  You're going to see a photo that the

21  defendant took of Melissa naked in a prison cell in his prison.

22  You're also going to see screenshots of a naked video chat that

23  the defendant had with Rachel after she was released and sent

24  to a halfway house, screenshots that he took without her

25  knowledge.

1      Now, before I get into more details regarding what the

2 evidence in this case is going to show, I want to introduce you

3 to the defendant's prison.  And you can see it on your screen

4 there, FCI Dublin.  It's located a few miles east of this

5 courthouse where we are today, and it's an all-women's prison

6 that houses a few hundred female inmates.

7      And each of the prisoners that are confined there, each of

8 the prisoners and former prisoners that you're going to hear

9 testify on the stand during this trial, have one or more felony

10 convictions.  That's what put them there.  And as they crossed

11 the threshold of that front gate that you see right there, the

12 defendant had authority and control over nearly every aspect of

13 their lives.

14      And it wasn't just authority; it was access.  The evidence

15 will show that the defendant had access to confidential court

16 documents that contained some of the most personal and intimate

17 details about the women under his charge.

18      And the defendant controlled what went on inside his

19 prison, but he also controlled what left.  You'll hear how the

20 defendant had the power to monitor all inmate communications:

21 Email, mail, video calls, calls.

22      He was also the gatekeeper for any referrals of sexual

23 abuse allegations to criminal investigators.  You will hear

24 how, by BOP policy, he was informed of all sexual abuse

25 allegations that occurred at his prison and that only he had

the power to send a referral of a sexual abuse allegation to criminal investigators.

Let's meet Melissa.  She's one of the women that the defendant sexually abused, and she was at the defendant's prison from 2015 to about July of 2021.

And as you'll hear, each of the prisoners at FCI Dublin were given a job to do while they were there.  Melissa's job was to clean the visiting room.  The visiting room is where friends and family would come and visit with the inmates who were confined there at the prison.

She'll tell you how she met the defendant when he first arrived at the prison in around December of 2018, and their initial interactions began with compliments and flattery.  He told her she was beautiful.  He said the crime she committed wasn't her fault.  He said she shouldn't be in prison.  He told her personal details about his own life.  He told her that he wanted to be with her when she got out of prison.

Eventually, the talk turned more sexual.  He told her things he wanted to do to her sexually.  He showed her pictures of his penis on his work phone.  And this was all part of his manipulation, and it worked.

You'll hear how Melissa started to develop romantic feelings for the defendant, feelings that were complicated by the fact that he was her warden.

And eventually, things turned physical.  Melissa will

testify that in about December of 2019, she was exercising at the rec yard when the defendant came and got her and took her to the visiting room and took her into one of the bathrooms, the bathroom that you see there on your screen.  When they got into the bathroom, they kissed.  The defendant grabbed her breasts and stuck his finger in her vagina.

This wasn't the only time things were physical between them.  The second instance followed a very similar pattern. The defendant and Melissa were once again in the visiting room, and the defendant told Melissa to show him a broken sink in one of the bathrooms, the bathroom you see there on your screen. When they went into the bathroom, they kissed, and the defendant again put his finger in her vagina.

The third encounter also happened in the visiting room, this time in the changing stalls.  And you'll hear how on the day that this occurred, earlier in the day, the defendant was escorting a group of outside agency auditors around the prison, who were there as part of a pre-inspection of the prison for compliance with the Prison Rape Elimination Act or PREA.  You will hear a little bit about PREA.  It's a law that was designed to stop sexual abuse in prisons.

And on this occasion, the defendant again took Melissa to the visiting room, and they went into the changing stalls, and they kissed, and he again touched her genitals.

The fourth encounter between the defendant and Melissa

1    occurred in the UNICOR distribution warehouse, and you can see

2    it there on the bottom left-hand corner of your screen.   On

3    this occasion, the defendant and Melissa were in the warehouse

4    with some other prison guards, and the defendant told the other

5    guards that they were going to go look at some cabinets in a

6    different area of the warehouse.   And when they got back to

7    that more secluded area, they kissed, and the defendant again

8    put his finger in her vagina.

9         Now, the touching was just one component of the abuse.

10   Melissa will also tell you that the defendant instructed her to

11   be naked for him in her cell when he did rounds.   And sometimes

12   this occurred in her cell; sometimes he told her to go to a

13   more secluded cell down the hall.

14        You will hear about another instance when the defendant

15   told her to flash him, and when she did, he threw candy on the

16   ground at her feet, cheap compensation for her compliance.   And

17   that's not the only incident you're going to hear about

18   involving candy.

19        But you're not just going to hear about it; you're going

20   to see it.

21        On one of these occasions when the defendant instructed

22   Melissa to be naked in the more secluded cell down the hall,

23   she will tell you how the defendant stepped inside the cell,

24   pulled out his phone, and began taking pictures of her.

25        This is one of those photos, one of the photos that you'll

see.  And as you can see, the defendant's reflection is in the mirror -- the defendant's reflection is in the mirror behind Melissa, the window behind Melissa, in his warden uniform with his work phone taking the photo.

And Special Agent Katherine Barclay from the FBI will testify that the FBI found this photo on the defendant's personal computer, along with cropped images of this photo, cropped to focus on Melissa's genitals.

Melissa wasn't the only one.  This is Maria.  She's another woman who was sexually abused by the defendant.  She was at the defendant's prison from 2019 until about 2022.

And as you'll hear, she worked in the kitchen until the defendant had her transferred to the laundry room in her unit because it was easier to see her there.

And the abuse of Maria took a very similar pattern.  It began with compliments and flattery.  He told her she was beautiful.  He said he wanted to be with her when she got out of prison.

Eventually, things turned sexual.  He showed her pictures of his penis on his work phone.  Like Melissa, this manipulation worked.  You'll hear how Maria started to have feelings for the defendant, feelings that were once again complicated by the fact that he was her warden.

Things with Maria turned physical as well.  She will tell you about an incident when she was in the laundry room, the

laundry room that you see there on your screen.  The defendant

came to her and gave her some laundry to wash, and then he

grabbed her hand and put it on his erect penis and told her,

"This is all yours."

Now, like with Melissa, the defendant also instructed

Maria to be naked for him at particular times.  She will tell

you how she complied with this instruction and how the

defendant would stand outside of her housing unit and look

through her windows while she was naked inside.  You will

actually hear from witnesses who saw the defendant outside her

window.

And Maria will also tell you on one of those occasions

when the defendant instructed her to be naked, he came inside

her housing unit, opened her cell door, stepped inside her

cell, and touched her breasts.

Melissa and Maria weren't the only ones.  This is Rachel.

She's another woman who was sexually abused by the defendant.

She was at the defendant's prison from 2016 until about

September of 2020.

And as you'll hear, she was an electrician, so she would

go around the prison fixing light bulbs and other electrical

things that were broken.

And the abuse of Rachel followed a similar pattern.  He

told her she was beautiful.  He said he wanted to be with her

when she got out of prison.  He showed her pictures of his

1    penis on his work phone.

2         He also instructed Rachel to be naked for him at

3    particular times, but she wasn't comfortable doing it in his

4    prison and so she didn't.

5         Eventually, things with Rachel turned physical.  She'll

6    tell you how on one instance, she was working in the electrical

7    shop, the electrical shop that you see there on your screen,

8    and the defendant came inside the office, and they kissed, and

9    he grabbed her butt.

10         Now, this relationship began at the defendant's prison,

11   but it continued after Rachel was released and sent to a

12   halfway house.  You will hear how the defendant gave her an

13   email address and told her to stay in contact, and she did.

14   Rachel and the defendant spoke on the phone.  They had video

15   chats.

16         And on one of these video chats, you will hear how, at the

17   defendant's urging, Rachel got naked and began touching

18   herself.  Little did she know the defendant was recording that

19   video chat, and you'll see screenshots of that video chat,

20   screenshots that Agent Barclay will testify were found, again,

21   on the defendant's personal computer.

22         Here are two of the screenshots that you'll see showing

23   Rachel and the defendant.

24         Now, to keep this abuse going, the defendant had to keep

25   his prisoners quiet and compliant, and to do that, he employed

the full range of tools at the warden's disposal.  He made
promises about transfers to lower-security camps.  He made
promises about granting compassionate release and setting them
free.  He told them they would get in trouble if anyone found
out.  He told them he was best friends with the person at his
prison who conducted investigations into sexual abuse
allegations.  And with Maria, he instructed her to destroy any
evidence that could implicate their relationship.

After Rachel was released to the halfway house, he told
her that another inmate had been placed back in prison when
they found photos of another prison guard on her phone.

He also searched for and downloaded an application to,
quote, hide photos.  But despite his best efforts, he couldn't
keep this under wraps forever.  While still at the defendant's
prison, Melissa got word of her abuse to her lawyers, and they
got the information to the FBI.

You'll hear how on July 22nd, 2021, the FBI executed
multiple search warrants on the defendant's house and the
prison, his office in the warden complex.  And among the things
they found, you will hear that they found his work phone, which
contained hundreds of photos of his penis, some of which had
been taken on the job in the bathroom just a few feet from his
office.  They also found the personal computer that contained
the photos that you just saw a moment ago.

And in addition to executing these search warrants, the

1    FBI actually sat down with the defendant in a voluntary

2    interview.  They gave him the chance to come clean and tell the

3    truth.  Instead, he lied.  He denied ever touching any inmates

4    inappropriately.  Ladies and Gentlemen, the evidence will show

5    that he did just that on multiple occasions with Melissa,

6    Maria, and Rachel.

7         He also denied ever telling any of his prisoners to be

8    naked for him at particular times.  The evidence will show that

9    he did just that with Melissa, Maria, Rachel, and others.

10        This is Katrina, one of the women that the defendant

11   instructed to be naked.  She arrived at the defendant's prison

12   in March of 2020, and she's still there.  She'll tell you how

13   on July 21st, 2021, the day before the defendant gave his

14   statement to the FBI, he instructed her to be naked in her

15   cell.  And that wasn't the first time.

16        Ladies and Gentlemen, the evidence in this case will show

17   that the defendant sexually abused Melissa, Maria, and Rachel

18   on multiple occasion and that he lied about his sexual exploits

19   with those women and with others.  That's why at the end of

20   this case, we'll ask you to return a verdict of guilty on all

21   counts.

22             **THE COURT:**  Mr. Reilly?

23                      OPENING STATEMENT

24        **MR. REILLY:**  Good morning, Ladies and Gentlemen.  My

25   name is Jim Reilly.  I'm with the law firm of Summit Defense.

I represent Mr. Ray Garcia in this case.

And I'd like to start off by resolving one of the uncertainties that you heard about during the jury selection process.

I'm going to have a minute.

That uncertainty was whether Mr. Garcia would testify or not, and I'm going to tell you right now that he will testify, and he's going to address each of the allegations against him in that testimony.

He's going to tell you that with respect to the first count in the indictment, that he did not digitally penetrate the vagina of Melissa.

He will tell you with respect to the second count, that he did not digitally penetrate Melissa's genital opening.

With respect to the third count, he will tell you that he never touched Melissa's genitals in any way.

With respect to the fourth count, he will tell you that he did not digitally penetrate Melissa's genitals.

He will also tell you that with respect to Maria and the fifth count, that he did not have her touch his penis while they were in the laundry room.

And with respect to the sixth count, he will tell you that he did not touch her breasts.

With respect to Rachel, he will tell you that with re- -- in the seventh count, that he never touched Rachel's buttocks.

1     And with respect to the last count of lying to the FBI or

2  a government agency, he's going to tell you that, yes, he said

3  in that interview, "I never touched any of those women.  I

4  never asked them to be naked so that I could take pictures of

5  them."  And that was the truth.

6     Now, he's also going to deny a number of the other claims

7  that Melissa made, and I'm not going to go through them all,

8  but, essentially, the claims that he was grooming her, in

9  effect, by paying her compliments and telling her he would do

10  things for her, he's going to deny doing those.

11     The evidence is also going to show that Melissa is a

12  convicted felon, that Maria is a convicted felon, that Rachel

13  is a convicted felon, and that the other witnesses who are

14  going to testify who were inmates at the time obviously are all

15  convicted felons.

16     Another thing the evidence will show is that there are

17  cameras everywhere in this facility, every hallway, every

18  public space.  About the only place there aren't any cameras is

19  the bathrooms into which you can go off of one of the more

20  public rooms.

21     And yet the evidence is not going to show one single video

22  of any of these supposed events, no walking down the hallways,

23  no going into any of these rooms, no coming out of any of these

24  rooms.  There is no evidence whatsoever to support the claims

25  that these things happened.

1    Mr. Garcia will tell you that, yes, he likes candy.  He

2 has candy on his desk -- or he had candy on his desk in the

3 associate warden's office when he was the associate warden and

4 in the warden's office when he was the warden.

5    He also had candy in his car, and interestingly enough,

6 when the search warrants were executed, the evidence will show

7 you that they found a lot of candy in his car.  And that's the

8 only time you're going to see candy.

9    You're not going to see candy in Melissa's cell; you're

10 not going to see a candy cane that supposedly he gave to her or

11 asked her to use; you're not going to see candy on the floor

12 that was supposedly thrown there to attract her attention or to

13 pay her off for doing things for him.

14    There are -- and you'll hear about them; you're not going

15 to see them because there's no point -- literally hundreds --

16 hundreds -- of sexually explicit photos that Mr. Garcia took.

17 It would be fair to say he is an extreme documentarian of his

18 own sexual exploits.

19    What you will not see is one single photo of him having

20 any sexual contact with Melissa.  You will not see one single

21 photo of him having contact -- sexual contact with Maria.  In

22 fact, you won't see any photos that he took of Maria.  You will

23 not see one single photo of any sexual contact between

24 Mr. Garcia and Rachel.

25    You will see some photos of this video that was taken when

1    they were having, basically, phone sex after she was released

2    from custody, but you will not see any photos of anything that

3    happened while she was an inmate.

4         You will hear a lot of other evidence, and I'm not going

5    to try to go through all of it right now, but what you will not

6    see or hear is anything showing that Mr. Garcia committed any

7    crime other than the uncorroborated testimony of these

8    witnesses, these women who are going to say these things

9    happened.  And that's all there is.

10        Mr. Garcia and I thank you in advance for your attention

11   during the trial.

12            **THE COURT:**  Thank you, Mr. Reilly.

13        Ms. Priedeman, first witness.

14            **MS. PRIEDEMAN:**  The Government calls Melissa.

15            **THE COURT:**  Now, I know everyone always overeats at

16   Thanksgiving, but I did order bagels.  Did they show up for you

17   all?  Oh, good.  So we do have snacks for you, but if you want

18   to bring your own favorite kind, that's totally fine.  There's

19   a fridge in there for you and stuff like that.

20        Any Warriors fans?  Yeah?  They won.  And the 49ers, too.

21   49er fans?  Yes.

22            **A JUROR:**  And the Raiders won, as well.

23            **THE COURT:**  Who?  And the Raiders won, too?  You're

24   still a die-hard Raider fan?  I know people are either still or

25   they're still upset with them.  You never know.  When I was a

```
 1    state court judge, the Monday after a Raiders game was always a
 2    very busy day.
 3         All right.  Nobody got hurt playing touch football?  We
 4    stopped playing after my best friend got sent to the hospital
 5    for a broken clavicle.
 6              THE CLERK:  Please raise your right hand.
 7                          MELISSA H.,
 8    called as a witness for the Government, having been duly sworn,
 9    testified as follows:
10              THE CLERK:  You can be seated.
11         Please state your name, using your initials.
12              THE WITNESS:  M.J.H.
13              MS. PRIEDEMAN:  Good morning.
14              THE COURT:  You know, you need -- can you either pull
15    that mic down -- I'm having a hard time hearing you.  And then
16    scoot your chair in.  Okay?  Great.  Let's make sure we can
17    hear.
18                        DIRECT EXAMINATION
19    BY MS. PRIEDEMAN:
20    Q.   Good morning.  What is your first name?
21    A.   Melissa.
22    Q.   You might need to scoot a little bit.  There you go.
23              THE COURT:  And if we can increase the mic sound.
24    Thank you.
25         You may proceed.
```

**BY MS. PRIEDEMAN:**

**Q.** Good morning, Melissa.

**A.** Hi.

**Q.** Are you currently incarcerated?

**A.** Yes.

**Q.** Where?

**A.** In Victorville.

**Q.** Is that a federal prison?

**A.** Yes.

**Q.** In 2014, were you convicted of conspiracy to commit murder?

**A.** Yes.

**Q.** Was that a felony conviction?

**A.** Yes.

**Q.** Do you see that binder on the stand?

**A.** Yes.

**Q.** Can you take a look at Exhibit 217, please.

      **THE COURT:** You said 217?

**BY MS. PRIEDEMAN:**

**Q.** Do you recognize what that is?

**A.** Yes.

**Q.** What is it?

**A.** That's me.

      **MS. PRIEDEMAN:** Your Honor, the Government moves to admit Exhibit 217.

1          **MR. REILLY:**  No objection, Your Honor.

2          **THE COURT:**  217 is admitted.

3          (Government Exhibit 217 received in evidence)

4    **BY MS. PRIEDEMAN:**

5    **Q.**  Melissa, were you previously incarcerated at FCI Dublin?

6    **A.**  Yes.

7    **Q.**  When, approximately, were you incarcerated at FCI Dublin?

8    **A.**  January of 2015.

9    **Q.**  And when did you leave FCI Dublin?

10   **A.**  June of 2021.

11   **Q.**  June?

12   **A.**  I believe.

13   **Q.**  Okay.  Does FCI Dublin have both a prison and a camp?

14   **A.**  Yes.

15   **Q.**  What's the difference between a prison and a camp?

16   **A.**  The FCI is higher security.  It has a barbed-wire fence,

17   and you can't leave there.

18          So the camp is a lower security, and you can actually

19   leave the compound to go to work.

20   **Q.**  And when you say "FCI," is that the prison?

21   **A.**  Yes.

22   **Q.**  So are the prison and camp separate facilities?

23   **A.**  Yes.

24   **Q.**  Were you incarcerated at the prison or the camp when you

25   were at FCI Dublin?

1    **A.**   I was incarcerated at both of them.

2    **Q.**   When, approximately, were you at the prison?

3    **A.**   In January of 2015 to June of 2020 -- '21.

4    **Q.**   And when were you at the camp?

5    **A.**   I was there at the end of June of 2021 to July of 2021.

6           **MS. PRIEDEMAN:**  And, Ms. Slattery, can you pull up

7    Exhibit 314, please.

8    **Q.**   Melissa, do you recognize what's depicted on your screen?

9    **A.**   Yes.

10   **Q.**   What is it?

11   **A.**   It's the whole compound of the prison.

12          **MS. PRIEDEMAN:**  Your Honor, the Government moves to

13   admit Exhibit 314.

14          **MR. REILLY:**  I have no objection, Your Honor.

15          **THE COURT:**  314 is admitted.

16          (Government Exhibit 314 received in evidence)

17          **MS. PRIEDEMAN:**  Your Honor, may we publish Exhibit 314

18   to the jury?

19          **THE COURT:**  You may.

20   **BY MS. PRIEDEMAN:**

21   **Q.**   Melissa, can you point out where on this diagram the

22   prison is located?

23   **A.**   This is the whole prison right here (indicating).

24   **Q.**   Okay.

25   **A.**   Did it go?

1   **Q.**   I don't think it quite -- there you go.

2   **A.**   This is the whole prison right here (indicating).

3   **Q.**   And where is the camp?

4   **A.**   Right here (indicating).

5   **Q.**   Are inmates at FCI Dublin assigned to housing units?

6   **A.**   Yes.

7   **Q.**   Where did you live when you were at the FCI Dublin prison?

8   **A.**   In B-Unit.

9   **Q.**   Were you assigned jobs at FCI Dublin?

10  **A.**   Yes.

11  **Q.**   What jobs were you assigned?

12  **A.**   When I first got there, I worked in the kitchen, and then

13  I worked in the visiting room the rest of the time.

14  **Q.**   And what's the purpose of the visiting room?

15  **A.**   It's -- I was an orderly, so I cleaned before visits and

16  after visits.

17  **Q.**   And what type of visits are you referring to?

18  **A.**   Our family would come to visit us.

19       **MS. PRIEDEMAN:**   Ms. Slattery, can you please pull up

20  Exhibit 50?

21       **THE COURT:**   5-0?

22       **MS. PRIEDEMAN:**   Yes.

23  **Q.**   Melissa, do you recognize what is depicted in this

24  photograph?

25  **A.**   That's the visiting room.

1           **MS. PRIEDEMAN:**  Your Honor, the Government moves to

2    admit Exhibit 50.

3           **MR. REILLY:**  No objection.

4           **THE COURT:**  Admitted.

5           (Government Exhibit 50 received in evidence).

6           **MS. PRIEDEMAN:**  May we publish Exhibit 50 to the jury?

7           **THE COURT:**  You may.

8    **BY MS. PRIEDEMAN:**

9    **Q.**   Melissa, what are we looking at in this picture?

10   **A.**   This is the visiting room where we have contact visits

11   with our family.  In the very back is the kid's room or it's a

12   play area.  And then those doors, they lead outside to a back

13   patio with a little playground.

14   **Q.**   And is this where you worked?

15   **A.**   Yes.

16   **Q.**   Are you familiar with Ray Garcia?

17   **A.**   Yes.

18   **Q.**   How do you know him?

19   **A.**   He was my boss when I worked in the visiting room, and he

20   was the assistant warden and the warden at Dublin.

21   **Q.**   Do you see Mr. Garcia in the courtroom today?

22   **A.**   Yes.

23   **Q.**   Can you identify him, please.

24   **A.**   He has a mask on with glasses and a gray suit on.

25   **Q.**   Where is he seated?

A.    He's right there.

MS. PRIEDEMAN:   The Government would ask that the record reflect the witness has identified the defendant.

THE COURT:   So reflected.

MS. PRIEDEMAN:   We can take down this exhibit, too. Thank you.

Q.    What is your understanding of the role of the warden at FCI Dublin?

A.    The warden oversees everything at the prison.   They control everything at the prison.

Q.    What type of things could the warden help inmates with?

A.    If you have any questions, if you're like with unit team or, you know, if you had any problems, you can go to him and ask him.

Q.    Could you make any requests to him?

A.    Policy is you're supposed to go through administrative remedies first.

But they always stand at main line.   It's -- like at lunchtime, the executive staff would stand there, so if you had any type of questions, you could ask them.   And he would always be there.

Q.    Did you have an understanding who the ultimate decision-maker was at FCI Dublin?

A.    Yes.

Q.    And who was it?

1    **A.**   The warden.

2    **Q.**   Could the warden punish inmates?

3    **A.**   Yes.

4    **Q.**   How?

5    **A.**   They can put you in the SHU.  They can ship you across the

6    country, you know, to a different prison.  They have the final

7    say in everything.  They make those executive decisions.

8    **Q.**   Can you explain to the jurors what the SHU is?

9    **A.**   The SHU is -- it's the Special Housing Unit.  So they're

10   little cells, like dungeons, and you are locked in there 24

11   hours a day.  You don't get commissary.  You don't really get

12   phone calls.  It's very scary and depressing and sad.

13   **Q.**   Melissa, can you describe your initial interactions with

14   the defendant.

15   **A.**   Yes.  So when I -- when he first got there as an assistant

16   warden, he would always come, ask me if I was okay, if I needed

17   anything all the time, you know.

18        He would ask me how my son was and -- and if there was

19   anything that I needed, for me to go to him and ask him.  And

20   he was always really sweet and nice and caring.

21   **Q.**   Did he ever make comments about the crime you had

22   committed?

23   **A.**   Yes.

24   **Q.**   What did he say?

25   **A.**   He said that I wasn't there for a violent crime.  He said

1  that I shouldn't be in there.  He would go into detail about

2  conspiracy.  He said that it ranges on, like, different areas.

3  So he just constantly told me that I wasn't there for a violent

4  crime.

5  **Q.**  Did the defendant ever comment on your appearance?

6  **A.**  Yes.

7  **Q.**  What did he say?

8  **A.**  He always told me how beautiful I was and how -- how sexy

9  I was and how soft my skin was and how he couldn't wait to

10  touch me and how beautiful my eyes and lips were.  And every

11  day he would come out to the rec and tell me how amazing my

12  body was.

13  **Q.**  Did he ever visit you in the visitation room?

14  **A.**  Yes.

15  **Q.**  What type of interactions did you have with him in the

16  visitation room?

17  **A.**  Physical.

18  **Q.**  Focusing on the comments that we just talked about, how

19  did it make you feel when he first started making those

20  comments?

21  **A.**  He made me feel special.  You know, he would tell me that

22  he was there to make my time easier and that he was always, you

23  know, going to protect me and make sure nothing happened to me.

24      You know, I had a lot of issues with staff making comments

25  to me about why I was in prison, so he made it where I could

1    always go to him if I needed anything.  He always took care of

2    everything for me.

3    **Q.**   What type of things did he take care of for you?

4    **A.**   So any time I needed anything in the visiting room, we had

5    to give a list of supplies to safety.  And I started giving

6    them to him, like lists of paper towels and chemicals.  He

7    would always come and get the list from me, you know, and he

8    would talk to me.

9        You know, he -- any type of, like, paperwork that I

10   needed, you know, he would -- he would do for me, you know.

11   Little special extra things.

12   **Q.**   At some point, did the nature of his comments change?

13   **A.**   Yes.

14   **Q.**   How did they change?

15   **A.**   They were always very sweet and loving, like, "You're so

16   beautiful.  You're just so amazing," like, so sweet and like a

17   gentleman, you know, everything that I wanted to hear.

18       And then he became very pornographic, very vulgar, you

19   know.  He would make comments how much he wanted to fuck me and

20   eat my pussy and, you know, stick his big dick inside of me to

21   fill me up, you know.  He couldn't wait to spread my legs and

22   look at my pussy and stick his tongue between my legs.

23   **Q.**   What was going through your mind when the defendant made

24   those statements?

25   **A.**   You know, he -- he was so nice and so sweet, you know.

1    You know, he was very pornographic.  You know, I was in shock,

2    kind of.  I was in shock more so, you know, but I cared about

3    him, you know.

4         And I know that he had all these sexual fantasies, so I

5    allowed him to say that, you know.  Some of it turned me on,

6    but it -- it became very, like, pornographic, you know.

7         He would go back and forth.  He would say nice things,

8    sweet, sexy things and sweet, loving things, and then he would

9    always talk about his -- his penis and, you know, make comments

10   to me.

11   Q.   Did you have feelings for the defendant?

12   A.   Yes.

13   Q.   Did you ever write notes to the defendant?

14   A.   Yes.

15   Q.   What type of notes?

16   A.   Love letters and, like, you know, fantasy letters, you

17   know.  I would write letters and tell him, like, "Thank you for

18   helping me with everything, especially when my mother passed

19   away.  Thank you for caring," you know.

20        I would talk about sex in the letters to him, you know.

21   That he really, really liked.

22   Q.   How did you give him those notes?

23   A.   So I had an envelope, and I had, like, legal documents in

24   there with my information on there.  So I would put the letters

25   in there, and when he would come to the unit or outside, I

1  would hand them to him.

2  **Q.**   Did the defendant ever comment on the notes you gave him?

3  **A.**   Yes.

4  **Q.**   What did he say?

5  **A.**   He would tell me how much he loved them and enjoyed them.

6  He told me that -- I could remember him telling me that he

7  loved them so much, and he read them, like, a bunch of times

8  over the weekend and that he masturbated to them and he cummed

9  everywhere.

10  **Q.**   Did the defendant ever comment on what he was wearing?

11  **A.**   Yes.

12  **Q.**   What did he say?

13  **A.**   So he -- he would have a blue shirt on and a blue tie that

14  had different colors of blue.  And he would come to my cell,

15  and he would knock on it, and he would pull me out, and we were

16  standing on the top tier by my room.  And he said, "Do you know

17  why I'm wearing this today?"  And I said, "No."  And he said,

18  "This reminds me of you.  This tie reminds me of your blue

19  eyes.  I wore this so I could keep you with me every day and

20  have you with me every day."

21  **Q.**   How did that make you feel?

22  **A.**   Like he loved me.

23  **Q.**   Did the defendant ever talk to you about transferring to

24  camp?

25  **A.**   Yes.

1   **Q.**   What did he say?

2   **A.**   He told me that -- that I qualify for camp and that I

3   wasn't there for a violent crime, and it's what you do inside

4   of prison to -- you have to have -- like, you have to reach

5   certain quality -- or you can't have any write-ups, and, you

6   know, to get your points lowered and to take classes.  So he

7   always said that I would qualify.

8   **Q.**   Did he want you to be transferred to camp?

9   **A.**   Yes.

10   **Q.**   Did he tell you that?

11   **A.**   Yes.

12   **Q.**   What did he say?

13   **A.**   So he came to my cell one day, and he pulled -- he pulled

14   me out of my cell and he said, "I'm going to take you on a

15   furlough.  I'm going to drive you to camp.  How would you like

16   that?"  And I said I'd love that.

17       And he said that his house was in between Dublin and

18   Victorville and that he had a jacuzzi, and he wanted to take me

19   to his house to the jacuzzi and lay me on his bed and fuck me

20   all night, and he wanted me to sit on his face to make him cum.

21       He wanted to -- all he would talk about is spreading my

22   legs and looking at my pussy and take pictures of me so he can

23   have them with him and look at them all the time.

24   **Q.**   When did the defendant start talking to you about camp?

25   **A.**   When he first got there.

**Q.**   Did you want to be transferred to a camp?

**A.**   Yes.

**Q.**   Why?

**A.**   Because my son is a minor, and it's a lot closer to Las Vegas, where he lived, and it would be easier for my family to bring him to me.

**Q.**   Did you talk to the defendant about your son?

**A.**   Yes.

**Q.**   Did the defendant ever tell you personal information about himself?

**A.**   Yes.

**Q.**   What did he tell you?

**A.**   He told me that he wasn't married.  He told me that he had a son, and what attracted him to me was how much I loved my son and cared about him, and that's how he felt about his son.

He told me that he had a timeshare in Las Vegas.  He told me his birthday was April 18th, 1967; that he rides Harleys, he has three of them; and that he makes his own whiskey.

**Q.**   Melissa, you mentioned that things at some point were physical with the defendant.

When did the relationship first turn physical?

**A.**   Between December of 2019 to March of 2020.

**Q.**   Was that first incident in December of 2019?

**A.**   Yes.

**Q.**   Was there anything significant happening in your life

1  around December of 2019?

2  **A.**    My mother passed away in November of 2019.

3  **Q.**    Did you talk to the defendant about what was going on with

4  your mom?

5  **A.**    Yes.

6  **Q.**    How did he react?

7  **A.**    He was so sweet and caring, and I can remember he -- he

8  would look up information on his cell phone about furloughs

9  because he -- he told me that I could get a furlough to go to

10  my mother's funeral.

11      He told me that -- he would come find me out on the rec

12  yard when I was working out and, you know, ask me about my

13  mother.

14      And there was an incidence where I was very upset, that I

15  was crying because she was dying, and, like, I just wanted to

16  see her on a video visit.  And the prison wouldn't allow me to

17  do that because you have to have -- you have to schedule them

18  four days in advance.

19      So I knew that if Mr. Garcia was there, he could do that.

20  He always told me that he could.  And so he came out to the

21  rec, and he told me to sit down on the table so he could talk

22  to me.

23      And he said that, you know, I have to be strong and that I

24  have a -- my son to go home to.  He said that "this is almost

25  over."  He was like, "Remember, you know, we're going to go

1   drink wine together in Napa Valley," you know.  He was just

2   very caring.

3   **Q.**   Can you tell the jurors what a furlough is?

4   **A.**   So a furlough is -- in prison, if there's a death in your

5   family or something, they approve for you to like -- a few

6   days' pass, you know, like a day or two or three pass.  But you

7   have to -- only they can grant that, and usually they don't.

8   **Q.**   You mentioned Napa Valley.

9        Did the defendant make comments to you about being with

10  you outside of prison?

11  **A.**   Yes.

12  **Q.**   What did he say?

13  **A.**   He told me that we were going to go to Napa Valley and

14  drink wine and that we were -- he couldn't wait for me to be in

15  Vegas so he could take me to his timeshare and do a lot of

16  things with me.

17  **Q.**   All right.  I want to focus on that first sexual

18  interaction in December of 2019.

19       Can you describe to the jury what happened?

20  **A.**   So I was at rec and I was working out, and he came and got

21  me, and he took -- he took me to the visiting room because in

22  the visiting room, the -- the officers' station was being

23  reconstructed.  And so when we got in there, there was nothing

24  there, and he -- he brought me there to explain to me what they

25  were doing.

1    But I could remember him telling me that there's --

2    there's, like, no audio in the visiting room.  So he just kept

3    talking to me about how sexy I was and how much he wanted to

4    make love to me and how he can't even walk by my room without,

5    like, you know, looking in -- wanting to look in there while I

6    have a green robe on.  And he was talking like that.

7    And then when we walked out, you know, he was like, you

8    know, "I want to kiss you."  We talked about that before that

9    incident, and I can remember him saying, "Well, I know four

10   places in the visiting room that don't have cameras."

11   And so when we walked back out, we walked back in, and he

12   said, "Well, pick which room."  And so we walked back inside

13   the visiting room, and I can remember I went into one of the

14   bathrooms and he went into the -- you know, to look in the

15   other bathrooms.  And then when he came in, that's where that

16   happened.

17   **Q.**   And what happened, Melissa?

18   **A.**   So I was sitting on the counter on the sink, and he just

19   came right up to me and started kissing me.  And he had one of

20   his hands on my boobs and touching them and touching them, and

21   I had my hands on his face.

22   And I can remember I was sitting on the counter, and he

23   pulled my pants -- like jerked me towards him, and he stuck his

24   finger down my pants and he stuck his finger inside of -- in my

25   vagina.

1          And then I grabbed his hand and he grabbed mine, and he

2     started to put it on his penis and had me rub his -- his penis

3     while he was hard.

4     **Q.**   Can you describe how he grabbed your breasts?

5     **A.**   The way that he talked and how sweet and loving he was, he

6     was different when he kissed me and touched me.  He was like --

7     like super, super excited and -- and -- and kind of rough.

8     **Q.**   How did you feel when he put his finger inside of your

9     vagina?

10    **A.**   I was in shock, you know.  I was in shock.  I was -- I

11    didn't know what to think, you know?  I -- I couldn't believe

12    it was happening, but I felt like he loved me and he cared

13    about me, you know, and I wanted to make him happy.

14    **Q.**   You said you took his hand.  Why did you take his hand?

15    **A.**   Because it hurt.

16    **Q.**   What hurt?

17    **A.**   His finger inside of me.  And I was just, like, in shock,

18    you know.

19    **Q.**   You said then he put your hand on his penis.

20         Did you notice anything about his penis at that point?

21    **A.**   Yeah.  He had an erection.

22    **Q.**   And what happened after he put your hand on his penis?

23    **A.**   He kept moving it up and down for me to touch him.  He had

24    his hand over mine, and he was rubbing it, like, a lot, fast.

25    **Q.**   How did that interaction make you feel?

1    **A.**   You know, I felt like -- like he cared about me and he

2    loved me.  And, you know, he just said the sweetest, nicest

3    things, you know?  It took me by surprise, you know, but I

4    wanted to make him happy.

5    **Q.**   Did the defendant say anything to you after that

6    interaction?

7    **A.**   I remember him walking me back to the rec, and, you know,

8    he would say to me, "How about some more kisses?"  He -- he

9    would ask me if he could take pictures -- he asked me if he

10   could take pictures of me so that he could have them with him

11   so he could look at me all the time.

12            **MS. PRIEDEMAN:**  Ms. Slattery, can you pull up

13   Exhibit 46, please.

14   **Q.**   Melissa, do you recognize what's in this picture?

15   **A.**   Yes.

16   **Q.**   What is it?

17   **A.**   That's the visiting room.

18            **MS. PRIEDEMAN:**  Your Honor, the Government moves to

19   admit Exhibit 46.

20            **MR. REILLY:**  No objection.

21            **THE COURT:**  Admitted.

22              (Government Exhibit 46 received in evidence)

23            **MS. PRIEDEMAN:**  May we publish the exhibit to the

24   jury, please?

25            **THE COURT:**  You may.

1  BY MS. PRIEDEMAN:

2  Q.   Melissa, can you describe what that doorway is in that

3  picture?

4  A.   This doorway right here leads to the back of the visiting

5  room, where there's four bathrooms.

6  Q.   Is that where you went with the defendant during that

7  interaction?

8  A.   Yes.

9       MS. PRIEDEMAN:   All right.   Ms. Slattery, can you

10  please pull up Exhibit 39.

11  Q.   Melissa, do you recognize what's in this picture?

12  A.   Yes.

13  Q.   What is it?

14  A.   It's the -- it's the back where the bathrooms are in the

15  visiting room and one of the bathrooms.

16       MS. PRIEDEMAN:   Your Honor, the Government moves to

17  admit Exhibit 39.

18       MR. REILLY:   No objection.

19       THE COURT:   It's admitted.

20       (Government Exhibit 39 received in evidence)

21       MS. PRIEDEMAN:   May we publish Exhibit 39 to the jury?

22  Q.   Melissa, can you describe where the bathrooms are in

23  relation to this photograph?

24  A.   So there's two bathrooms right here (indicating) and then

25  right here there's two bathrooms (indicating).

1          The two bathrooms back here (indicting) is where the

2     inmates use the bathroom during the visits, and these two

3     bathrooms right here (indicating) is where the -- your family

4     uses the bathrooms.

5     **Q.**   Where did you go with the defendant during the

6     interaction?

7     **A.**   This bathroom right here (indicating).

8          **MS. PRIEDEMAN:**   Ms. Slattery, can you pull up

9     Exhibit 38, please.

10    **Q.**   Melissa, do you recognize this picture?

11    **A.**   Yes.

12    **Q.**   What is it?

13    **A.**   It's the bathroom.

14         **MS. PRIEDEMAN:**   All right.

15         Your Honor, the Government moves to admit Exhibit 38.

16         **THE COURT:**   No objection?

17         **MR. REILLY:**   No objection.

18         **THE COURT:**   Admitted.

19          (Government Exhibit 38 received in evidence)

20         **MS. PRIEDEMAN:**   May we publish Exhibit 38 to the jury?

21         **THE COURT:**   You may.

22    BY MS. PRIEDEMAN:

23    **Q.**   Melissa, when you say "the bathroom," what do you mean?

24    **A.**   This is the bathroom where we first did anything.

25    **Q.**   Where you had the first sexual interaction?

1    **A.**   Yes.

2            **MS. PRIEDEMAN:**  Ms. Slattery, can you pull up

3    Exhibit 29, please.

4    **Q.**   Melissa, do you recognize this picture?

5    **A.**   Yes.

6    **Q.**   What is it?

7    **A.**   This is the bathroom that I just explained to you about.

8            **MS. PRIEDEMAN:**  Your Honor, the Government moves to

9    admit Exhibit 29.

10           **THE COURT:**  No objection, Mr. Reilly?

11           **MR. REILLY:**  No, Your Honor.

12           **THE COURT:**  Admitted.

13       You may publish.

14           (Government Exhibit 29 received in evidence)

15           **MS. PRIEDEMAN:**  Please publish.

16   **Q.**   Melissa, can you point out where you were standing when

17   you had that first sexual interaction with the defendant?

18   **A.**   It was right here on that counter (indicating).

19   **Q.**   Did you have more than one sexual interaction with the

20   defendant?

21   **A.**   Yes.

22   **Q.**   When, approximately, was the last sexual interaction you

23   had with the defendant?

24   **A.**   In March of 2020.

25           **THE COURT:**  Ms. Priedeman, is now a good time for our

|     |                                                                                    |
| --- | ---------------------------------------------------------------------------------- |
| 1   | first break?  We have a couple of minutes, but before you --                        |
| 2   | **MS. PRIEDEMAN:**  Yeah.  I could ask a few more                                    |
| 3   | questions and then be at a good place.                                               |
| 4   | **THE COURT:**  Okay.  Go ahead.                                                     |
| 5   | **MS. PRIEDEMAN:**  Actually, you know what?  This is a                              |
| 6   | good time to take a break.                                                           |
| 7   | **THE COURT:**  All right.                                                           |
| 8   | Okay.  Ladies and Gentlemen, we will stand in recess for                            |
| 9   | the first of our two breaks.  We will have a 20-minute break                        |
| 10  | and then we'll come back.                                                            |
| 11  | We will stand for the jury.                                                          |
| 12  | **THE WITNESS:**  Do I --                                                            |
| 13  | **THE COURT:**  You can remain seated.                                               |
| 14  | (Proceedings were heard out of presence of the jury:)                               |
| 15  | **THE COURT:**  All right.  The record will reflect the                             |
| 16  | jury is out of the courtroom.  We will stand in recess for 20                       |
| 17  | minutes.                                                                             |
| 18  | (Recess taken at 9:57 a.m.)                                                          |
| 19  | (Proceedings resumed at 10:10 a.m.)                                                  |
| 20  | **THE COURT:**  Let's call the jury back in.                                         |
| 21  | (Proceedings were heard in the presence of the jury:)                               |
| 22  | **THE COURT:**  Okay.  We are back on the record.  The                              |
| 23  | record will reflect that the jury is back, our witness is back.                     |
| 24  | Ms. Priedeman, you may continue.                                                     |
| 25  | **MS. PRIEDEMAN:**  Thank you, Your Honor.                                           |

1   **Q.**   Hello again, Melissa.

2   **A.**   Hi.

3   **Q.**   You said the first sexual interaction with the defendant

4   started when he got you from rec.

5        Can you describe to the jurors what "rec" is?

6   **A.**   Rec is the yard where we have -- where we go and exercise.

7   They have two big tracks and a weight pile and a softball

8   field.

9   **Q.**   Can you take a look at Exhibits 240, 241, and 242 in your

10  binder, please.

11       Do you recognize what's in those photographs?

12  **A.**   That's the rec.

13           **MS. PRIEDEMAN:**   Your Honor, the Government moves to

14  admit Exhibits 240, 241, and 242.

15           **MR. REILLY:**   No objection.

16           **THE COURT:**   They're admitted.

17     (Government Exhibits 240, 241, and 242 received in evidence)

18  **BY MS. PRIEDEMAN:**

19  **Q.**   Melissa, did you have other interactions with the

20  defendant at rec?

21  **A.**   Yes.

22  **Q.**   Can you -- in general, can you describe what those

23  interactions entailed?

24  **A.**   He would come out there, and he would come talk to me

25  every single day.  He would walk out there to check up on me to

1    see --

2            **THE COURT:**  Ms. Priedeman, are you going to publish

3    those for the jury?

4            **MS. PRIEDEMAN:**  Not at this time, Your Honor.

5            **THE COURT:**  Okay.  At some point?

6            **MS. PRIEDEMAN:**  Yes, Your Honor.

7            **THE WITNESS:**  So he would come out there just to talk

8    to me.

9        There was an incident where he came out there, and he had

10   a black jacket on, and he pulled out of his -- his pocket a big

11   blowup picture of his penis to show me.

12   **BY MS. PRIEDEMAN:**

13   **Q.**  Did you ever notice anything about the defendant's body

14   when you interacted with him at the rec?

15   **A.**  He always had an erection.

16   **Q.**  Did you notice anything else?

17   **A.**  Like what he was wearing or...

18   **Q.**  Did you notice anything about his erection?

19   **A.**  Sometimes when I would talk to him, he always like -- he

20   always would -- would say, "Look, look, look what you do to me

21   every time I talk to you," and he would have a hard-on.  And,

22   you know, sometimes it moved a little bit in his pants.

23       He always had his cell phone on him all the time, you

24   know.

25   **Q.**  You said the defendant showed you a blowup picture of his

1   penis.

2   **A.**   Yes.

3   **Q.**   Did he show you pictures of his penis on more than one

4   occasion?

5   **A.**   Yes.

6   **Q.**   How would he show you those pictures?

7   **A.**   He always had them on his cell phone.  So he always

8   showed -- he -- one time we were at rec, and he had his cell

9   phone, and he would show me -- he said, "Do you want to see how

10   I -- how I do squats?"  And he would show me naked pictures of

11   him, like full-body shots of him naked and penis pictures of

12   him where they were -- where he had an erection.

13   **Q.**   Did you notice anything about his penis in those pictures?

14   **A.**   Yes.

15   **Q.**   What did you notice?

16   **A.**   It was hard, had an erection.  He -- sometimes there was

17   semen coming out of it.

18   **Q.**   Did you notice anything about the background of the

19   photographs?

20   **A.**   Yes.

21   **Q.**   What did you notice?

22   **A.**   On some occasions, I could remember that he -- he would be

23   in his bathroom.  There was a bathroom.  There was, like, a big

24   mirror and lights right here.  Those were the full-body shots.

25      I would see his -- his butt, you know.  It was -- like, he

1    had a tan.  His butt was white, like he was laying out in the

2    sun.  He would -- and there was the mirror, so he would -- I

3    could see the front and the back of him.

4         On other pictures, I could remember seeing, like, the

5    warden's bathroom, like the tile in his -- I saw his pants, his

6    belt, and shoes in some of the pictures.

7    **Q.**   Had you seen the warden's bathroom before?

8    **A.**   Yes.

9    **Q.**   Why?

10   **A.**   Because he would always take me there to clean and to work

11   up there.

12   **Q.**   Would he say anything to you when he showed you the

13   photographs of his penis?

14   **A.**   Yes.

15   **Q.**   What did he say?

16   **A.**   He would always say, like -- I remember one time I was

17   coming out -- I was at work and -- in the visiting room, and we

18   were talking, and he -- he went to the bathroom.  He was like,

19   "I -- I just miss you.  I miss you.  I just -- I want to touch

20   you.  I want to kiss you."

21        And he went -- he left for a few minutes, and then he came

22   back, and I remember him showing me a picture of him -- a penis

23   picture of him hard.  And he was like, "This is what -- every

24   time I talk to you or I'm in your presence, this is what you do

25   to me," and he had an erection.

1  **Q.**   Did you recognize where that picture had been taken?

2  **A.**   Yes.

3  **Q.**   Where was it taken?

4  **A.**   In the warden's bathroom complex.

5       **MS. PRIEDEMAN:**  Ms. Slattery, can you pull up

6  Exhibit 127, please.

7  **Q.**   Melissa, do you recognize this picture?

8  **A.**   Yes.

9  **Q.**   What is it?

10  **A.**   That's him, and that's the bathroom in the warden's

11  complex.

12  **Q.**   Have you seen a picture like this before?

13  **A.**   Yes.

14       **MS. PRIEDEMAN:**  Your Honor, the Government moves to

15  admit Exhibit 127.

16       **MR. REILLY:**  No objection.

17       **THE COURT:**  127 is admitted.

18       (Government Exhibit 127 received in evidence)

19       **MS. PRIEDEMAN:**  We would ask for permission to publish

20  the photograph as well.

21       **THE COURT:**  Granted.

22       **THE CLERK:**  The gallery is on.

23       **MS. PRIEDEMAN:**  This is not one of -- this is not one

24  of those photographs, but I don't know if Defense counsel has

25  an objection to it being shown to the gallery.

1          **MR. REILLY:**  Yes, Your Honor.  This should not be
2    shown to the --
3          **THE COURT:**  So this can be published to the jury only.
4    We'll put it in -- we'll move it into that category.
5          **MS. PRIEDEMAN:**  Thank you.
6    **Q.**   Melissa, do you recognize the background of this
7    photograph?
8    **A.**   Yes.
9    **Q.**   Is this similar to a photograph that the defendant showed
10   you?
11   **A.**   Yes.
12         **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up
13   Exhibit 288.
14   **Q.**   Melissa, do you recognize what is shown in this picture?
15   **A.**   Yes.
16   **Q.**   What is it?
17   **A.**   It's his penis and his hand and his -- and the background
18   is in the warden's complex in the bathroom.
19   **Q.**   Is this similar to a picture that the defendant showed
20   you?
21   **A.**   Yes.
22         **MS. PRIEDEMAN:**  Your Honor, the Government moves to
23   admit Exhibit 288.
24         **MR. REILLY:**  No objection.
25         **THE COURT:**  It's admitted.

1              (Government Exhibit 288 received in evidence)

2              **THE COURT:**  It can be published.

3              **MS. PRIEDEMAN:**  I ask that it's just published to the

4     jury, please.

5     **Q.**   Melissa, do you recognize where this photograph was taken?

6     **A.**   Yes.

7     **Q.**   And did the defendant show you pictures like this?

8     **A.**   Yes.

9     **Q.**   And where -- where do you recognize that it's taken?

10    **A.**   In the warden's complex in the bathroom.

11             **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up

12    Exhibit 295.

13    **Q.**   Melissa, do you recognize what is shown in this

14    photograph?

15    **A.**   Yes.

16    **Q.**   What is it?

17    **A.**   That's him taking a picture of himself.

18    **Q.**   By "him," who are you referring to?

19    **A.**   Mr. Garcia.

20    **Q.**   Did the defendant show you a picture similar to this?

21    **A.**   Yes.

22             **MS. PRIEDEMAN:**  Your Honor, the Government moves to

23    admit Exhibit 295.

24             **MR. REILLY:**  No objection.

25             **THE COURT:**  295 is admitted.

1          (Government Exhibit 295 received in evidence)

2          **MS. PRIEDEMAN:**  May we publish it to the jury?

3          **THE COURT:**  Publish to the jury only.

4     BY MS. PRIEDEMAN:

5     **Q.**   Melissa, do you recognize who is shown in this photograph?

6     **A.**   Yes.

7     **Q.**   Who is it?

8     **A.**   It's Mr. Garcia.

9     **Q.**   Did he show you pictures like this?

10    **A.**   Yes.

11    **Q.**   How frequently would the defendant show you pictures of

12    his penis?

13    **A.**   A lot.  All the time.

14    **Q.**   When would he show you pictures of his penis?

15    **A.**   He would show me when he was doing rounds, when he was

16    inside of my unit.  He showed me in the visiting room, at rec,

17    outside of food service.

18    **Q.**   How did you feel when the defendant showed you those

19    pictures?

20    **A.**   I felt like he cared about me, you know, that he loved me

21    and that he wanted to be with me.  So I felt like that was his

22    way of, like, loving me.

23    **Q.**   You mentioned that the defendant did rounds at FCI Dublin.

24         Can you describe to the jury what doing rounds means?

25    **A.**   So rounds is -- usually the officers will -- will do

1    rounds, and they walk by your cell to make sure that -- you

2    know, that you're not dead, that you're alive and that you're

3    breathing.  It's just like a -- to check -- to check and see if

4    the inmates are okay.

5    **Q.**   Did the defendant ever give you instructions prior to

6    doing his rounds?

7    **A.**   Yes.

8    **Q.**   What did he tell you to do?

9    **A.**   He would tell me to be in my cell or Andrea's cell at a

10   certain time, like 8:30 in the morning or 9:30 in the morning,

11   when he would come do rounds.

12   **Q.**   Did he tell you what you should be doing when you were

13   supposed to be in your cell or Andrea's cell?

14   **A.**   Yes.

15   **Q.**   What did he say?

16   **A.**   For me to be undressed so he could look at me.

17   **Q.**   And who is Andrea?

18   **A.**   Andrea is a girl that I knew in prison.  She was my

19   friend.

20   **Q.**   Did you undress for the defendant when he told you to?

21   **A.**   Yes.

22   **Q.**   How did you know when you should be undressed for him?

23   **A.**   He would come tell me, like, the day before, you know.  I

24   can remember he always would come find me or see me at rec or

25   when I was walking back.  And he would say, "I'm going to come

1   by at 8:30," or, "I'm going to come by at 9:30," and, you know,

2   "so I can look at you."  I already knew what that meant.

3   **Q.**   How did you know what that meant?

4   **A.**   Because he wanted to take naked pictures of me and look at

5   me because he said that I was the most amazing woman that he's

6   ever seen and he was obsessed with my body.

7   **Q.**   Why did -- did you undress for him in Andrea's cell as

8   well?

9   **A.**   Yes.

10  **Q.**   Why did you undress for him in Andrea's cell?

11  **A.**   Her cell in prison is -- it's secluded.  So it's -- we

12  call it "the wing," and you can't -- it's -- it's -- the

13  officers' station can't see up there.  And there's only four

14  cells right here, and it's blocked off, so you -- it's very

15  secluded.  It was safer there.

16  **Q.**   Whose idea was it for you to undress in Andrea's cell?

17  **A.**   Mr. Garcia's.

18  **Q.**   What did he tell you?

19  **A.**   He told me that it was safer there and that he went to

20  control to make sure that -- that you -- that you couldn't see

21  anything on the cameras, and that the cameras couldn't see,

22  that he already checked on them.

23          **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up

24  Exhibit 7.

25  **Q.**   Melissa, do you recognize this picture?

1    **A.**    Yes.

2    **Q.**    What is it?

3    **A.**    That's Andrea's cell.

4              **MS. PRIEDEMAN:**  Your Honor, the Government moves to

5    admit Exhibit 7.

6              **MR. REILLY:**  No objection.

7              **THE COURT:**  It's admitted.

8                  (Government Exhibit 7 received in evidence)

9              **MS. PRIEDEMAN:**  May we publish Exhibit 7 to the jury?

10             **THE COURT:**  You may.

11   **BY MS. PRIEDEMAN:**

12   **Q.**    Melissa, is this Andrea's cell?

13   **A.**    Yes.

14   **Q.**    What is that brown -- what is the brown on the right side

15   of the door?

16   **A.**    That's a tent so you can't really see in and out.  And

17   that's the side of the -- of the unit.

18   **Q.**    Is it a window?

19   **A.**    Yes.

20             **MS. PRIEDEMAN:**  You can take that down, Ms. Slattery.

21   **Q.**    How many times did the defendant instruct you to undress

22   for him?

23   **A.**    I -- I can't count.  I don't know.  A lot.

24   **Q.**    When did you first undress for him?

25   **A.**    In December of 2019.

**Q.**   Was it after that first sexual interaction with him?

**A.**   Yes.

**Q.**   When you were undressed for the defendant, did he ever ask you to put anything inside your vagina?

**A.**   Yes.

**Q.**   Can you describe to the jury what happened?

**A.**   So in Andrea's cell, I knew that he was coming to see me. And I could see out her window.  He would come from the captain's complex, and he was wearing a black jacket, and he was putting Chapstick on.

     And he came to go do rounds, and I can remember I had a white robe on and I had the door cracked.  And he was walking, and he had his cell phone down by his leg, and there was a light on.

     And he came inside the cell and shut the door, and I remember I got on the bed.  I took my robe off and got on the bed on all fours, and he said -- he said, "Don't move.  Stay like this, don't move," you know, "Don't move," and he took pictures of me.

     And I could remember -- I don't remember exactly -- when he walked in, he gave me -- he gave me a candy cane, and it was small and it was half eaten and sucked on.  And he said, "Put this inside of you."

     And I can remember I reached, like, behind me to do that, and, like -- I was, like, nervous.  So I -- I faced him, and I

1    was, like, on all fours, and I kind of got up, and I put the

2    candy cane inside of me, and I gave it to him.  And I remember

3    he kissed me and he put his finger inside of my vagina, and he

4    said, "Now put your clothes on."

5        And then I can remember when he left my unit, I remember

6    watching outside of Andrea's cell, her window.  And the food

7    service is right there, and there's a little door with, like, a

8    trash compactor to the right.  And he was in there for a long

9    time, and I was watching, and I remember him -- he walked out,

10   and I remember him looking at his cell phone.  And he was

11   walking back up to the top of the yard, and I remember him

12   going like this (indicating).

13       And I remember later on that afternoon, he came out to --

14   to rec.  And he was walking towards me, and he had the candy

15   cane in his mouth, and he said that "you taste really good."

16   **Q.**   How did it feel when the defendant told you to put that

17   candy cane inside your vagina?

18   **A.**   It made me feel like -- like I did it for him, to please

19   him.  I did it because that's what he wanted.  You know, I -- I

20   was, like, embarrassed, you know.  I've never done anything

21   like that.  And I was nervous, but I wanted him to be happy.

22   **Q.**   How did it feel when you put the candy cane inside of

23   yourself?

24   **A.**   It burned.

25           **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up

1    Exhibit 55.

2    **Q.**   Melissa, do you recognize this picture?

3    **A.**   Yes.

4    **Q.**   What is it?

5    **A.**   That's me.

6          **MS. PRIEDEMAN:**  Your Honor, the Government moves to

7    admit Exhibit 55.

8          **THE COURT:**  I see this is stipulated.  It's admitted.

9          (Government Exhibit 55 received in evidence)

10          **MS. PRIEDEMAN:**  May we publish Exhibit 55 just to the

11   jury, please.

12   **Q.**   Melissa, who is that on the bed in this picture?

13   **A.**   That's me.

14   **Q.**   Do you see anyone else in this photograph?

15   **A.**   Mr. Garcia.

16   **Q.**   Where do you see him?

17   **A.**   Right here in the window.

18          **MS. PRIEDEMAN:**  Ms. Slattery, can you please zoom in

19   on the window.

20   **Q.**   Who is that, Melissa?

21   **A.**   Mr. Garcia.

22   **Q.**   Who took this picture of you?

23   **A.**   Mr. Garcia.

24   **Q.**   Do you know when it was taken?

25   **A.**   In December of 2019.

1    **Q.**   Was it during the incident with the candy cane that you

2    just described?

3    **A.**   Yes.

4    **Q.**   Whose cell were you in when this photograph was taken?

5    **A.**   Andrea's.

6          **MS. PRIEDEMAN:**  Ms. Slattery, can you zoom back out,

7    please.

8    **Q.**   Melissa, there is some letters and numbers on a piece of

9    furniture in the left-hand corner.

10        What is -- do you recognize that number?

11   **A.**   It's BO3272L.

12   **Q.**   Is there any significance to you of that number?

13   **A.**   That's Andrea's cell.

14        **MS. PRIEDEMAN:**  Ms. Slattery, you can take that

15   exhibit down, please.

16   **Q.**   Melissa, can you take a look at Exhibits 52, 53, and 54 in

17   your binder.

18        Do you recognize these pictures?

19   **A.**   That's me.

20        **MS. PRIEDEMAN:**  Your Honor, the Government moves to

21   admit Exhibits 52, 53, and 54.

22        **MR. REILLY:**  May I have just a moment, Your Honor?

23      No objection.

24        **THE COURT:**  They're admitted.

25     (Government Exhibits 52, 53, and 54 received in evidence)

1    **BY MS. PRIEDEMAN:**

2    **Q.**   Melissa, you mentioned the defendant made comments about

3    surveillance cameras to you.

4         Did he make any comments to you about surveillance cameras

5    after the candy cane incident you described?

6    **A.**   He -- he talked about the -- the surveillance cameras in

7    the wing on both sides of the cell.  He said that he already

8    went to control and checked to make sure that nobody could see

9    anything, that we were safe, that everything was good.

10   **Q.**   Did he take -- did the defendant take pictures of you on a

11   different occasion?

12   **A.**   Yes.

13        **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up

14   Exhibit 56.

15        **THE COURT:**  Which exhibit?

16        **MS. PRIEDEMAN:**  56.  56.

17   **Q.**   Melissa, do you recognize this photograph?

18   **A.**   Yes.

19   **Q.**   What is it?

20   **A.**   That's me.

21        **MS. PRIEDEMAN:**  Your Honor, the Government moves to

22   admit Exhibit 56.

23        **MR. REILLY:**  No objection.

24        **THE COURT:**  Admitted.

25        (Government Exhibit 56 received in evidence)

1          **MS. PRIEDEMAN:**  May we publish to the jury?

2          **THE COURT:**  You may.

3    BY MS. PRIEDEMAN:

4    **Q.**   Melissa, who is that in this picture?

5    **A.**   That's me.

6    **Q.**   Who took this picture?

7    **A.**   Mr. Garcia.

8    **Q.**   Where was this photograph taken?

9    **A.**   Andrea's cell, I believe.

10         **MS. PRIEDEMAN:**  You can take that exhibit down,

11   Ms. Slattery.

12   **Q.**   Melissa, can you take a look at Exhibit 51 in your binder,

13   please.

14        Do you recognize this photograph?

15   **A.**   Yes.

16   **Q.**   What is it?

17   **A.**   That's me.

18         **MS. PRIEDEMAN:**  Your Honor, the Government moves to

19   admit Exhibit 51.

20         **MR. REILLY:**  No objection.

21         **THE COURT:**  Admitted.

22         (Government Exhibit 51 received in evidence)

23   BY MS. PRIEDEMAN:

24   **Q.**   Melissa, you previously described sexual conduct that

25   occurred with the defendant in the visitation bathroom.

1    Did you have an additional sexual interaction that

2    occurred in a visitation bathroom?

3    **A.**    Yes.

4    **Q.**    Can you tell the jury what happened?

5    **A.**    On which incident?

6    **Q.**    On that -- on the second interaction in the visitation

7    bathroom.

8    **A.**    I remember that I was at rec, and he came and got me.  And

9    there was an officer that was rewiring and setting up the

10   computers because the officers' station just got fixed, and

11   they were doing something with the computer system.  So it was

12   me and Mr. Garcia and this other officer.

13       And we were inside the visiting room, but he brought me in

14   there because there was a problem with one of the sinks in the

15   bathroom.  We had been complaining about it for a long time,

16   that it's been broke, the handle.

17       And so he said to me, "Come show me" -- while the officer

18   was at the officer station doing stuff with the computer, he

19   said, "Come show me what sink is broke."  And it was the very

20   last bathroom against the wall.

21       And I could remember that we went inside of there, and I

22   was up against the wall, and he started kissing me and grabbing

23   my boobs and rubbing on my vagina like really, really rough,

24   you know.

25       And he said, "Okay, let's go to the next bathroom," and it

1   was right next to it.  And I can remember I was up against the

2   wall right here, and he started kissing me, and he put his

3   hands down my pants and stuck his finger inside of my vagina.

4        And then we went to this last bathroom, and I can remember

5   he -- he, like, walked in there and kissed me.  And when he

6   walked back out, he -- he always does this thing with his,

7   like, face and his eyes, like "Show me, show me."

8        And so I did.  I pulled my -- my pants down, and I turned

9   around and bent over for him, and then we walked back out.  I

10  walked out with him into the visiting room, and then I went

11  back to rec.

12  **Q.**   Did he say "show me" or did he just give you --

13  **A.**   He said, "Show" -- like, "Show me, show me," you know.

14  Not too loud, but -- because the officer was over here.

15  **Q.**   How did that interaction make you feel?

16  **A.**   Like he was -- you know, I just felt like -- like super

17  special, you know?  I felt special.  I felt like he cared about

18  me, you know, and that I was going to -- we were going to be

19  together when we got out, you know.

20        He acted a little different, like, our interactions, the

21  way that he would talk to the way that he touched me, you know?

22  It wasn't like super sweet and loving, and it -- it was -- it

23  wasn't how he said it, if that makes sense, you know?  It

24  wasn't like, "I want to touch your face and" -- you know, like

25  that.  He -- he -- it's like he was like a -- sex craved, you

1   know, like he couldn't get enough, like he was, like, hungry.

2           **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up

3   Exhibit 37.

4   **Q.**   Melissa, do you recognize this picture?

5   **A.**   Yes.

6   **Q.**   What is it?

7   **A.**   That's the bathroom where the broken sink is.

8           **MS. PRIEDEMAN:**  Your Honor, the Government moves to

9   admit Exhibit 37.

10          **MR. REILLY:**  No objection.

11          **THE COURT:**  Admitted.

12              (Government Exhibit 37 received in evidence)

13  **BY MS. PRIEDEMAN:**

14  **Q.**   Melissa, you said this is the first bathroom where the

15  broken sink was.

16      Is this where you kissed and the defendant rubbed your

17  vagina?

18  **A.**   Yes.

19          **THE COURT:**  Do you want to publish it or not?

20          **MS. PRIEDEMAN:**  Oh, sorry.  Yes.  Can we publish

21  Exhibit 37, please.

22          **THE COURT:**  You may publish.

23  **BY MS. PRIEDEMAN:**

24  **Q.**   Melissa, is this the first bathroom you went into with the

25  defendant?

1    A.    Yes.

2    Q.    Is this where you kissed the defendant and he rubbed your

3    vagina?

4    A.    Yes.

5          MS. PRIEDEMAN:   Ms. Slattery, can you please pull up

6    Exhibit 35.

7    Q.    Melissa, do you recognize this picture?

8    A.    Yes.

9    Q.    What is it?

10   A.    This is the bathroom that's right next door to the first

11   bathroom.

12         MS. PRIEDEMAN:   Your Honor, the Government moves to

13   admit Exhibit 35.

14         MR. REILLY:   No objection.

15         THE COURT:   Admitted.

16      You may publish.

17         (Government Exhibit 35 received in evidence)

18   BY MS. PRIEDEMAN:

19   Q.    Melissa, what happened with the defendant in this

20   bathroom?

21   A.    This is where he kissed me and touched my -- my -- my butt

22   and my -- my boobs and he stuck his finger in his -- my vagina.

23         MS. PRIEDEMAN:   Ms. Slattery, you can take that one

24   down.   Thanks.

25   Q.    I'm going to switch gears a little bit, Melissa.

1    Are you familiar with the Prison Rape Elimination Act?

2  **A.**   Yes.

3  **Q.**   Is that sometimes called PREA?

4  **A.**   Yes.

5  **Q.**   As an inmate at FCI Dublin, do you remember receiving

6  information about PREA?

7  **A.**   No.

8  **Q.**   At some point in 2020, did individuals come to FCI Dublin

9  as part of a PREA evaluation?

10  **A.**   Yes.

11  **Q.**   What was your understanding of the purpose of that visit?

12  **A.**   So the purpose of that visit was for the shower curtains.

13  I can remember one of my counselors wanted me to be the model

14  because I was tall.  They wanted two -- two models, a tall one

15  and a short one, to measure the height of the shower curtains

16  because they were installing two different shower curtains.

17      And I can remember it was on A side.  So I came down the

18  hall, you know, and I walked down the stairs, and he was right

19  there.  And he said, "Come here, I want to talk to you."

20      And, you know, I wasn't feeling too well because I hurt my

21  back just a little bit working out.  And I know that all

22  those -- there was people there.  They had this, like, bulletin

23  out, and everybody was dressed nice in suits.

24      And any time anybody comes to Dublin, they give you heads

25  up, so everything has to be, like, immaculate and your best

1    behavior or they'll serve better food or -- like that.

2         And so I could remember him telling me he -- I said, "The

3    counselor wants me to be the model for the shower curtains."

4    He said, "No, don't worry about that."

5         And I could remember him talking about -- I believe it

6    was -- he didn't say the word "COVID," but some, like, flu

7    going around and stuff.  And he's like, "Well, I'll just see

8    you later at rec."

9         And so I walked up the stairs.  While I was walking, he,

10   like, followed me and came up on me and said, "I just want to

11   tell you how beautiful your lips are."

12        And so later on, I went out to rec, and he came and got

13   me, and he took me to the visiting room.  And there was two

14   officers there, and he wanted me to show them where the --

15   like, a big binder like this was, like an SDS binder.

16        And I can remember he -- he said something to the two

17   officers, so they left to go get the keys in control that was

18   outside of the visiting -- outside of visiting.  And I could

19   remember he wanted to -- in the visiting room, there's a small

20   room where there are, like, the cabinets, and I kept supplies

21   and there was a cabinet.

22        And so he followed me in there, and he just kept saying,

23   "I want to touch your body.  I just need to touch you.  I just

24   need to touch you.  I just want to touch your body."  And he

25   was, like, let's -- I remember he -- there was a little window

1   in there.

2       So we walked -- I walked out, and I can remember him,

3   like, running a little bit across the office -- the officers'

4   station, and we went into the back bathroom.  And I could -- I

5   remember saying, like, "There's a big -- you know, there's a

6   camera right there."  And he was like, "Where?"  I mean, it's,

7   like, huge.

8       And I remember, like, grabbing the door.  And there's a

9   wall because they were building, like, these little cubbyholes

10  for inmates to change after visits.  And I can remember, like,

11  holding -- pulling the door open like this (indicating), and I

12  can remember he started kissing me and touching me and touching

13  my vagina and kissing me and, like, touching my boobs.

14  **Q.**   When you say "he," Melissa, just to clarify, are you

15  referring to the defendant?

16  **A.**   Mr. Garcia.

17  **Q.**   Where were you when the defendant started kissing you and

18  touching you?

19  **A.**   In the back by the bathrooms, across from the bathrooms in

20  the visiting room.

21  **Q.**   Where specifically were you standing?

22  **A.**   Against the wall where they were building the dress-out

23  rooms where the curtains were.  But those weren't up back then.

24  **Q.**   How did he touch your breasts?

25  **A.**   I thought he was going to pop my implant.  He grabbed my

1    boob really hard that time.  You know, he was -- kept rubbing

2    and rubbing and rubbing and, like, rubbing my vagina, you know.

3    Like, he didn't want to get caught, you know, because he was

4    like, "We have to hurry, there's -- the, you know, two officers

5    are coming back."

6    **Q.**   Did he touch your vagina over your clothes or under your

7    clothes?

8    **A.**   Over my clothes.

9    **Q.**   Can you take a look at Exhibits 40, 42, and 44 in your

10   binder, Melissa.

11       Do you recognize these pictures, Melissa?

12   **A.**   Yes.

13   **Q.**   What are they?

14   **A.**   That's where the -- this occurrence just happened.  It's

15   right here by the door, behind -- on this side of the door.

16   **Q.**   Just give me a minute.

17   **A.**   Okay.

18       **MS. PRIEDEMAN:**  Your Honor, the Government moves to

19   admit Exhibits 40, 42, and 44.

20       **MR. REILLY:**  No objection.

21       **THE COURT:**  They're admitted.

22     (Government Exhibits 40, 42, and 44 received in evidence)

23       **MS. PRIEDEMAN:**  May we publish Exhibit 40, please?

24       **THE COURT:**  You may.

25

BY MS. PRIEDEMAN:

Q.   Melissa, what is shown in this picture?  Just a minute.

What is shown in this picture?

A.   This is the visiting room.  To the left is the two
bathrooms and to the right, right here where the door is
(indicating), is the janitor closet.  And right here against
the wall is where that happened (indicating).

Q.   Are these the cubbyholes you were referring to?

A.   Yes.

MS. PRIEDEMAN:  All right.  Can we please publish
Exhibit 42.

Q.   Melissa, what is shown in this photograph?

A.   The same thing, the wall where that happened right here
(indicating).

Q.   Were you just -- is that first cubbyhole -- is that where
you were standing?

A.   So the first cubbyhole pushed in against the wall, right
here against this wall (indicating).

MS. PRIEDEMAN:  Can we please publish Exhibit 44.

Q.   Can you point out to the jury where you were standing in
relation to this picture?

A.   It's right here against this wall (indicating), this way
(indicating).

Q.   Thank you, Melissa.

MS. PRIEDEMAN:  You can take that down, Ms. Slattery.

1  **Q.**   Melissa, would you have felt comfortable reporting what

2  was going on with the defendant to the PREA individuals who

3  were visiting?

4  **A.**   No.

5  **Q.**   Why not?

6  **A.**   Well, PREA didn't exist at Dublin.  I really didn't know

7  what they were.  I didn't know who they were.  I just thought

8  they were there for the showers, the shower curtains.

9      And in an environment like that, that's a death sentence

10  to report something like that.  You -- I had no idea who they

11  were.

12  **Q.**   What do you mean it's a death sentence?

13  **A.**   In prison, you can get killed for doing what I'm doing,

14  coming forward, being a snitch.  That's what they call it in

15  prison.

16      And in Dublin, Mr. Garcia was best friends with the main

17  guy, Mr. Putnam, who was in charge of SIS.  And SIS is -- they

18  investigate anything that happens inside of the prisons:

19  Fights, drugs, misconduct, anything.  And that was his best

20  friend, and he always told me that was his best friend, that he

21  did 23 years in prison with him.

22      And in that environment, everybody talks.  Officers tell

23  you everything.  Officers will tell you what this person is

24  doing or who they're married to or who they're sleeping with.

25  They all talk about everything, so nothing -- you know, nothing

1   is a secret.

2        And I could -- I could have lost my life over that.   I

3   could have -- you know, a lot of bad things could have happened

4   to me, so I was scared.

5   **Q.**   I want to turn in a moment to the last physical

6   interaction you had with the defendant, but before I do that, I

7   want to turn back to the incident you described with the broken

8   sink.

9        When, approximately, did that happen?

10  **A.**   That was between December of 2019 to March of 2020.

11  **Q.**   Sometime in between there?

12  **A.**   Yes.

13  **Q.**   All right.   Did you have an interaction with the defendant

14  in a warehouse?

15  **A.**   Yes.

16  **Q.**   Can you tell the jury what happened?

17  **A.**   So Mr. Garcia came and got me from rec, and while we were

18  walking, he always talked about this cabinet in the visiting

19  room and that he was going to find me one and -- to -- to fit

20  in my -- my room for my supplies.

21       And he told me that he was going to be leaving to

22  Washington, D.C., for a couple of weeks because he worked on

23  a -- he worked on a -- in a special unit, like on a special

24  task force for Washington, D.C., and that he had to go fix

25  some -- he fixed problems.

1    And so he wanted to spend some time with me, so he took me

2    a little bit -- the warehouses are still on the compound, but

3    they're away from the housing units, behind AB housing unit.

4         And so when I went in there -- we were walking up there.

5    He was just telling me, you know, how much he was going to miss

6    me and that he was going to be gone for a couple of weeks.

7         And when we got to the warehouse, there was -- I could

8    remember two officers and -- with some inmates in there.  And

9    it's a big, huge, huge warehouse.  And there was, like, old

10   furniture and -- and filing cabinets and stuff.

11        And so I can remember he would say, "Come here" -- the

12   people were, like, over here (indicating), and I remember him

13   saying, "I didn't think there was going to be all these people

14   in here today."

15        And so we went to look at one of the file cabinets, and he

16   pulled, like, the doors open, and he started kissing me and

17   touching me.  And I can remember we -- we went to another file

18   cabinet to look, and he did the same thing.  And then on the

19   third -- the third time we were looking at the file cabinet, he

20   was kissing me and put his hands down my pants, and he put his

21   finger in my vagina.

22   Q.   When, approximately, did this happen?

23   A.   In March.  Like the beginning, middle of March.

24   Q.   What year?

25   A.   Of 2020.

1   **Q.**   Was this the last sexual interaction you had with the

2   defendant?

3   **A.**   Yes.

4           **MS. PRIEDEMAN:**  Can we pull up Exhibit 314.  This is a

5   previously admitted exhibit.

6           **THE COURT:**  So every time you look back to your

7   assistant, we can't hear you.

8           **MS. PRIEDEMAN:**  Sorry.

9           **THE COURT:**  Okay.  So which number again?

10          **MS. PRIEDEMAN:**  314.

11      May we publish 314 to the jury?  It's been previously

12  admitted.

13          **THE COURT:**  Yes, you may.

14  **BY MS. PRIEDEMAN:**

15  **Q.**   Melissa, can you point out on this diagram where the

16  warehouse is that you were just discussing?

17  **A.**   So these are my units right here (indicating).  And behind

18  here, it was -- I believe it was this -- this warehouse right

19  here (indicating).

20  **Q.**   Thank you.

21          **MS. PRIEDEMAN:**  Ms. Slattery, you can take this

22  exhibit down.

23  **Q.**   Melissa, you said that this was the last sexual

24  interaction with the defendant.

25          Why did the sexual interactions with the defendant stop?

**A.**   In -- April 1st of 2020 is when FCI Dublin went on a
lockdown for the COVID, so everything stopped.  Everybody was
locked in their cells forever, months, months at a time, so,
you know, everything was closed, the rec, and they would bring
our -- the food to us and, like, every four days you would get
a shower with just your cell.

    And it was because all eyes, I remember him telling me,
would be -- you know, everybody was watching.  Nobody was
moving around.

**Q.**   Did you continue to interact with the defendant even after
the COVID lockdown?

**A.**   Yes.

**Q.**   What type of interactions did you have with the defendant
after the COVID lockdown?

**A.**   I still got naked for him in -- in my cell.

    I -- I know that he would call me out to work in the -- in
his office, in his building and the drug building.  He would
take me out to do special assignments just so I could, like,
get out and he could talk to me and spend time with me.

    He continued to show me naked pictures of him.  He would
let me work in the visiting room and, like, bring who I wanted,
like my two roommates, you know.  He let me stay out there for
as long as I wanted to to listen to music, to bring food in
there to cook in there, to, you know, watch TV, just to be away
from everybody, you know.

1    **Q.**   Did the defendant ever give you anything?

2    **A.**   Yes.

3    **Q.**   What did he give you?

4    **A.**   For Valentine's Day, he came out when I was working out.

5    I was on a treadmill or elliptical.  And he -- there's a cup

6    holder on the machine, and I can remember him coming up to me,

7    telling me, "Happy Valentine's Day," and he gave me some pink

8    Hershey Kisses.  He would give me candies all the time.

9    **Q.**   What did you do with that candy?

10   **A.**   I ate it.

11   **Q.**   Did he ever ask you to do anything and then give you

12   candy?

13   **A.**   Yes.

14   **Q.**   Can you tell the jury about that?

15   **A.**   So when I would write him letters and we would -- I would

16   give them to him all the time, he would -- in the envelope, it

17   was a reason for him to come back to talk to me.  He would -- I

18   had my information in there, and when he would return those

19   letters to me, there would be candies in there, like SweeTarts

20   and Laffy Taffies.

21        And one time in the -- he would always give me candies

22   when I was, like, working out upstairs, even during COVID, in

23   the -- in our little workout room.

24        He would -- I was in the drug building waxing the floors,

25   redoing the floors for him, and there was, I believe, two or

1   three officers in there.  And there was an empty room that one

2   of the officers were going to move their furniture in there.

3       And when I went in there, you know, he always does that,

4   like, with his eyes.  And so I -- I, like, pulled up my shirt

5   and pulled my pants down and turned around for him.  And he had

6   candy, and he, like, got on his -- like bent down and he would

7   slide me candy.

8   **Q.**   Before you pulled up your shirt, did he say anything?

9   **A.**   "I want to see you."

10      He would come -- he would come all the time, even when I

11  was working, like, all day in -- in the drug building

12  throughout the whole day to come, like, talk to me and to check

13  on me, you know, just to spend time with me.

14      Sometimes I could -- I remember one time when one of the

15  officers was taking me back to the visiting room to drop off

16  supplies, he -- he popped out of the -- the kitchen, like the

17  staff lounge, like, right when I walked out.  So he was on his

18  phone, I remember.

19      And there's a circle in the complex, so I was walking.  He

20  made it where we met up at the top of the yard just to talk to

21  me.

22  **Q.**   I want to go back to the incident you just described when

23  he gave you candy after you pulled your shirt up.

24      How did that make you feel?

25  **A.**   That made me feel like a stripper.

1   Q.   All right.  I'm going to switch gears a little bit again.

2        You said that you were at both the prison and the camp.

3        How does the process of transferring to camp work?

4   A.   You have to just -- you have to meet certain standards.

5   You have to meet -- you can't have -- you have to be 18 months

6   disciplinary free and you really have to get your points down

7   to 15 and below.

8        So when I started at Dublin, I was at a 28.  So I

9   programmed and programmed my entire time there, and I -- I've

10  never had a disciplinary action, I've never had a shot, I've

11  never been to the SHU.  So I got my points down to under 15 so

12  I could go to camp.

13  Q.   What is a management variable?

14  A.   A management variable is something they put on me almost

15  my whole time there.  A management variable is -- it's at their

16  discretion, your unit manager, to put that on you for whatever

17  reason they want.  It keeps you behind the fence.  It doesn't

18  allow you to go to a camp.

19       So when I would go to teams, they would put 2 years

20  management variables on me all the time, 18 months, 2 years.

21  Q.   Who put the last management variable on you?

22  A.   Ms. Milliken.

23  Q.   How did that happen?

24  A.   I believe I was going out for team, and in prison you go

25  to team twice a year, every six months.  And my case manager, I

1    believe, was out having a baby, so Ms. Milliken was the unit

2    manager.

3         And when I went into team, she was very condescending.

4    She liked to play God with your life, and she would make

5    comments to me about, "I would never send anybody with -- like

6    you with a charge to a camp."

7         She would tell me stories how she called the FBI just to

8    make sure an inmate didn't get out to a halfway house, to keep

9    them in prison an extra year.  She -- she would -- she was

10   amazed that I've never had a shot, and I can remember her

11   saying, "Well, if I was in prison like you, I'd be in the SHU

12   for beating a bitch up."

13   **Q.**   You were eventually transferred to the camp; right?

14   **A.**   Yes.

15   **Q.**   Did the defendant tell you anything about his role in

16   transferring you to camp?

17   **A.**   He told me he did it.

18   **Q.**   How did you feel when the defendant told you that?

19   **A.**   Special.

20   **Q.**   Did the defendant ever encourage you to apply for other

21   forms of relief?

22   **A.**   Yes.

23   **Q.**   What did he tell you to apply for?

24   **A.**   He told me when -- when the COVID -- when the COVID came,

25   they were changing some things in federal prison.  They were

1    doing compassionate releases.  And he told me that -- that I

2    should put in for a compassionate release.

3        He told me that he would help me do it and that the

4    procedure was when you do a compassionate release, it goes to

5    the warden, and he said they automatically deny it, and then it

6    goes to the judge, and the judge makes the final say-so, and

7    usually the judge says yes.

8    Q.   What is your understanding of what compassionate release

9    means?

10   A.   He always explained to me that the compassionate release

11   was -- everything he explained to me was what you did in

12   prison.  It wasn't -- it didn't have anything to do with your

13   charges; it's the clear conduct.  It's how good you are in

14   prison and that -- you know, he -- he told me that there was a

15   lot of people that were getting them and that sometimes he --

16   on -- the judge releases you on certain technicalities, like,

17   if -- they have only like 30 days to answer you, and if they

18   don't, you could automatically get a release.

19       So he would tell me sometimes that he would have to go

20   back to his office to have meeting -- or phone conversations

21   with judges because they were releasing an inmate.

22   Q.   Did you ultimately apply for compassionate release?

23   A.   Yes.

24   Q.   Did the defendant grant it?

25   A.   No.

1  **Q.**   How did that make you feel?

2  **A.**   I mean, I was fine with that because that's normal

3  procedure.   Then it goes to the judge.

4  **Q.**   Earlier, you mentioned Lieutenant Putnam.

5  What is your understanding of what his role at FCI Dublin

6  is?

7  **A.**   Mr. Putnam is Mr. Garcia's best friend.  And I know that

8  they've worked together for 23 years.  They've worked at

9  different prisons together.  And he is the head of SIS.  And

10  SIS is -- they investigate what happens in prisons.

11  **Q.**   Do they investigate sexual abuse?

12  **A.**   Yes.

13  **Q.**   Did the defendant ever make comments to you about getting

14  in trouble for his relationship with you?

15  **A.**   No.

16  **Q.**   Did he ever say anything about being concerned about

17  getting in trouble?

18  **A.**   Just at the end.  He -- he -- he told me that the FBI was

19  there investigating safety, and I -- I remember him telling me

20  that they were investigating some other officers.

21  And he told me that the FBI found semen at the women's

22  camp and that -- I remember -- I remember him just saying there

23  was -- I remember seeing like this big black tarp over by

24  safety, and that, he said, was the FBI.

25  **Q.**   Did the defendant ever make any comments about whether he

1  could be fired?

2  **A.**   He told me that he worked for Washington, D.C., and that

3  he could never be fired.

4  **Q.**   Did the defendant ever make a comment to you about

5  convicts?

6  **A.**   Yes.

7  **Q.**   What did he say?

8  **A.**   He told me that he likes convicts, and he told me that,

9  you know, a convict is somebody in prison that keeps their

10  mouth shut, that turns their head to anything.  You don't ever

11  tell on anybody for anything.

12      And he knew that he -- that I would never be like that.

13  You know, he liked that I was quiet.

14  **Q.**   Melissa, have you filed a civil case related to your

15  sexual interactions with the defendant?

16  **A.**   Yes.

17  **Q.**   How much money are you asking for related to that case?

18  **A.**   25 million.

19  **Q.**   What's your understanding of the status of that case?

20  **A.**   Nothing.  I don't know.  I haven't -- I've never seen it.

21  It's still pending.

22  **Q.**   Have you filed a compassionate release motion related to

23  your sexual interactions with the defendant?

24  **A.**   Yes.

25  **Q.**   What is your understanding of the status of that case?

1   **A.**   I've never gotten an answer.  It's still pending.

2   **Q.**   Is your civil case affecting your testimony here today?

3   **A.**   No.

4   **Q.**   Is your compassionate release motion affecting your

5   testimony here today?

6   **A.**   No.

7   **Q.**   Has the Government made you any promises related to your

8   testimony in this case?

9   **A.**   No.

10  **Q.**   Did you request to be released from BOP for reasons other

11  than what happened with the defendant?

12  **A.**   Yes.

13  **Q.**   For what reasons, just generally?

14  **A.**   Medical reasons.

15  **Q.**   What is your understanding of the status of that request?

16  **A.**   I still don't have an answer.

17  **Q.**   At some point, did your interactions with the defendant

18  change?

19  **A.**   Yes.

20  **Q.**   What happened?

21  **A.**   I remember at the end of 2020, the end of the year, I was

22  working out with one of my friends.  And I can remember him

23  coming to me and saying, "You know, Melissa, I really -- I

24  really -- I wish I could spend more time with you right now,

25  but I can't."

1    He said that there was three officers that were watching

2  him, and there's rumors going around that he was fucking around

3  with an inmate from food service that lives in EF.  And I can

4  remember him always saying, "As if," and he said that -- for me

5  not to be worried about it, that he -- he only has feelings for

6  me on that compound, and that -- he told me one of the

7  officers, Mr. Smith, was -- he was putting him on leave because

8  he was one of the officers that was saying rumors about him.

9  **Q.**    Did you observe the defendant interacting with any other

10  inmates?

11  **A.**    Yes.

12  **Q.**    What did you see?

13  **A.**    During the COVID, you were stuck in your cell.  And in my

14  unit, there's a big, huge window where we worked out, and

15  there's windows all over.

16    And there was a particular time when the Unit EF was out

17  and they were shopping, and I can remember him walking up

18  there.  He used to always do that to me.  He would be at the

19  top of the yard, and if I was getting commissary, he would just

20  come, but -- he would mingle and talk to everybody else, but he

21  would come talk to me.

22    And I can remember there was an inmate that had her bag

23  like this and she dropped it, and he was, like, right behind

24  her and he was talking to her.  And when he was walking away, I

25  seen him look back and talk to her.

1        And this is the same inmate that I would see during COVID

2   that -- when it was lunchtime, he would be at certain areas

3   before -- in the kitchen, before around any staff, he would be

4   outside to talk to the inmates.  They came up to him and gave

5   him stuff.  But this inmate, I saw him -- saw her give him a

6   piece of paper, and he was following her into the kitchen to

7   talk to her.

8        I noticed he was at that window all the time.  I caught

9   him in the bushes outside of the chaplain's building watching

10  that unit when they were out for rec, because everything was

11  segregated because of COVID.

12  **Q.**   When you said you noticed him "at that window all the

13  time," what did you mean by that?

14  **A.**   He was always at this window talking to this inmate,

15  and -- and that was the inmate that I saw him interacting with.

16  **Q.**   Was it a housing unit window?

17  **A.**   Yes.

18  **Q.**   What housing unit?

19  **A.**   F.

20  **Q.**   When did you see him outside the F-Unit, approximately?

21  **A.**   In 2021.

22       **MS. PRIEDEMAN:**  Ms. Slattery, can you please pull up

23  Exhibit 321.

24  **Q.**   Melissa, do you recognize what's shown in this picture?

25  **A.**   Yes.

**Q.**   What is it?

**A.**   F-Unit.

      **MS. PRIEDEMAN:**   Your Honor, the Government moves to admit Exhibit 321.

      **MR. REILLY:**   May I have just a moment?

      **THE COURT:**   Mr. Reilly, it was stipulated to.

      **MR. REILLY:**   No objection.

      **THE COURT:**   All right.

      (Government Exhibit 321 received in evidence)

      **MS. PRIEDEMAN:**   May we publish Exhibit 321 to the jury, Your Honor?

      **THE COURT:**   Yes.   It's been admitted.

**BY MS. PRIEDEMAN:**

**Q.**   Melissa, can you please point out where you saw the defendant standing?

**A.**   This window right here (indicating).

**Q.**   Is it the first window that you're pointing to?

**A.**   Yes.

**Q.**   The first window on the lower unit; is that right?

**A.**   Yes.

      **MS. PRIEDEMAN:**   Ms. Slattery, you can take down that exhibit, please.

**Q.**   Melissa, have you ever spoken to the inmate that you saw the defendant interacting with?

**A.**   No.

**Q.**   Do you know her first name?

**A.**   Maria.

**Q.**   How do you know her first name?

**A.**   There was an inmate that lived in my unit that used to live in her unit, and I remember we were both downstairs, and they were letting EF out to go get lunch, and I remember seeing her talking to him.

And there was an inmate in my unit -- I said, "What's that girl's name," and they told -- and she told me.  But she said, "Oh, that's Mr. Garcia's girlfriend.  She -- he comes into the kitchen all the time, like, he" -- she told me that he would come into the staff lounge, and they were leaving -- he was leaving earrings and stuff under the table for her.

**Q.**   Did you confront the defendant about Maria?

**A.**   Yes.

**Q.**   What did you say?

**A.**   I asked him if that was true, and he said, "No."  He said, "Do you ever think I would do anything like that?"  He said that those are just rumors and I shouldn't worry about anything.

**Q.**   Were you upset when you thought the defendant was with another inmate?

**A.**   Yes.

**Q.**   Why?

**A.**   Because everything I did with him.  I gave him my heart.

1    I did everything that he wanted me to do, you know?  I believed

2    in him, you know?  I trusted him.  Like, he protected me and,

3    like, cared about me, you know?

4         So it hurt my feelings, because I would never do that to

5    him, you know.  And he -- he would -- he acted like, you know,

6    he was going to be with me when I got out.  So, yeah, my

7    feelings were hurt.

8    **Q.**   Were you angry?

9    **A.**   Yes.

10   **Q.**   At some point, did you stop talking to the defendant?

11   **A.**   Yes.

12   **Q.**   When, approximately, did that occur?

13   **A.**   In the middle of 2021.  I -- I was talking to him one time

14   in the kitchen.  It was just me and him in this little hall.

15   And I told him -- he kept telling me, like, "I'm the one that

16   got you to camp.  I did this for you.  I've done everything for

17   you."  He was -- he would say, "I would never do anything like

18   this to you.  I would never do anything."

19        And I called him a liar, you know.  I said, you know, "I

20   don't ever want to -- I don't ever want to talk to you again.

21   Everything that comes out of your mouth is a liar."

22        I watched him.  I watched him do to this inmate what he

23   did to me.  I watched him come out of bushes.  I watched him

24   for years.  He did the same thing to me that he did to her.  So

25   I know that -- what his MO is, and that phone is his MO.

1    I would watch him on that yard with nothing but executive

2  staff, Putnam, the AWs, and he would watch her come out of that

3  unit.  And he would have his phone, and he would be on the

4  phone, but when he would -- when she would get to the door, he

5  would make sure that he went in the front way so he could meet

6  her in the middle and talk to her and then walk back out with

7  the executive staff.  I watched him.

8  **Q.**   When you say "her," who are you referring to?

9  **A.**   Maria.

10 **Q.**   Melissa, did you tell any staff members about what

11 happened with the defendant?

12 **A.**   I told Dr. Townsend, but I didn't tell her his name and

13 everything that happened.  I was too scared.

14 **Q.**   Who is Dr. Townsend?

15 **A.**   She's the psychologist at Dublin.

16 **Q.**   Did you have an interaction with Ms. Townsend when the

17 defendant was nearby?

18 **A.**   Yes.

19 **Q.**   What happened?

20 **A.**   So after all of that happened, there was a graduation in

21 undercover rec.  It's this little area where they have little

22 graduations, and Mr. Garcia was there with the two AWs and I

23 was there, as well, with my friend.

24    And I was sitting on the bleachers, the concrete bleacher,

25 and I can remember him just staring at me, like mad-dogging me,

1    looking -- he looked at me like he wanted to kill me, like he

2    was super, super angry.  And I didn't say anything to him; he

3    didn't say anything to me.

4         And I remember Dr. Townsend walked up to leave, so I ran

5    after her, and I said, "Please, just walk with me.  Don't leave

6    me, and I want to talk to you."

7         And so we walked up a little bit towards the top of the

8    yard, and I remember Mr. Garcia with the two assistant wardens

9    walking towards me.  And I remember telling her, "Don't leave

10   me.  Just stay here and talk to me.  Please don't leave me."

11   Q.   Why didn't you want her to leave?

12   A.   Because I was scared, you know.  I -- I saw him, like,

13   look at me like that.  Like, it was a different side that I

14   saw, you know?

15   Q.   What were you scared could happen?

16   A.   At that point, like, everything just went through my head,

17   you know?  I have a little boy.  And in prison, doing what I'm

18   doing right now, I could lose my life or he could lose his

19   life.

20        So I was petrified, and I didn't trust anybody in there.

21   You know, I couldn't even tell her certain things because she

22   would have to report it to Mr. Putnam, and that was his best

23   friend.  I could -- I could -- they could put me in the SHU.

24   They could do whatever they want to do.

25   Q.   Why did you think you would go to the SHU?

**A.**    Because any time they investigate anything, that's where they put you.  And they'll leave you there for months and months and months.

**Q.**    Were you scared that the defendant would put you in SHU?

**A.**    Well, yeah.  He had the power to do that.

**Q.**    The education graduation that you just talked about, was that when you were at the camp already?

**A.**    No.

**Q.**    That was at the prison still?

**A.**    (Witness nods head.)

**Q.**    Okay.

What did you tell Dr. Townsend about the defendant?

**A.**    I don't remember everything.  I remember her -- I remember telling her that I didn't know what to do, that I had so much anxiety and stress that I couldn't eat or sleep.

And I've known Dr. Townsend since I've been there.  She made me feel safe.  I did a lot of therapy with her as well for a long, long time.  I took many, many classes with her.  But I knew -- and she told me that if I were to say anything to her, a name or what happened to me, she would have to report it.

So she told me -- I remember -- I would tell her that the only person I feel safest with is my sister, and -- but I can't say stuff on the phone or the email because they have access to all of that and they can listen.

So I begged Janessa to come see me, and she did.  And

```
 1   Janessa got ahold of one of my attorneys, Ms. Kim, and she came

 2   to see me.  And I talked to Ms. Kim, and Ms. Kim told me

 3   that --

 4            MR. REILLY:  Objection, Your Honor.  Hearsay.

 5            THE COURT:  Sustained.

 6   BY MS. PRIEDEMAN:

 7   Q.   Melissa, let me just go back a little bit.

 8        Is Janessa your sister?

 9   A.   Yes.

10   Q.   After you talked to your -- what happened after you talked

11   to your sister and your lawyer?

12   A.   I talked to the FBI.

13   Q.   How did that conversation occur?

14   A.   I was at camp, and I was on the phone with the FBI and you

15   and one of my attorneys in a room.

16   Q.   What happened after that call?

17   A.   I remember -- I remember when I would work at the camp,

18   Mr. Garcia would come and -- come see me all the time or walk

19   out -- I never talked to him after that -- and, like, I was

20   nervous.  So Mr. -- he would stop at my work.

21        And I remember one incident where -- where I worked, there

22   was two big garage doors.  And I saw him coming, so I went into

23   the bathroom to avoid him.  And he came in one side, and he was

24   talking to the inmates, and then when I opened up the door, he

25   was on this side over here on his cell phone.  And I was
```

1    scared, so I went back in the bathroom, and I waited in there

2    for a long time.

3          But one day when I went back to work -- or went back to my

4    unit, an inmate told me that Mr. Garcia was on the news.  And I

5    remember people yelling in my unit saying, "Die," you know.

6    "You're going to fucking die.  Whoever snitches, they should

7    fucking die."

8    **Q.**   How did that make you feel?

9    **A.**   Scared.

10   **Q.**   Did you stay at FCI Dublin after that?

11   **A.**   No.

12   **Q.**   What happened?

13   **A.**   I -- I remember I went to -- Mr. Putnam drove me to your

14   office, and on the way back, he told me if I ever needed him or

15   anything, for me to go up to the office, and they would call

16   him.

17         And I remember that SIS officer, Ms. Strack, I was crying

18   and upset, and she said, "Well, do you think I can call the FBI

19   any time that -- any time that you want or because -- you know,

20   just act like nothing."  And she sent me back to my unit.

21         And then I remember they called me back up there, and

22   that's when you and Katherine were on the phone.

23   **Q.**   At some point, were you transported to Victorville?

24   **A.**   Yes, that day.

25   **Q.**   How has your experience at Victorville been?

**A.**   It's been -- I've been tormented there, like -- I live in
fear every single day because of this.  I've had officers
almost try to beat me up.  I've had officers -- my counselor
put me in my -- in his room, told me that it's my fault and
that nothing like this would have happened at -- it's all my
fault at Dublin and that they don't want that stuff here at
Victorville.

I've had chaplains and officers have their phones saying
that -- that this is what inmates do, they fuck to take their
shots off, that it's -- nothing like this would ever happen,
that it's the inmates.

I've had people leave notes under my door or under my bed
and pasted on the walls.  I've had officers ask me a million
questions and try to pull me in their office to ask me about
Mr. Garcia.

I go on medical runs, and an officer a few weeks ago,
right before I came here, she said, "Oh, I heard about" -- she
said, "Oh, I remember you, Melissa."  She's like, "You're
fucking the warden."  She said, "I just came from Dublin."

**MR. REILLY:**  Excuse me, Your Honor.  I'm going to
object and ask that the last part of the answer be stricken as
hearsay and also object to no question pending.

**THE COURT:**  The objection is sustained.

Ladies and Gentlemen, it's stricken.  So we need to hear
just from the people.  That's what we call hearsay, about what

that other person may or may not have said.  That person is not

here.  That statement is stricken.

**BY MS. PRIEDEMAN:**

**Q.**  Melissa, how has coming forward about what happened with

the defendant affected you?

**A.**  Getting sentenced to 15 years was nothing compared to what

I've gone through.  I have anxiety.  I can't sleep.  I live in

fear every single day.  I don't know if I'm going to live, you

know?  Like, it's been horrible.  It's been horrible.  It's

been the scariest thing that I've ever done.

    And living inside of those prisons, not anybody in this

room can understand, nobody, unless you are in these clothes

and is behind a fence.  They play God with your life.  They

control it.

    And I've gone through that for 11 years that I've been in

prison.  They talk bad about me, and because I did come

forward, people say things to me.  People talk about me.  I've

had cops, like, threaten me and say that everything is my

fault.

            **MR. REILLY:**  Your Honor, again, hearsay.

            **THE COURT:**  Yes.  The objection is sustained.

            **MS. PRIEDEMAN:**  Your Honor, no further questions.

            **THE COURT:**  Mr. Reilly, we are going to be -- we're

due for another break in 10 minutes, but if it's best to just

take our break now, then you're not interrupted in 10 minutes,

1   or would you like to start with 10 minutes?

2                **MR. REILLY:**  Yes.  I would prefer that we just go

3   ahead and take the break now.

4                **THE COURT:**  All right.  We will stand in recess, then,

5   for 20 minutes.

6        (Proceedings were heard out of presence of the jury:)

7                **THE COURT:**  All right.  You may be seated.  The record

8   will reflect the jury is gone.

9        Just a logistical note.  We will finish today at 1:30

10  rather than 1:40, which is typically our time.

11       All right.  We will stand in recess for 20 minutes.

12                     (Recess taken at 11:41 a.m.)

13               (Proceedings resumed at 12:02 p.m.)

14               **THE COURT:**  Okay.  Let's get the jury back.

15       (Proceedings were heard in the presence of the jury:)

16               **THE COURT:**  You may be seated.

17       The record will reflect that the jury is back.  The

18  witness is on the stand.

19       Mr. Reilly, you may proceed with cross-examination.

20               **MR. REILLY:**  Thank you, Your Honor.

21                       <u>**CROSS-EXAMINATION**</u>

22  **BY MR. REILLY:**

23  **Q.**  All right.  Melissa, I'm going to call you by your first

24  name since we've all agreed to do that.  Not meaning to be

25  disrespectful, but to maintain your confidentiality and

1   privacy, we're going to use first names only.

2   **A.**   Okay.

3   **Q.**   The reason that you're -- that you made this complaint --

4   allegations, these allegations against Mr. Garcia, was to gain

5   benefit for yourself, wasn't it?

6   **A.**   No.

7   **Q.**   You have filed for a sentence reduction?

8   **A.**   Yes.

9   **Q.**   A Rule 35, do you know what that is?

10  **A.**   No.

11  **Q.**   Okay.  It's a federal rule that allows for a sentence to

12  be reduced in return for cooperation and assistance in another

13  prosecution.

14      You have an attorney that's representing you in that

15  regard?

16  **A.**   I have an attorney, yes.

17  **Q.**   And so you've asked for a reduction in your sentence;

18  correct?

19  **A.**   I've never seen any legal document that my attorney has

20  ever filed.

21  **Q.**   Okay.  You've asked for a compassionate release again a

22  second time; correct?

23  **A.**   Yes.

24  **Q.**   And, of course, you asked to be transferred to a different

25  location, which was granted; correct?

1   **A.**   I don't ever remember that.

2   **Q.**   Well, that's why you moved from Dublin to Victorville,

3   wasn't it?

4   **A.**   I never asked to be -- that was never a request.  The FBI

5   did that.

6   **Q.**   The -- are you aware of the status of your request for

7   compassionate release?

8   **A.**   No.

9   **Q.**   So you just know it's pending?

10   **A.**   Yes.

11   **Q.**   And it's your understanding, though, that as -- it's more

12   likely that any of these things will be granted if you

13   cooperate in this prosecution; correct?

14   **A.**   No.

15   **Q.**   That's not your understanding?

16   **A.**   No.

17   **Q.**   You think this will not help you at all?

18   **A.**   I never thought about it like that.

19   **Q.**   Okay.  If that's the case, why did you hire a lawyer to

20   represent you?

21   **A.**   The lawyer that I have was my original attorney on my

22   original case, why I'm in prison, so he has always been my

23   attorney.  Any time I needed any type of legal stuff, I have

24   contacted him.

25   **Q.**   All right.  And you contacted him about a compassionate

1    release?

2    **A.**   No.  Actually, I didn't.  He filed for a clemency a long

3    time ago.

4    **Q.**   Did you ask him to do that?

5    **A.**   Him and I discussed this, and --

6    **Q.**   This was before any of these allegations arose; correct?

7    **A.**   Yes.

8    **Q.**   But since then, since you've made these allegations, now a

9    compassionate release request has been submitted, has it not?

10   **A.**   Yes.

11   **Q.**   And that was at your request?

12   **A.**   My attorney just did it for me.

13   **Q.**   No.  I understand he did it, but he did it because you

14   wanted him to?

15   **A.**   I never asked him to do anything.

16   **Q.**   Did he tell you that he was going to do that?

17   **A.**   Yes.  He asked for my consent, and I said yes.

18   **Q.**   Okay.  So even though you didn't ask for it to begin with,

19   you agreed that that request could be submitted.

20   **A.**   Yes.

21   **Q.**   And the purpose of that request is to get you out of

22   custody more quickly than would otherwise be the case?

23   **A.**   Compassionate releases take a long time.  I've had a

24   clemency in for years, and I still have never had an answer.

25   And I'm still waiting on an answer for my compassionate

1    release.

2    **Q.**   I understand that.

3          But the question is the whole point of asking for the

4    compassionate release is to get you out of custody more

5    quickly?

6    **A.**   Yes.

7    **Q.**   And it's your belief and your understanding that by

8    cooperating in this prosecution, that is more likely to happen

9    than it would be if you were not cooperating; correct?

10   **A.**   No.

11   **Q.**   That's not your understanding?

12   **A.**   No.

13   **Q.**   And you filed a civil case?

14   **A.**   Yes.

15   **Q.**   Or your lawyer filed a civil case on your behalf?

16   **A.**   Yes.

17   **Q.**   And you're seeking damages?

18   **A.**   I don't know.  I've never seen the documents.

19   **Q.**   Okay.  Monetary damages?

20   **A.**   I don't know what that is.

21   **Q.**   Money.

22   **A.**   Yes.

23   **Q.**   You're expecting to get money from the civil suit?

24   **A.**   I'm not expecting anything.

25   **Q.**   Do you understand that that's a possibility?

1    A.    Yes.

2    Q.    And do you understand that that possibility is greater if

3    you cooperate in this case and particularly greater if you

4    happen to cooperate to the extent that Mr. Garcia is convicted?

5    A.    No.

6    Q.    That's not your understanding?

7    A.    No.

8    Q.    So you think it will make no difference whatsoever in

9    terms of the civil case whether you testify here in this case

10   or not?

11   A.    I don't know.

12   Q.    Or whether Mr. Garcia gets convicted or not?

13   A.    I don't know.

14   Q.    You also have pending a possible early release based on

15   the CARES Act?

16   A.    Yes.

17   Q.    And that's due to some medical condition?

18   A.    Yes.

19   Q.    Not related to this case.

20         That medical condition was not something that was in any

21   way caused by or exacerbated by Mr. Garcia?

22   A.    What does that mean?

23   Q.    He didn't make things worse for you medically?

24   A.    Mentally, yes.

25   Q.    Is your CARES Act medical condition a mental state rather

1    than a physical?

2    **A.**    No.

3    **Q.**    Okay.  So with respect to the CARES Act request, the

4    allegations that you've made against Mr. Garcia, they have not

5    made your medical condition worse than it otherwise would have

6    been; correct?

7    **A.**    I don't know because I'm not a doctor.  I know I have a

8    lot of stomach issues and that could be due to stress.

9    **Q.**    Did he injure you in any way physically?

10    **A.**    In what way?  You have to elaborate on that, please.

11    **Q.**    All right.  Did any of the things that you say he did

12    cause you any permanent physical injury?

13    **A.**    No.

14    **Q.**    Now, you had previously requested a compassionate release

15    or reduction in sentence when Mr. Garcia was the warden;

16    correct?

17    **A.**    Yes.

18    **Q.**    And that was based on your family situation?

19    **A.**    I don't know, because Mr. Garcia is the one who actually

20    did the compassionate release with the inmate that I worked

21    with.  So I never got to see the full thing.

22    **Q.**    Do you understand what the basis for that request was?

23    **A.**    Mr. Garcia, your client, would tell me that the

24    compassionate release -- that it was -- it was for the good

25    conduct that I did in prison.

1   Q.   Didn't your request indicate that your son's caregiver had

2   passed away and that part of the reason that you needed a

3   compassionate release was so you could take care of your son?

4   A.   Yes.  I remember that.

5   Q.   And Mr. Garcia rejected that request, did he not?

6   A.   Yes.

7   Q.   And that made you angry, didn't it?

8   A.   Yeah.

9   Q.   I'm sorry?

10  A.   Yes.

11  Q.   Okay.  And this is a good way for you to get back at him

12  for that, isn't it?

13  A.   No.

14  Q.   You have mentioned a number of things that relate to

15  movement within the facility at FCI Dublin.

16      It's true, is it not, that there are cameras on the

17  ceilings primarily, but sometimes on the walls, that allow

18  videotaping and/or observation of every hallway in the

19  building?

20  A.   There's cameras, like, not -- there's cameras inside the

21  units, but there's not cameras in the lobbies.

22  Q.   There is a camera in the visitation room, is there not?

23  A.   Yes.

24  Q.   On the ceiling?

25  A.   Yes.

1    **Q.**   And it's -- do you know what kind of camera it is?  Do you

2    know anything about that?

3    **A.**   No.

4    **Q.**   Okay.  Is it your understanding that these cameras can see

5    inmates wherever they go in the visitation room, within the

6    room itself?

7    **A.**   Inside the main room.  I don't -- I don't know nothing

8    about cameras.  It's a big bubble on the ceiling.

9    **Q.**   All right.  And there's one in the hallway going out of

10   the visitation room toward these little cubbyholes that you

11   talked about also, isn't there?

12   **A.**   Yes.

13   **Q.**   A big one?

14   **A.**   Yes.

15   **Q.**   And it's your understanding that that camera can see

16   anything that's happening in that hallway; correct?

17   **A.**   I don't know.

18   **Q.**   That would be the point of having a camera, would it not?

19   **A.**   I don't know.

20   **Q.**   Do you think it's possible for you to hide from that

21   camera in that hallway somewhere?

22   **A.**   I don't know.

23   **Q.**   All right.  You told us that you wrote a lot of notes and

24   letters to Mr. Garcia.

25   **A.**   Yes.

1  **Q.**   Do you know how many times you did that, how many such

2  notes or letters?

3  **A.**   A lot.

4  **Q.**   What do you consider a lot?  Are we talking about 10?  50?

5  A hundred?

6  **A.**   I don't know.

7  **Q.**   Did you write him every day?

8  **A.**   No.

9  **Q.**   Once a week?

10  **A.**   Sometimes.

11  **Q.**   For how long a period of time?

12  **A.**   I don't know.

13  **Q.**   When was it that you first met Mr. Garcia?

14  **A.**   When he became -- when he came to the prison as the AW.

15  **Q.**   That's associate warden?

16  **A.**   Yes.

17  **Q.**   And that happened in early 2019; correct?

18  **A.**   I believe he was there before that.

19  **Q.**   Do you remember seeing him prior to the -- January of

20  2019?

21  **A.**   Yes.

22  **Q.**   At that facility?

23  **A.**   I don't know the exact dates.

24  **Q.**   Okay.  And when was the last time -- excuse me.

25       When was the last time you wrote him any such letter?

1   **A.**   I don't remember.

2   **Q.**   How about the first time?  Do you remember that, roughly

3   when that was?

4   **A.**   No.

5   **Q.**   Was it before or after the first of the physical incidents

6   that you described?

7   **A.**   I don't remember.

8   **Q.**   Were you writing these letters throughout the --

9   throughout the entire time that you were having this physical

10  relationship that you claim that Mr. Garcia had with you?

11  **A.**   Are you asking me if I wrote him letters between

12  December of 2019?

13  **Q.**   Yes.  And March of 2020.

14  **A.**   Did I write him letters?

15  **Q.**   Yes.  Or notes.

16  **A.**   Yes.

17  **Q.**   And did you write any before December of 2019?

18  **A.**   I don't remember.

19  **Q.**   Or after March of 2020?

20  **A.**   Yes.

21  **Q.**   And you don't have any idea how many of these letters

22  altogether you wrote?

23  **A.**   No.

24  **Q.**   Did he ever give any of them back to you?

25  **A.**   Never.

1    **Q.**   Did he ever tell you what he did with them?

2    **A.**   Yes.

3    **Q.**   Now, you said that he paid you a lot of compliments,

4    personal compliments, about your looks; correct?

5    **A.**   Yes.

6    **Q.**   Your body?

7    **A.**   Yes.

8    **Q.**   Skin color?

9    **A.**   No.

10    **Q.**   No?  I didn't mean color, really, but your skin, generally

11    speaking, he said was beautiful skin; correct?

12    **A.**   Yes.

13    **Q.**   And you liked that attention; right?

14    **A.**   It was very nice of him.

15    **Q.**   And so you say that this first incident that happened in

16    2000 -- December 2019, you were at rec?

17    **A.**   Yes.

18    **Q.**   And then you went into the visiting room?

19    **A.**   Yes.

20    **Q.**   Okay.  And that's the same visiting room we just talked

21    about a minute ago that has the camera on the ceiling; right?

22    **A.**   Yes.

23    **Q.**   And where exactly did you say that you went to from the

24    visiting room -- visitation room?

25    **A.**   The bathroom right here that's closest to the officers'

1    station.

2    **Q.**   And to get from the visitation room to that bathroom, you

3    have to walk down the hall, right, at least for a short period

4    of time, short walk?

5    **A.**   Yeah.  You have to go through the door, the big --

6    **Q.**   Through the doorway?

7    **A.**   Yes.

8    **Q.**   Okay.  So as you go through that doorway then, your

9    movements are visible to the camera that's in the visitation

10   room and the camera that's in the hallway; correct?

11   **A.**   There's cameras on the ceiling, yes.  I don't know

12   anything about cameras or how they move.  It's a big ball, so I

13   don't actually see a camera.

14   **Q.**   But it's your understanding, is it not, that these cameras

15   are there to keep track of you folks while you're in there?

16   **A.**   The cameras, to my knowledge, in the visiting rooms is for

17   contraband, for when you have contact visits with your family,

18   that if they wanted to go back and look at those cameras, if

19   anybody gave you contraband.

20   **Q.**   It would show up?  They could possibly see it on the

21   camera?

22   **A.**   If they were working, yes.

23   **Q.**   Yeah.

24        And similarly with any of the cameras that are on the

25   ceilings of the hallways, if something untoward happened in the

hallway, they could go and look at the camera -- at the video

from the camera in the hallway to see what happened, too,

couldn't they?

**A.**   I don't know because I don't even know if the cameras

worked.

**Q.**   All right.  Were you taught or trained in any way about

what the camera function was, what the purpose of it was?

**A.**   Never.

**Q.**   Then how did you know that it was to check on contraband

in the visitation room?

**A.**   I mean, that's what I assume.

**Q.**   Why would you assume that?

**A.**   Because we're in prison.

**Q.**   I think you said there were four places in visitation

where there were no cameras; is that right?

**A.**   Your client said that to me.

**Q.**   And did he tell you where they were?

**A.**   He told me where they weren't.

**Q.**   Okay.  What I meant by that was did he tell you where the

four places were?

**A.**   He said that he knew that there was four places in the

visiting room that didn't have cameras, and they were the

bathrooms.

**Q.**   All right.  So typically it's the case that in the

bathrooms, there are no cameras; right?

1    A.    Yes.

2    Q.    In any of the bathrooms you were ever in at Dublin, did

3    you ever see a camera in the bathroom?

4    A.    No.

5    Q.    All right.  But to get into the bathroom, any bathroom,

6    you would have to go down a hallway where there was a camera;

7    correct?

8    A.    Yes.

9    Q.    Did you ever see a hallway anywhere when you were walking

10   around within the building at Dublin that did not have a camera

11   in the ceiling?

12   A.    Many places.

13   Q.    Hallways?

14   A.    The drug building, the kitchen, warehouses, rec.

15   Q.    There's no -- no cameras in the rec?

16   A.    I've never seen any cameras at the rec.

17   Q.    But in the living quarters and the connections between the

18   living units and the visitation room, all of those hallways

19   have cameras; correct?

20   A.    In the units, there are cameras, yes, in the hallways.

21   Q.    All right.  And you can go outside the building, right --

22   A.    Where?

23   Q.    -- at times from your unit?

24   A.    Yes.

25   Q.    And there's obviously no cameras outside; right?

1  **A.**   No.

2  **Q.**   No, that's not right, or, no, there are no cameras?

3  **A.**   I've never seen any cameras outside.

4  **Q.**   All right.  But in your own mind, you knew quite well that

5  if you were walking around inside the building where these

6  cameras were, that you were subject to surveillance, didn't

7  you?

8  **A.**   When you're walking on the top tier or the bottom tier,

9  there's cameras, but in the lobbies, there are no cameras.

10 **Q.**   All right.  During this -- the first time that you had

11 some -- you say you had some physical contact with Mr. Garcia,

12 you said that you took his hand away because it hurt?

13 **A.**   Yes.

14 **Q.**   And then you said that he took your hand and was rubbing

15 on his penis; is that right?

16 **A.**   Yes.

17 **Q.**   And was that over the clothes or inside?

18 **A.**   On his penis?

19 **Q.**   Yes.

20 **A.**   It was over his clothes.

21 **Q.**   You also said that he would come to you every day at rec?

22 **A.**   All the time.

23 **Q.**   Does "all the time" mean every day, or is that something

24 different?

25 **A.**   Most of the time, he would come every day.  Not every

1     single day.

2     **Q.**   And I think you said that whenever he did come to see you

3     at rec, he always had an erection?

4     **A.**   No, not every single time he came to me at rec, he did not

5     have an erection.  At times, yes, he did.

6     **Q.**   And you could tell that even when he was dressed?

7     **A.**   Yes.

8          **MR. REILLY:**  Ms. Slattery, could we see Exhibit 127,

9     please.

10    **Q.**   Now, you told us that you recognized where this took place

11    by the floor; is that right?

12    **A.**   Yes.

13    **Q.**   And what's on the floor is basically off-white tile;

14    right?

15    **A.**   Yes.  It looks like tile.

16    **Q.**   The kind of off-white tile that might be located in any

17    one of hundreds or thousands of bathrooms around the country?

18    **A.**   I don't know.

19    **Q.**   Is there anything in this picture specifically that tells

20    you that it was taken within the facility?

21    **A.**   I remember him coming back out of the warden's complex

22    when I was working, and he showed me this picture, and he said,

23    "This is what you do to me every time that I talk to you."

24         **MR. REILLY:**  Okay.  That doesn't answer my question,

25    so I'll ask that that be stricken, Your Honor.  It's

1  nonresponsive.

2             **THE COURT:**  It's fine.  Ask again.  Overruled.

3  **BY MR. REILLY:**

4  **Q.**   Okay.  The question is, is there anything specific about

5  this picture that tells you that it was taken within the

6  facility?

7  **A.**   The floor.

8  **Q.**   Okay.  Other than the floor?

9  **A.**   Him wearing those clothes, because that's what he wore all

10 the time to work.

11            **MR. REILLY:**  Okay.  Once again, nonresponsive.  Ask

12 that it be stricken.

13            **THE COURT:**  That was responsive.

14 **BY MR. REILLY:**

15 **Q.**   The clothes tell you where the picture was taken?

16 **A.**   The clothes tell me that he was working that day.  That's

17 what he would always wear.

18 **Q.**   And did he, like, come to work in some other clothes and

19 then put these on only at work and then take them off when he

20 went home?

21 **A.**   What was the question?

22 **Q.**   To your knowledge, did Mr. Garcia wear some other clothes,

23 civilian clothes, when he came to work and only put these

24 clothes on while he was at the facility?

25 **A.**   I've seen Mr. Garcia in civilian clothes before, but most

1    of the time, he had those on.

2    Q.   Okay.  But you have no way of knowing whether he put those

3    clothes on at home the day this picture was taken and then

4    drove to work in his uniform, do you?

5    A.   He came and told me that he took this --

6    Q.   Excuse me.

7    A.   -- picture --

8            MR. REILLY:  That's nonresponsive, Your Honor.  I

9    would ask that that be stricken.

10           THE COURT:  That's stricken.

11   BY MR. REILLY:

12   Q.   Okay.  The question is, when he -- when this picture was

13   taken, do you have any way of knowing whether he came to work

14   that day dressed in his uniform or not?

15   A.   No.

16   Q.   So that picture could have been taken anywhere that

17   happened to have tile floor that looks like that, couldn't it?

18   A.   I don't know.

19           MR. REILLY:  Thank you, Ms. Slattery.  You can turn

20   that off.

21   Q.   You told us that Mr. Garcia showed you a lot of

22   photographs of his penis?

23   A.   Yes.

24   Q.   Did he also show you photographs of himself engaging in

25   any kind of sexual activity?

1  **A.**   I've seen his hand on his penis and semen coming out of

2  it.

3  **Q.**   Anything else?

4  **A.**   Just him naked in pictures.

5  **Q.**   I'm sorry?

6  **A.**   Him naked in the pictures.

7  **Q.**   He never showed you pictures of himself engaging in sexual

8  activity with anyone other than himself?

9  **A.**   No.

10 **Q.**   Now, you mentioned that on numerous occasions, he took

11 photographs of you naked; correct?

12 **A.**   You'll have to define "numerous."

13 **Q.**   More than two?  Three?  Five?  Ten?

14 **A.**   He took more than one.

15 **Q.**   More than one picture or on more than one occasion?

16 **A.**   He took more -- he took pictures of me on more than one

17 occasion.

18 **Q.**   And you said earlier "frequently"; right?

19 **A.**   I remember a few times.

20 **Q.**   I'm sorry?

21 **A.**   I remember he took pictures of me a few times.

22 **Q.**   At least a few times.  Okay.

23       Did he ever tell you that he deleted those pictures?

24 **A.**   No.

25 **Q.**   Now, you also said that prior to making his rounds, he

1    would give you instructions to be in your cell at a specific

2    time undressed; right?

3    **A.**    Yes.

4    **Q.**    How often did that happen?

5    **A.**    A lot.

6    **Q.**    What is a lot?  Every day?  Once a week?

7    **A.**    Sometimes once a week, sometimes twice a week.

8    **Q.**    And you complied with that request?

9    **A.**    Yes.

10   **Q.**    And that would either be in your cell or in Ms. Zambrano's

11   cell?

12   **A.**    Yes.

13   **Q.**    That's -- Ms. Zambrano is Andrea; right?

14   **A.**    Yes.

15   **Q.**    And when you were undressed in either of those two

16   locations, did you observe whether or not Mr. Garcia took

17   pictures of you?

18   **A.**    Yes.

19   **Q.**    And did you think that he did take such pictures?

20   **A.**    Yes.

21   **Q.**    And how often do you think that happened?

22   **A.**    I don't know.

23   **Q.**    Every time you did this or not?

24   **A.**    Every time I would get undressed?  Is that what you're

25   asking me?

1    **Q.**    Yes.

2    **A.**    No.

3    **Q.**    Half the times that you got undressed?

4    **A.**    No.

5    **Q.**    More than two or three times, though?

6    **A.**    I could remember four times.

7    **Q.**    You can specifically, right now as you're sitting here,

8    remember that he took pictures of you while you were undressed

9    four times?

10   **A.**    Oh, no.  I'm sorry.

11       I remember him having his phone and taking pictures of me

12   out on the rec and in my cell and Andrea's cell.

13   **Q.**    Four times?

14   **A.**    I wasn't undressed in rec.  I had clothes on.  I remember

15   his phone.

16   **Q.**    Okay.  So there would be pictures of you in whatever you

17   were wearing in rec, and then you would go to your cell, and he

18   would take pictures of you naked?  Is that what you're saying?

19   **A.**    He took some pictures of me naked in my cell.

20   **Q.**    And is that what you're saying happened four times?

21   **A.**    No.

22   **Q.**    More than four?

23   **A.**    No.

24   **Q.**    What did you mean when you said you remember him taking

25   pictures of you when you were naked four times?

**A.**   Well, like I just told you, I didn't mean to say that.

**Q.**   Okay.  What exactly did you mean to say?

**A.**   What I meant to say was when I was at rec before, I could remember he would have his phone, and he would have his light on, and he would stand back, and I could tell -- I assumed he was taking pictures of me.  I've never seen those pictures.

**Q.**   All right.  And was that also true of times when you were getting undressed in either your cell or Andrea's cell?

**A.**   Yes.  I knew he was taking pictures then.

**Q.**   And how did you know that?

**A.**   Because he asked for them and he wanted them and I gave them to him.

**Q.**   Did he ever show you those pictures?

**A.**   No.

**Q.**   And how many times did that happen where he asked specifically to take pictures of you while you were naked?

**A.**   I don't remember.

**Q.**   Well, you said earlier it was not every time; right?

**A.**   Yes.

**Q.**   Was it most of the time or most of the time not, or somewhere in the middle?

**A.**   Did he ask me to take pictures -- if he could take pictures of me while he would do rounds and I would get undressed?

**Q.**   Yes.

**A.**   Did that happen a lot?  No.

**Q.**   Can you estimate for us how often it happened?

**A.**   Would you -- excuse me.  What?

**Q.**   Can you estimate for us how often that happened?

**A.**   Me getting undressed for him or him taking the pictures?

**Q.**   Him asking to take pictures was what you said.

**A.**   He asked me a lot of times.

**Q.**   And did you always say yes?

**A.**   There was -- we couldn't do that all the time, especially during the COVID.

**Q.**   All right.  But when he asked, did you say yes?

**A.**   When he asked me, I said yes.

**Q.**   All right.  And that happened lots of times?

**A.**   No.

**Q.**   Isn't that what you just said, that it happened lots of times?

**A.**   No.

**Q.**   Hmm.  Okay.

         How often did that happen?

**A.**   What's the question?

**Q.**   That he asked you to take pictures of you while you were naked -- that he asked if he could take pictures of you while you were naked.

**A.**   I remember he asked a few times.

**Q.**   And what is a few?

**A.**   He's asked me quite a few times, and I remember two times that he took pictures of me while I was naked.

**Q.**   Now, you just said he asked you quite a few times, and earlier you said every time he asked, you said okay or you let him do it.

Is that right or not right?

**A.**   Can you please just ask me one question at a time so I understand?

**Q.**   Okay.  Earlier, you told us that he asked you lots of times --

**A.**   Yes, he did.

**Q.**   -- if he could take pictures of you while you were naked, and you also said earlier that whenever he asked you that, you let him do it; is that right?

**A.**   He asked me a lot of times if he could take pictures, and that never happened except a few times.

**Q.**   So he would ask and you would say yes, but then he wouldn't take the pictures?

**A.**   Yes.  It wasn't the right time.

**Q.**   Was there ever a time he asked to take pictures where you said no?

**A.**   No.

**Q.**   Were there ever times when, to your perception, he was taking pictures of you naked without having asked for your consent that he do that?

1   **A.**   Yes.

2   **Q.**   And how often did that happen?

3   **A.**   I don't know.

4   **Q.**   More than once?

5   **A.**   I don't know.

6   **Q.**   What made you think he was taking pictures on --

7   without -- without having asked you about it?

8   **A.**   I can remember a time where he was down the hall from my

9   cell, and he was talking to two inmates, and he was playing

10  with his phone and the light was on.  And when he came to my

11  cell, he put the phone and him inside of my cell really fast,

12  and I saw that light, and I was naked then.

13  **Q.**   Is that the pictures that have been put into evidence or

14  not?

15  **A.**   I don't know if that one was.

16  **Q.**   Were you in your cell when this happened or Andrea's?

17  **A.**   I was in Andrea's cell and my cell.

18  **Q.**   No.  This one specific time that you just referred to

19  where you saw him talking to other correctional officers and he

20  came to your -- came to you with his -- the light on on his

21  cell phone.

22  **A.**   That was my cell.

23  **Q.**   All right.  So that's not the pictures that we saw earlier

24  then?

25  **A.**   No.

1  Q.   Those were taken in Andrea's cell; right?  You read the

2  cell number right off the side of the bed, right, or off the

3  side of the -- whatever it was -- frame.

4  A.   Yes.

5  Q.   This incident with the candy cane where you say he gave

6  you a candy cane and asked you to insert it into yourself, can

7  you tell us again where that happened?

8  A.   Andrea's room.

9  Q.   And were you on that same bed that's in that other

10  picture?

11  A.   Yes.

12  Q.   And I think you said you were on all fours?

13  A.   Yes.

14  Q.   To your perception, did Mr. Garcia take pictures of that

15  event?

16  A.   The candy cane incident, no, I don't remember that.

17  Q.   All right.  That candy cane incident, did he touch you at

18  all at that -- on that occasion?

19  A.   In Andrea's cell?

20  Q.   Yes.

21  A.   Yes.

22  Q.   On the day he gave you the candy cane?

23  A.   Yes.

24  Q.   And how did he touch you that day?

25  A.   He kissed me and put his finger in my vagina.

1   **Q.**   And you remember saying in an early interview that there

2   was no penetration on that occasion?

3   **A.**   No.

4   **Q.**   And then in a follow-up interview saying there was more

5   than one incident in Zambrano's cell and you may have been

6   confused about what happened that day?

7   **A.**   Yes.   There was two incidents in Zambrano's room.

8   **Q.**   Two incidents in which Mr. Garcia penetrated your vagina?

9   **A.**   Yes.

10  **Q.**   During the time period from the first time you claim that

11  Mr. Garcia touched you sexually until the last time, did he

12  continue to compliment you?

13  **A.**   Yes.

14  **Q.**   And tell you that he could help you in some way?

15  **A.**   I don't understand what you mean.

16  **Q.**   Transfer you to another facility, maybe get you an earlier

17  release, anything like that?

18  **A.**   Yes.   He said that he was the one that was going to get me

19  to camp.

20  **Q.**   And did you ask him to do that?

21  **A.**   No.

22  **Q.**   The second time that -- you say that you were at the rec

23  and Mr. Garcia took you into a bathroom, grabbed your boobs

24  roughly, and rubbed your vagina and penetrated; is that right?

25  **A.**   What time?

1    Q.    What you described on direct as the second incident.

2    A.    Okay.  What about it?

3    Q.    Okay.  Was that before or after the two incidents in

4    Zambrano's room?

5    A.    It was after.

6    Q.    And during that incident, that second incident, you said

7    as he was leaving, he asked you to turn and bend over?  Or did

8    you do that voluntarily?

9    A.    No.  He asked me.

10   Q.    And did he take pictures on that occasion?

11   A.    No.

12   Q.    How do you know that?

13   A.    Because he didn't have his phone in his hand pointing it

14   at me.

15   Q.    All right.  And this incident involving the PREA

16   situation, you said they were there to do shower curtains?  Is

17   that what you said?

18   A.    Yes.  That's my understanding.

19   Q.    And somehow Mr. Garcia was involved in that?

20   A.    Yes.  He was -- yes.

21   Q.    And you said that he was touching your boobs and your

22   vagina and kissing you in the visiting room?

23   A.    Yes.

24   Q.    And that visiting room has a camera; right?

25   A.    Yes.

1  **Q.**   And so he was doing all of this right out in front of the

2  camera?

3  **A.**   No.

4  **Q.**   Well, didn't you just say it happened in the visiting

5  room?

6  **A.**   Yes.

7  **Q.**   Then how could it not have been right in front of the

8  camera?

9  **A.**   Because the door -- we pulled the door open, and it was

10  behind the wall, against the wall.

11  **Q.**   The door was against the wall?  Is that what you're

12  saying?

13  **A.**   The door is on the wall, and it was opened.

14  **Q.**   All right.  But the camera is on the ceiling; right?

15  **A.**   Yes.

16  **Q.**   And anything that's happening in that room can be seen by

17  that camera; right?

18  **A.**   I don't know.

19  **Q.**   Well, that's certainly what you believed, is it not?

20  **A.**   I don't know if it was on or off.

21  **Q.**   Not whether it was on or not, but if it was on, it could

22  see anything happening in the room.

23  **A.**   I don't know because I don't know what type of camera.

24  All I know, there is a big bubble on the wall.

25  **Q.**   And then this hallway that you described in the -- going

1     off of the visiting room where the --

2              **MR. REILLY:**  Well, Ms. Slattery, could you put up

3     Exhibit 40, please.

4     **Q.**   This is the hallway we're talking about; right?

5     **A.**   Yes.

6     **Q.**   And this is -- I mean, it looks like there's a camera

7     right there in the picture, doesn't it?

8     **A.**   No.

9     **Q.**   No?

10    **A.**   That's not a camera.

11    **Q.**   Okay.  But there's definitely one down the hall, is there

12    not, that big bubble?

13    **A.**   Yes.

14    **Q.**   All right.  And you indicated earlier that this particular

15    incident happened against this wall right there in the hallway,

16    didn't you?

17    **A.**   The incident where it happened is back against the wall,

18    and this door right here (indicating) was opened.

19    **Q.**   What do you mean by "opened"?

20    **A.**   The door was opened.

21    **Q.**   Does the door open in or out?

22    **A.**   It comes out.

23    **Q.**   Okay.  And are you saying that you were hiding behind the

24    door then as far as the camera was concerned?

25    **A.**   What I'm saying is the door was opened, and me and

1   Mr. Garcia were against the wall.

2   **Q.**   You --

3          **MR. REILLY:**   I'm sorry, Ms. Slattery, you can turn

4   that off.   Thank you.

5   **Q.**   You indicated that you have -- that you knew a fair amount

6   of personal information about Mr. Garcia?

7   **A.**   I knew some.

8   **Q.**   And did you learn any of that from Lieutenant Putnam?

9   **A.**   No.

10  **Q.**   Or from other inmates or correctional officers?

11  **A.**   No.

12  **Q.**   Inmates talk about this stuff all the time, don't they?

13  **A.**   No.

14  **Q.**   No?   They hear things about different COs and then they

15  share them with other inmates?   That never happens?

16  **A.**   Yes, that happens.

17  **Q.**   Okay.   Or correctional officers will talk to inmates and

18  that gets passed around; right?

19  **A.**   Yes.

20  **Q.**   And did you ever hear any information about Mr. Garcia

21  from either of those two sources?

22  **A.**   No.

23  **Q.**   All right.   And then you described another incident, what

24  you said was the last one, where Mr. Garcia got you from rec

25  again and you went to the warehouse?

1    **A.**   Yes.

2    **Q.**   There were a lot of other people around that day, weren't

3    there, in the warehouse?

4    **A.**   I remember there was two officers and some inmates.

5    **Q.**   Do you remember how many inmates?

6    **A.**   No.

7    **Q.**   More than one?

8    **A.**   Yes.

9    **Q.**   More than two?

10    **A.**   Yes.

11    **Q.**   More than four?

12    **A.**   I don't know.

13    **Q.**   And these two officers and the inmates that were with

14    them, they were just right there walking around in the

15    warehouse; right?

16    **A.**   I remember they were in there.

17    **Q.**   And you said that Mr. Garcia was kissing and touching you

18    and he fingered and touched your vagina?

19    **A.**   Yes.

20    **Q.**   Where exactly in the warehouse did that take place?

21    **A.**   Behind the cabinets, the big file cabinets that are very

22    tall.

23    **Q.**   And is that something that you can just walk behind them?

24    **A.**   Yes.

25    **Q.**   And there's -- I take it there's no door or other

1    enclosure to that space behind the cabinets?

2    A.   There were -- there were doors that you could open like

3    this (indicating).  He opened them one at a time like this

4    (indicating) and then he opened it like that (indicating).

5    Q.   These were doors on the cabinets themselves?

6    A.   Yes.

7    Q.   But there wasn't -- those doors didn't, like, latch and

8    have a door frame that they went into; right?

9    A.   I don't know what that means.

10   Q.   Like this door right here behind you to your right has a

11   handle, and then if you open it and then close it, it's in a

12   frame; right?

13   A.   You have to open it like this (indicating) and open it

14   like that (indicating).  There's two walls --

15   Q.   Right.

16   A.   -- two doors.

17   Q.   But when you open them, those doors don't go into a frame

18   like the frame on the regular door, do they?

19   A.   They open.

20   Q.   And they just kind of hang there?

21   A.   They stay open unless you shut them.

22   Q.   Right.  But they just hang there; right?  If you push on

23   them, they'll move.

24   A.   I mean, if you shut it, it will move.

25   Q.   Okay.  And there's nothing to prevent one of these other

1    people who happened to be there from just coming around the

2    corner and pushing that door closed, is there?

3    **A.**    There wasn't any inmates near.

4    **Q.**    Well, if you were behind these cabinets with these doors

5    open, how did you know where the other inmates were?

6    **A.**    I recognized the inmates when I first walked into the

7    warehouse, but we went towards the back where the filing

8    cabinets were --

9    **Q.**    Right.

10    **A.**    -- and that's where those incidents took place.

11    **Q.**    Understood.

12         But while that was taking place, you had no idea where

13    those other inmates were, did you?  They could have been

14    walking around.

15    **A.**    Yes.

16    **Q.**    Correctional officers could have been walking around.

17    **A.**    There was two in there.

18    **Q.**    I understand.  And they could have been walking around;

19    right?

20    **A.**    They could have been, but I don't know.

21    **Q.**    Right.  You don't know.

22         So all of those people could have been walking around,

23    could have walked right into that spot where you were.

24    **A.**    If they wanted to.

25    **Q.**    And then do you recall roughly when that was, that last

1  occasion that you described?

2  **A.**   March of 2020.

3  **Q.**   And it was right after that that the COVID restrictions

4  went into effect; right?

5  **A.**   Yes.

6  **Q.**   And I think you said that you were more or less confined

7  to your cell during that COVID lockdown?

8  **A.**   We were -- we were restricted a lot more than before the

9  COVID.

10  **Q.**   Were you still able to go to rec?

11  **A.**   Yes.

12  **Q.**   Smaller groups maybe?

13  **A.**   By units.

14  **Q.**   Spread out more?

15  **A.**   By units, yes.

16  **Q.**   And I think you said that you still got naked in your cell

17  for Mr. Garcia, is that right, even after the COVID

18  restrictions went into effect?

19  **A.**   Yes.

20  **Q.**   And was that because he would tell you when he was coming

21  and ask you to do that?

22  **A.**   Yes.

23  **Q.**   And on any of those occasions, could you tell if he was

24  taking pictures of you?

25  **A.**   One incident that I already described to you, yes.

**Q.**   You already described one that happened after the COVID restrictions went into effect?

**A.**   Yes.

**Q.**   I wasn't clear.  Which incident was that?

**A.**   When he was talking to two inmates right down the hall from my cell.  And I remember him talking like this to the two inmates, and he had his phone on, and he came to my cell, and he kind of came in, and he put his phone like this (indicating) to take pictures of me.

**Q.**   And where were you in the cell at that time when he took that picture or those pictures?

**A.**   In my cell.

**Q.**   Were you on the bed?  Standing up?  Sitting at your desk?

**A.**   I remember when he first came into my cell, I was standing up.

**Q.**   Is that when he took the picture?

**A.**   I don't know for sure if he took it.  I assume he took it because I saw that light on, and he was real jittery.

**Q.**   What made you think he was jittery?

**A.**   His demeanor.

**Q.**   And what do you mean by "jittery"?

**A.**   There's inmates right outside of the unit of my cell down the hall, and he didn't want to get caught, so he did it really fast.

          **MR. REILLY:**  Ms. Slattery, could we see Exhibit 7,

1    please.  And I think that one will have to be closed off to the

2    audience.

3              THE COURT:  Number 7, you said, Mr. Reilly?  I have

4    Number 7 as just a photo of the cell, not as a sealed one.

5              MR. REILLY:  Maybe that's the wrong one.  If I could

6    have just a moment.

7         I'll come back to that.  I obviously have the wrong

8    number.

9    Q.   Did you have a cellmate during the COVID lockdown?

10   A.   Yes.

11   Q.   And where was she on this occasion when you say that

12   Mr. Garcia stuck his camera -- or his cell phone in and took a

13   real quick picture?

14   A.   I don't know.

15   Q.   Wasn't in the cell with you?

16   A.   No.

17   Q.   Do you know where she was?

18   A.   No.

19   Q.   Generally speaking, during that period of time, did you --

20   were you usually in the cell together or not?

21   A.   At times when the modified lockdown -- when there was a

22   modified lockdown, we got out for certain periods of time so we

23   could use the phone, take a shower, or use the little rec room

24   upstairs.

25   Q.   And were there times when one of you would go and the

1    other would still be in your cell?

2    **A.**   What do you mean?

3    **Q.**   When one of you would go out to do one of these things you

4    described for us and the second of you would stay in the cell.

5    **A.**   Yeah.  Sometimes we would all leave our cell to go walk

6    around the unit or take a shower, and sometimes we would stay

7    in our cell.

8    **Q.**   Did you have more than one roommate?

9    **A.**   During the COVID or my whole prison stay?

10   **Q.**   During the COVID.

11   **A.**   Yes.

12   **Q.**   And then to the best of your recollection, on this

13   occasion when you say Mr. Garcia did this, there was no one

14   else in the cell with you?

15   **A.**   No.

16          **MR. REILLY:**  All right.  Ms. Slattery, if you could

17   show us Exhibit 55, please.  And, again, this is one that's

18   closed to the audience.

19   **Q.**   Now, this is the photograph that you indicated -- excuse

20   me -- that you indicated that you can see Mr. Garcia in the

21   background, correct, in the reflection?

22   **A.**   Yes.

23          **MR. REILLY:**  Could you blow that up, Ms. Slattery, to

24   show that location?

25   **Q.**   Now, looking at that reflection, it appears that

1   Mr. Garcia was actually outside of your cell when that picture

2   was taken, doesn't it?

3   **A.**   No.

4   **Q.**   You think he was inside the cell?

5   **A.**   I know he was.

6           **MR. REILLY:**   Thank you, Ms. Slattery.   You can turn

7   that off.

8   **Q.**   Now, you told us about this Valentine's Day gift that

9   Mr. Garcia gave you.

10  **A.**   Yes.

11  **Q.**   Pink Hershey's Kisses?

12  **A.**   Yes.

13  **Q.**   Is that the only time he gave you candy?

14  **A.**   No.

15  **Q.**   How often did he give you candy?

16  **A.**   A lot.

17  **Q.**   And you mentioned on one specific occasion that you pulled

18  your shirt up and your pants down and he gave you candy?

19  **A.**   Yes.

20  **Q.**   Was that Valentine's Day?

21  **A.**   No.

22  **Q.**   And did he have his cell phone out to take pictures on

23  that occasion?

24  **A.**   On what occasion?

25  **Q.**   When you pulled your shirt up and pants down and he gave

1   you candy.

2   **A.**   No.

3   **Q.**   All right.  You also told us about -- that Mr. Garcia

4   indicated he would help you get a transfer to camp.

5   **A.**   He always said that -- that he was going to do that.

6   **Q.**   And was it your understanding that -- strike that.

7        You told us on direct that it was your understanding that

8   Mr. Garcia, when he was the warden, had control of everything;

9   right?

10  **A.**   That's what the warden does.

11  **Q.**   And that would include transferring you to the camp,

12  wouldn't it?

13  **A.**   Yes.

14  **Q.**   So once he became warden, even if you still had too many

15  points, he could send you to the camp, couldn't he?

16  **A.**   Mr. Garcia talked about camp when he was the assistant

17  warden and when he was the warden.  My points have been at a

18  number 10 for many years.

19  **Q.**   Okay.  So once he became warden and your points were below

20  15, he could have sent you to the camp right off; right?

21  **A.**   He would have to take the management variable off of me

22  first.

23  **Q.**   He would have to take the what off of you?

24  **A.**   Management variable.

25  **Q.**   And what was that?

1  **A.**   A management variable is what they put on you to keep you

2  behind a fence.   For whatever reasons the case manager does

3  that.   They can keep you there for your charge, for points,

4  disciplinary.

5  **Q.**   Okay.   And in your case, it was because of the nature of

6  your conviction; right?

7  **A.**   That's what Ms. Milliken told me.

8  **Q.**   You didn't get along very well with Ms. Milliken, did you?

9  **A.**   Ms. Milliken was very rude to me and mean and

10 condescending to me.

11 **Q.**   But at that point in your incarceration, the warden could

12 have said to Ms. Milliken, "I'm taking that administrative

13 restriction off and sending her to the camp," couldn't he?

14 **A.**   I don't know for sure.

15 **Q.**   So you don't know for sure then if he actually had control

16 over everything, do you?

17 **A.**   I only know what he told me.

18 **Q.**   Did he tell you he had the ability to do that?

19 **A.**   Yes.

20 **Q.**   Did you ask him to do it?

21 **A.**   No.

22 **Q.**   Why not?

23 **A.**   I don't know.

24 **Q.**   You wanted it; right?

25 **A.**   I wanted it for a long time, yes.

1   **Q.**   You -- you made the comment that Mr. Garcia expressed to

2   you concern about your relationship only at the end.

3         How did that come about?

4   **A.**   Wait.  Say it again, please.

5   **Q.**   Okay.  You told us on direct that Mr. Garcia expressed

6   concern about what was going on between you and him only at the

7   end.

8         Do you remember that?

9   **A.**   Yes.

10  **Q.**   And is that what happened?

11  **A.**   He started getting scared.

12  **Q.**   And why was that?

13  **A.**   He told me that there was officers watching him, and they

14  were saying that he was involved in a relationship with another

15  inmate from EF.

16  **Q.**   Another inmate from where?

17  **A.**   Unit EF.  The units are combined, like AB, CD, EF.  So I

18  lived in AB -- I lived in B, but A -- they're connected.

19  **Q.**   And this was this inmate named Maria?

20  **A.**   Yes.

21  **Q.**   Have you ever been on the outside of Unit F along the wall

22  outside the building?

23  **A.**   It's all inside.  There -- I don't understand.  There's a

24  fence where the rec is.  So have I ever gone along the fence

25  line?

1    **Q.**   Well, there's a -- the buildings have an outer wall;

2    right?

3    **A.**   It's just a unit.

4    **Q.**   Right.

5    **A.**   A unit, yeah.

6    **Q.**   And it has an outer wall.

7    **A.**   Yes.

8    **Q.**   Have you ever walked along the outer wall of Unit F?

9    **A.**   No.

10   **Q.**   And who was it that told you that this other inmate, this

11   Maria, was Mr. Garcia's girlfriend?

12   **A.**   I forgot her name.

13   **Q.**   I'm sorry?

14   **A.**   I forgot her name.  She was an inmate.

15   **Q.**   And after you heard about that, you started kind of

16   watching him, didn't you?

17   **A.**   I would look out the windows, yes.  It was the COVID.

18   Yes.

19   **Q.**   And trying to be more alert to what he was doing?

20   **A.**   Yes.  Because at the time, he was still doing what he

21   always did with me.

22   **Q.**   Now, you -- did you ever see him outside the window of

23   Maria's building?

24   **A.**   Yes.

25   **Q.**   And that's Unit F; right?

1    **A.**    Yes.

2    **Q.**    And that's the same wall that I was just asking you

3    about --

4    **A.**    Yes.

5    **Q.**    -- the exterior wall of the building?

6    **A.**    Yes.

7    **Q.**    And it has windows?

8    **A.**    Yes.

9    **Q.**    And they have shades; right?

10   **A.**    No.

11   **Q.**    No?  Coverings of some kind?  Maybe you don't call them

12   shades, but the windows are covered, aren't they, and the cover

13   can be lifted or put down?

14   **A.**    Oh, there's a little -- here's the window like this

15   (indicating), and then you can open the window.  The windows

16   open up --

17   **Q.**    Okay.

18   **A.**    -- so you could look outside.

19   **Q.**    Okay.  But if the window is closed, you can't see outside?

20   **A.**    If the window is closed.  If you're standing outside, you

21   can't look through that window because it's shut.

22   **Q.**    Right.

23       And you had Correctional Officer Espinosa check into this

24   Maria for you, didn't you?

25   **A.**    Yes.

1    **Q.**    Something he was not supposed to do?

2    **A.**    Yes.

3    **Q.**    And what was the reason for that?  Why did you ask him to

4    do that?

5    **A.**    I wanted to see her release date.  I remember him saying

6    something to me about that.  I remember him talking about

7    her -- her -- like how much time that she had.

8    **Q.**    And then you described an incident for us in which you saw

9    him walk into the building, you thought to meet with this

10   Maria --

11   **A.**    Yes.

12   **Q.**    -- is that right?

13         And was that Unit F?

14   **A.**    I saw him walk into the kitchen.

15   **Q.**    In what building?

16   **A.**    Well, the kitchen is separated from any buildings on the

17   prison.

18   **Q.**    Oh.  It's just the kitchen itself?

19   **A.**    Yes.

20   **Q.**    And you -- you testified on direct that you watched him

21   walk into that building in order to meet with Maria.

22   **A.**    Yes, the kitchen.

23   **Q.**    And did you actually see them make contact of any kind,

24   see them talking?

25   **A.**    Yes.

1   **Q.**   You were able to see that how?   Through a window or a

2   door?

3   **A.**   The windows on the units.

4   **Q.**   And that made you angry, didn't it?

5   **A.**   It upset me.

6   **Q.**   And when, approximately, did that happen?   Do you

7   remember?

8   **A.**   Sometime in 2021.

9   **Q.**   Do you remember what month?

10   **A.**   No.

11   **Q.**   But it would have been prior to July at least; right?

12   **A.**   I don't know.

13   **Q.**   Because it was in July that you started talking to the FBI

14   and the Bureau of Prisons about the allegations you're making

15   about Mr. Garcia; right?

16   **A.**   I believe I talked to the FBI in June or July of 2021.

17   **Q.**   July 15th sound right?

18   **A.**   I don't know the exact date.

19   **Q.**   Okay.

20       But you were motivated to make these allegations because

21   you were mad at him, weren't you?

22   **A.**   No.

23   **Q.**   So if he had continued to pay attention only to you and to

24   continue to be nice to you and to continue to give you candy,

25   you still would have gone to the FBI and complained about what

1    he was doing?

2    **A.**   Can you say that again, please?

3    **Q.**   Yes.

4        If Mr. Garcia had continued to be nice to you, pay you

5    compliments, give you candy, tell you that he was going to help

6    you, and that he was not involved with any other inmate, would

7    you have still gone to the FBI in July of 2021 to complain

8    about these allegations that you're making?

9    **A.**   I don't know what I would have done.  But I saw him with

10   my own eyes, what he was doing to her, and --

11   **Q.**   You were jealous.

12   **A.**   -- like, I wouldn't -- for him to do that not only to me,

13   but to another inmate, is wrong.

14   **Q.**   You were jealous.

15   **A.**   No, I wasn't jealous.  I was upset.  I was hurt.

16   **Q.**   Angry?

17   **A.**   I was hurt.

18   **Q.**   Angry?

19   **A.**   I was hurt.

20   **Q.**   Were you angry?

21   **A.**   No.

22   **Q.**   And then you said that after you had talked to the FBI,

23   that you were scared.

24   **A.**   Yes.

25   **Q.**   Why were you scared?

**A.**   Because I don't know what would have happened to me.   I --
I didn't know what was going to happen to me.

**Q.**   Well, did you think the FBI was going to run over to
Mr. Garcia and say, "Hey, Ray, Melissa's telling tales on you.
You better do something about it"?

**A.**   Any time you come forward like I am right now, there's
consequences.   I live in an environment that you couldn't
fathom.   I have seen things.   I have been through things that
nobody in this room has ever been through.   I know what happens
inside of prisons, and it's not nice.   It's very scary.

**Q.**   Were there any Dublin correctional officers present the
first time you talked to the FBI?

**A.**   No.

**Q.**   So there was FBI Agent Ms. Barclay; right?

**A.**   Honestly, I don't -- there was so many people on the phone
that I don't -- I don't remember any names.

**Q.**   Okay.   You remember that Ms. Priedeman, the U.S. Attorney,
was on the call?

**A.**   I remember my attorney and him saying "Molly."   I remember
Molly's name.

**Q.**   And also your former attorney, public defender?

**A.**   Yes.   Ms. Kim.

**Q.**   All right.   And did you think that any of them were going
to spread the word that this was taking place?

**A.**   The FBI isn't like federal correctional officers.

1    **Q.**    I'm sorry.  They're what?  They're not like --

2    **A.**    No.  Did I believe that they were going to go run and

3    spread the word to everybody that I just went and told them

4    what happened to me?

5    **Q.**    Yeah.

6    **A.**    No.

7    **Q.**    So you really didn't have any reason to be scared yet at

8    that point, did you, since this was all still kind of hush

9    hush?

10    **A.**    There was inmates that I confided into.

11    **Q.**    I'm sorry.  Say that again?

12    **A.**    There was inmates, a few of my friends, that I confided

13    into that I told about me and Garcia's relationship.

14    **Q.**    Had you told them that you were talking to the FBI?

15    **A.**    No.

16    **Q.**    All right.  So nothing changed as far as they were

17    concerned.

18    **A.**    The inmates?

19    **Q.**    Yeah.

20    **A.**    No.

21    **Q.**    And then you did a second interview a little over a week

22    later; right?

23    **A.**    I believe so.

24    **Q.**    And there was some new people involved in that interview?

25    **A.**    I just remember Ms. Molly and Katherine and Dena.

1    **Q.**   Okay.  That's Dena Crowe, FBI agent?

2    **A.**   I don't know her last name.

3    **Q.**   But did you think that anything had changed at the time of

4    that second meeting that made it more likely that someone was

5    going to be going to other inmates and saying, "Hey, Melissa's

6    a snitch"?

7    **A.**   I mean, that was within a week's period.  I remember when

8    Mr. Putnam and Ms. Strack transported me, and how they

9    transported me, an officer -- they came and got me from work,

10   and I guess an officer went into my room and got regular

11   clothes.

12       And when I was leaving behind the kitchen in camp, there

13   was an inmate that saw Ms. Strack and Mr. Putnam take me and

14   also -- the rumors started getting spread about that.

15       There was also another officer when I was walking back to

16   my unit one time, he had a book like this (indicating), and he

17   mentioned, "Yeah, I heard you went to go see the AUSA."  And,

18   you know, he's like, "Yeah, Strack and Ms. -- Putnam don't take

19   you on medical -- medical runs."

20       So when I got back to the unit, there was an inmate that

21   started making comments because it was on the news.  They were

22   making comments about me and Mr. Garcia.

23           **THE COURT:**  Mr. Reilly, are we good to stop here for

24   the day?

25           **MR. REILLY:**  Yes.  That's fine, Your Honor.  Thank

1    you.

2            **THE COURT:**  All right.

3        Ladies and Gentlemen, Members of the Jury, just a

4    reminder, the first page of your binder is there to remind you

5    what not to do.  So I will still give you this admonishment

6    today.

7        Until the trial is over, do not discuss this case with

8    anyone, including your fellow jurors, members of your family,

9    people involved in the trial, or anyone else.  Do not allow

10   others to discuss it with you through social media, any

11   electronic device.

12       Remember, no watching TV or listening to news accounts of

13   anything that's here.  There is no need for you to do it in any

14   event because you just spent all day doing that; right?  So you

15   have it, and you've got the best view in the house, so there's

16   nothing that you can learn from those media sources that you

17   don't already know.

18       A couple of other things.  What you're doing is hard work.

19   You're listening intently, and so I just suggest to you that if

20   you go home and you're feeling a little cranky, don't take it

21   out on your family.  You're just tired.  Just rest.  Get good

22   sleep, do your work, do whatever you need to do.  And we'll see

23   you tomorrow morning.  Okay?

24       Does anybody have any questions?  No?

25       Then we'll stand in recess until 8:30 tomorrow with the

1    jury.

2          (Proceedings were heard out of presence of the jury:)

3          **THE COURT:**  Okay.  Counsel, we will stand in recess

4    until 8:00 a.m. tomorrow.

5          **MR. REILLY:**  Thank you, Your Honor.

6          **MS. PRIEDEMAN:**  Thank you, **Your Honor.**

7                (Proceedings adjourned at 1:30 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

DATE:   Monday, November 28, 2022

*Pamela Batalo Hebel*

_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter