Kevin G. Little, SBN 149818
**LAW OFFICE OF KEVIN G. LITTLE**
Post Office Box 8656
Fresno, California 93747
Telephone:  (559) 342-5800
Facsimile:   (559) 242-2400
E-Mail: kevin@kevinglittle.com

Attorneys for Defendant
Ray J. Garcia

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.:  4:21-CR-00429-YGR |
| Plaintiff, | RAY J. GARCIA'S MOTION FOR NEW TRIAL; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES; SUPPORTING DECLARATION AND EXHIBITS |
| v. | [F.R.Cr.P. 33; Criminal Local Rule 47-2] |
| RAY J. GARCIA, | |
| Defendant. | Hearing:  March 15, 2023<br>Time: 2:00 p.m.<br>Courtroom: 1, 4th Floor<br>Oakland Federal Courthouse<br>1301 Clay Street, Oakland, CA 94612 |

TO THE HONORABLE COURT:

Defendant Ray Garcia, through his undersigned counsel and in accordance with Federal Rule of Criminal Procedure 33 and Northern District Criminal Local Rule 47-2, hereby makes this motion for a new trial.  This motion will be heard on March 15, 2023 at 2:00 p.m., or as soon thereafter as this matter may be heard, in the Oakland Federal Courthouse, located at 1301 Clay Street, Oakland, California 94612, in Courtroom 1, on the 4th Floor.  This motion will be based on the within memorandum of points and authorities, the accompanying declarations and exhibits, and any other evidence or argument that may be presented before this motion is submitted for decision, as well as the Court's record of this proceeding.

This motion seeks a new trial on three independent grounds:  (1) there was juror misconduct during deliberations that resulted in extrajudicial matters being considered by the jury, which resulted in

a violation of the defendant's rights to confrontation, a fair trial and due process; (2) defense counsel was impaired by a conflict of interest, which resulted in a denial of counsel and a structural error that requires a new trial; and (3) the defendant was denied his right to an unbiased judicial officer, which also constitutes a structural error requiring a new trial.

The defendant provides a proposed order reflecting the relief requested in his motion, as required by Northern District Criminal Local Rule  47-2, which incorporated Northern District Civil Local Rule 7.2(c).

MEMORANDUM OF POINTS AND AUTHORITIES

## I.      Procedural Background

A criminal complaint was filed initiating these proceedings on September 24, 2021.  DN 1.  The original indictment was filed on November 2, 2021, charging the defendant with two counts of sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b). DN 13.

On June 13, 2022, the Court set a November 30, 2022 trial date.  DN 38.

On July 5, 2022, the trial date was advanced to November 28, 2022.  DN 39.

On August 23, 2022, a Superseding Indictment was filed adding six additional counts: Count III, alleging a violation of 18 U.S.C. § 2244(a)(4); Count IV, alleging a violation of 1`8 U.S.C. § 2243(b); Count V, alleging a violation of 18 U.S.C. § 2244(a)(4); Count VI, alleging a violation of 18 U.S.C. § 2244(a)(4); Count VII, alleging a violation of 18 U.S.C. § 2244(a)(4); and Count VIII, alleging a violation of 18 U.S.C. § 1001(a)(2).  DN 40.

On November 8, 2022, trial was advanced to November 21, 2022.  DN 71.

At the conclusion of trial, on December 8, 2022, the defendant was found guilty as to all counts of the Superseding Indictment.  DN 111.

On December 13, 2022, the Court approved the substitution of the undersigned counsel for the defendant's trial counsel, James T. Reilly of Summit Defense.  DN 117.

The Court ordered the current post-trial briefing and sentencing briefing schedule on December 19, 2022.  DN 125.

## II.     Standard of Review

Federal Rule of Criminal Procedure 33 provides as follows:

(a) Defendant's Motion. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

(b) Time to File.

(1) Newly Discovered Evidence. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

(2) Other Grounds. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Federal Rule of Criminal Procedure 33 allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The burden of justifying a new trial rests with the defendant. *See United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986). The decision to grant a new trial is within the sound discretion of the trial court. *See United States v. Love*, 535 F.2d 1152, 1157 (9th Cir. 1976), *cert. denied*, 429 U.S. 847 (1976).

III.   Argument

A.   *The Verdict is Tainted by Prejudicial Juror Misconduct*

Shortly after the jury's verdict, the foreman, Simeon Meyer, submitted to an interview with a reporter from a television news station.  In that interview, Mr. Meyer not only revealed that extrinsic matters were discussed and considered during deliberations, but also indicated that they helped the jury reach unanimous verdicts.  A defendant in a criminal case is entitled to a jury that reaches a verdict only on the basis of evidence produced at trial. *Turner v. Louisiana*, 379 U.S. 466 (1965); *Estrada v. Scribner*, 512 F.3d 1227, 1238 (9th Cir. 2008); *Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006). When the jury considers extraneous or extrinsic facts not introduced in evidence, a defendant has effectively lost his Sixth Amendment rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence. *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995).

Specifically, Mr. Meyer told the reporter that he was "moved by [the female jurors'] stories as mothers and daughters"  *See* Exhibit A, KTVU news article, *Dublin Prison Warden Sex Abuse Trial: How the Jury Came to its Guilty Verdict*, published December 9, 2022, page 2.  Myer further stated that "an elderly female juror brought her own personal stories as 'touching examples of humanity.'" *Id*. Mr. Meyer

1   also stated that there was an initial division in the jury.  *Id*. at p. 3.  A new trial is required where, as here,

2   "a reasonable possibility that the extrinsic material could have affected the verdict." *United States v. Mills*,

3   280 F.3d 915, 921 (9th Cir. 2002).

4       At minimum, an evidentiary hearing is required.  When presented with an allegation of juror

5   misconduct, a trial court should ordinarily hold an evidentiary hearing to hear admissible juror testimony

6   and determine the precise nature of the extraneous information. *United States v. Ruiz Montes*, 628 F.3d

7   1183, 1186 (9th Cir. 2011). An evidentiary hearing is required unless the court is able to determine

8   without a hearing that the allegations if true would not warrant a new trial. *United States v. Navarro–*

9   *Garcia*, 926 F.2d 818, 822 (9th Cir. 1991).  A news article that reveals potential misconduct, rather than

10  deliberation information barred by Federal Rule of Evidence 606(b),[1] may be considered in assessing

11  juror misconduct.  *See United States v. Febus*, 218 F.3d 784, 795 (7th Cir. 1999)(refusing to consider

12  news article because it concerned the jurors' deliberations and did not suggest extraneous influences);

13  *United States v. Gurry*, 427 F.Supp.3d 166, 176 n. 1 (D. Mass. 2019) (same); *United States v. Tin Yat*

14  *Chin*, 275 F.Supp.2d 382, 384 (E.D. N.Y. 2003)(considering article, but finding no proof of

15  misconduct).

16      Exhibit A is currently the only available evidence suggesting juror misconduct, but defendant

17  submits that is alone sufficient to warrant an evidentiary hearing.  None of the jurors agreed to be

18  interviewed voluntarily, and KTVU destroyed the raw footage of Mr. Meyer's post-verdict interview.

19  *See* Declaration of Kevin G. Little, ¶¶ 3-4; Exhibit B, KTVU Certification of Destruction of Records.

20      *B.  Because Trial Counsel Was Plagued by An Actual Conflict of Interest Prejudice is Presumed*

21      Trial counsel called one witness, the defendant himself.  Counsel presented two exhibits, one

22  provided by the defendant himself during trial and a diagram of FCI Dublin he received in discovery

23  from the prosecution.  *See* Exhibit C, Declaration of Ray J. Garcia, ¶ 10.  Counsel did not identify any

24  witnesses or exhibits by the deadlines set by the Court.  *Id*., ¶ 4. Counsel did not follow up with any of

25  the witnesses identified by the defendant in a sufficient time and manner to permit them to testify at

26  trial, although they had important knowledge that did not otherwise make it into the trial record.  *Id*., ¶¶

27

28      ─────────────────
      [1] Rule 606(b) excludes evidence pertaining only to the jury's deliberative process, but not proof of the jury's access to extraneous prejudicial information.

3, 8; Exhibit D, Declaration of Daniel Flint, ¶¶ 3-9.  Trial counsel did not even meet with the defendant to prepare him to testify, instead sending him a hastily composed e-mail in the wee hours of the morning the same day the defendant was scheduled to testify.  *See* Exhibit C, ¶ 7.  Trial counsel never sent the prosecution any discovery request.  *Id*., ¶ 3.  Trial counsel never met with the defendant to review the discovery, including any information that had been extracted from his electronic devices.  Id.., ¶ 5. Trial counsel only met with the defendant relatively briefly before, during or after court proceedings in the courthouse.  *Id*., ¶ 6.

There was a clear explanation for trial counsel's inaction and lack of preparation:  the less he did, the more he and his firm made.  Defense counsel's flat fee trial retainer provided for the same pay no matter how hard or not so hard he worked.  *See* Exhibits E and F, Defendant's Retainer Agreements with Summit Defense.  The facts at hand show that, at least in this instance, the flat fee financial arrangement trial counsel had provided a perverse incentive and created an actual conflict of interest.

The Sixth Amendment right to counsel includes a correlative right to representation free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271 (1981).  When there is proof of an actual conflict of interest that adversely impacted trial counsel's performance, prejudice is presumed and a new trial is required.  *Cuyler v. Sullivan*, 446 U.S. 335, 348-350 (1980).  "Under Supreme Court precedent, [a defendant] needs only to meet the lower standard of showing that the `attorney's behavior seem[ed] to have been influenced' by the conflict." *Lockhart v. Terhune*, 250 F.3d 1223, 1231 (9th Cir. 2001)

Regarding the conflict issue with his trial attorney, once the defendant has proved (1) an actual conflict, and (2) a negative effect upon the representation, prejudice is presumed and a probable effect on the outcome of the trial need not be shown. *Cuyler v. Sullivan*, 446 U.S. at 350 (1980); *Mickens v. Taylor*, 535 U.S. 162, 172 (2002). To show an "adverse effect," the defendant need only show that "some effect on counsel's handling of particular aspects of the trial was likely."  *United States v. Walter-Eze,* 869 F.3d 891, 901 (9th Cir. 2017). It is enough to show that as a likely result of the conflict, "counsel failed to put on certain defenses and witnesses…[or] failed to explore the possibility of a plea agreement." *Id*. Moreover, because prejudice need not be shown, "the strength of the prosecution's case is not relevant to whether counsel's performance was adversely affected." *Id*.

The defendant recognizes that in this Circuit claims of ineffective assistance of counsel normally

must be raised in a motion under 28 U.S.C. § 2255.  *See United States v. Hanoum*, 33 F.3d 1128, 1130-31 (9th Cir. 1994); *United States v. Ross*, 206 F.3d 896, 900 (9th Cir. 2000). However, *Hanoum* did not foreclose the granting of a new trial on *Cuyler* grounds where, as here the record permits a determination within the parameters of a new trial motion. *See United States v. McKenna*, 327 F.3d 830, 845 (9th Cir. 2003); *United States. v. Jeronimo*, 398 F.3d 1149, 1155 (9th Cir. 2005) (holding that deferring IAC claims until collateral review is just a general rule).

Accordingly, because the obvious record of trial counsel's failures is so suggestive of his conflict of interest, the defendant is entitled to a new trial.  At minimum, a hearing should be held if any further record development or disputed facts arise before the hearing.

C.     *The Record is Replete With Perceptible Microaggressions Demonstrating Implicit Bias*

Jurors tend to be significantly predisposed against defendants charged with sexual offenses, making it more difficult for them to receive fair trials. *Cf. Coy v. Iowa*, 487 U.S. 1012, 1020-1021 (1988). In this case, that recognized dynamic was compounded by subtle, yet perceptible expressions of implicit bias, in the form of perceptible microaggressions against the defendant and his counsel at the outset of the defendant's testimony. While the Court was more than pleasant with jurors and prosecution witnesses, it became obvious once the defense case began that similar accommodations would not be extended.

As one of many examples, at the outset of the testimonies of other witnesses, the Court politely asked if testifying persons were comfortable removing their masks.  *See* RT 572:5-7 and 1245:24-1246:4.  However, Mr. Garcia was told, "take off that mask so the parties -- or the jury can see your face." RT 881:9-10.  This was also immediately after the Court stated in front of the jury, "Let's get going.  I'm not wasting time… On the stand." RT 880:24-881:1.  The Court also made unnecessarily critical remarks early in the defendant's testimony, in front of the jury.  *See* RT 899:19-21 ("Mr. Reilly, we need to hear it from him. I know you've got a plan in place, but I want the words from him, not you.").  Additional examples are contained in the compendium attached hereto as Exhibit G.

It is now well established that hostility and favoritism can be expressed in the form of microaggressions or microaffirmations.  *See* R. Rini, *The Ethics of Microaggression*, (Routledge 2021).  While implicit and likely unintentional, the obvious difference in the treatment of the defendant via á vis

the other trial participants very probably made the defendant's disfavored status clear.

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Indeed, the "legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship." *Mistretta v. United States*, 488 U.S. 361, 407 (1989). "The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Caperton v. A.T. Massey Coal Co*., 556 U.S. 868, 873 (2009).  A claimant need not prove actual bias to make out a due process violation. *Johnson v. Mississippi*, 403 U.S. 212, 215 (1971).  A reviewing court may order a new trial if the records establishes "an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality." *United States v. Mostella*, 802 F.2d 358, 361 (9th Cir. 1986); *United States v. Morgan*, 376 F.3d 1002, 1006-1007 (9th Cir. 2004)

Because judicial bias constitutes a structural error, a new trial is further warranted.

For all these reasons, the defendant submits he is entitled to a new trial.

Dated:  February 2, 2023

/s/ Kevin G. Little
Kevin G. Little
Counsel for Defendant
Ray J. Garcia

**<u>Declaration of Kevin G. Little</u>**

The undersigned, Kevin G. Little, hereby declares as follows:

1.    I am the attorney of record for the defendant, Ray J. Garcia, having been approved to substitute for former counsel James T. Reilly on December 13, 2022.

2.    Attached are true and correct copies of the following exhibits:  A - KTVU news article, *Dublin Prison Warden Sex Abuse Trial: How the Jury Came to its Guilty Verdict*, published December 9, 2022; B – KTVU Certification of Destruction of Records; C- Declaration of Ray Garcia; D – Declaration of Daniel Flint; E – Defendant's Pre-Filing Retainer with Summit Defense; F – Defendant's Trial Retainer with Summit Defense; G – Compendium of Record Comments During the Testimony of Defendant.

3.    My staff and I attempted to contact the trial jurors and interview them, and we were unable to interview any jurors.

4.    If called as a witness in this matter, I could truthfully and competently testify to the foregoing.

Sworn under penalty of perjury under the laws of the United States on February 2, 2023, in Fresno, California.


*/s/ Kevin G. Little*
Kevin G. Little

# EXHIBIT A

**Watch Live**

# Dublin prison warden sex abuse trial: How the jury came to its guilty verdict

By Lisa Fernandez | Published December 9, 2022 | Updated 12:21PM | Dublin prison | KTVU FOX 2 |

**Ex-warden of Bay Area women's prison convicted of sex abuse**

Ray Garcia, the former warden of the federal women's prison in Dublin, was convicted of eight counts of sexual abuse and lying to the FBI. Women held in the prison testified that Garcia fondled them, took nude photos and other acts of misconduct.

**OAKLAND, Calif.** - A jury of 10 men and two women found Ray J. Garcia – the former warden of the all-women's Federal Correctional Institute at Dublin – guilty of eight counts of sex abuse and lying to the FBI.

Garcia is the highest ranking U.S. Bureau of Prisons official to be convicted of such crimes, according to the Department of Justice.

The trial, held in U.S. District Court in Oakland, lasted seven days. The jury deliberated for about 14 hours over three days.

In an exclusive interview, Simeon Meyer of San Francisco – the jury foreman – shared his opinions on the case and broke down how he and his peers came to their decision on Thursday just before noon.

## Who was on the jury?

At first, Meyer said he didn't even notice there was a preponderance of men on the jury.

12/19/22, 6:07 PM
Case 4:21-cr-00429-YGR Document 135-3 Filed 02/02/23 Page 11 of 38
Dublin prison sex abuse trial: How the jury came to its guilty verdict

It wasn't until one of the two female jurors spoke up about the gender inequity that made him realize how "odd" it was.

Looking back, Meyer said he wished there had been more women on the panel, as he was moved by their stories as mothers and daughters.

Meyer is the controller for the Chalet Restaurant Group. He said some of the other jurors are chemists, accountants, corporate executives and tech employees. One juror is a newly documented citizen.

Each brought a unique perspective to the case, Meyer said, and often used their careers as the basis to forming their opinions.

For instance, a female corporate executive noticed how broken the federal prison system is from a business perspective.

An elderly female juror brought her own personal stories and "touching examples of humanity," Meyer said.

**Ex-FCI Dublin prison warden dodges questions on sex abuse allegations**
Former FCI Dublin prison warden Ray Garcia dodged questions from KTVU's Evan Sernoffsky while leaving court.

## What did you think of Ray Garcia?

Meyer said he thought the former warden was "arrogant" and full of "hubris." He said none of the jury believed the inconsistencies in his stories and he could tell that this was a classic "abuse of power" case.

One comment that Garcia made stood out to Meyer and the rest of the jurors that seemed especially out of line.

"I have plenty of pictures I can use for arousal of free women I can see any day of the week," Garcia said angrily under cross-examination. "I do not need a picture of an inmate to arouse me."

The reason the jury deliberated over three days, Meyer said, because at first, there were two male "holdouts."

Everyone else thought Garcia was guilty at the start of deliberations. But the two men were only about "80 to 90%" there on the first day, Meyer said.

Those two wanted to methodically go through the counts to make sure that Garcia actually digitally penetrated one of the victims, Melissa, in the bathroom – as opposed to some of the other counts, which alleged a more general, "abusive sexual contact."

"Two people needed to be convinced on the sexual act charge vs. the sexual contact charge," Meyer said. "We needed to come together to really discuss it."

One of those jurors - a new citizen to the United States -- also wanted to weigh Garcia's long, 30-year career with the BOP as a factor in his decision.

In the end, though, Meyer said these two jurors playing devil's advocates just made for a more thorough deliberation.

## What did you think of the women who testified?

Meyer said the women were completely believable, and even though Garcia's defense painted them as convicted felons with reasons to lie, that thought never crossed the jury's mind.

The jury believed that the women who testified had all been sexually assaulted and they were moved by the stories the women told of being retaliated against for speaking out.

Meyer said Melissa, the first witness, was especially compelling as she told of how Garcia instructed her to get naked on all fours on a friend's bed and then insert a candy cane into her vagina.

She then teared up telling the jury how her life inside prison has been hell since coming forward with her story.

A young male juror and an Indian woman kept asking their peers: What motivation would Melissa and the others have to lie?

## How did you feel looking at so many explicit photos?

Attorneys told the jury that Garcia has "hundreds" of photos of his penis – at least one with semen coming out – on his prison-issued cell phone.

There were also naked photos of Melissa on all fours in a cell room, and screenshots of a victim named Rachel during a naked video chat with Garcia that she didn't know were being taken.

Meyer said that the jury was only shown two of the warden's penis photos and the naked pictures of Melissa and Rachel.

"We definitely saw dick pics," he said.

Only the jury was shown these pictures and no one in the gallery was allowed to see them to protect the women's dignity. Meyer said the jury was not shown the semen photo.

While Meyer said seeing these pictures was important, he didn't like seeing them up for so long on the computer in his jury box.

He said he got uncomfortable and had to put a notebook up to block the view at times.

No one giggled over the photos in deliberations, Meyer said, adding that everyone acted seriously while discussing them.

**Powerless in Prison: Surviving Sex Abuse**
Over the course of eight months, KTVU has spoken with more than three dozen women who say they have been sexually assaulted or witnessed such abuse at FCI Dublin. Many who spoke up were retaliated against.

## What did you think of the prosecution's star rebuttal witness?

During trial, several women and the prison psychologist testified that Garcia often bragged he wouldn't be investigated because the head of the Special Investigative Services – Lt. Stephen Putnam – was his best friend of 23 years.

So when Putnam was called to testify as the prosecution's rebuttal witness, Meyer said he expected Putnam to vouch for Garcia.

That didn't happen.

"We thought him to be a buddy and have his back," Meyer said. "But he didn't."

Putnam shot down all of Garcia's claims, including the fact that it's never OK to take a picture of a naked woman and it's not the job of the warden to develop confidential informants.

The jury took notice of Putnam's testimony, Meyer said.

## What did you think of the prosecutors?

Meyer said he liked Asst. U.S. Attorneys Mollie Priedeman and Andrew Paulson.

"They were fantastic," he said. "They did a really good job."

Case 4:21-cr-00429-YGR  Document 135  Filed 02/02/23  Page 15 of 38

He said they were both methodical in showing how Garcia had a pattern of grooming women before sexually abusing them.

And he said he especially liked their closing arguments and how they pointed out how ridiculous Garcia's explanations were.

## What did you think of the defense?

Meyer said he thought defense attorney James Reilly "did a really poor job."

He said he and the other jurors did not like how Reilly tried to paint the women as lying convicted felons and how he "treated them with impunity."

Meyer said he felt Reilly also badgered the witnesses and had a general "lack of direction."

He said he scribbled all sorts of comments to himself about Reilly's treatment of the women on the edges of the 65 pages of notes he took during trial.

## What did you think of the judge?

Meyer said everyone liked Judge Yvonne Gonzales Rogers and how she ran her courtroom.

"She was awesome," Meyer said. "I liked her demeanor and her fairness."

## How did you spend seven days with strangers since you couldn't talk about the case?

Meyer said it was difficult to spend a week with people he didn't know and not be able to talk about the one thing that was bonding them together – the trial.

"We were pretty quiet," he said. "It was a little awkward."

Once in a while, someone might ask about golf during the breaks, he said.

Despite the jurors being strangers, though, Meyer said he was very proud of how they worked together and ended up coming to a unanimous decision, especially since there was such "heavy testimony" to consider.

*Lisa Fernandez is a reporter for KTVU. Email Lisa at lisa.fernandez@fox.com or call her at 510-874-0139. Or follow her on Twitter @ljfernandez*



This material may not be published, broadcast, rewritten, or redistributed. ©2022 FOX Television Stations

# EXHIBIT B

## DECLARATION OF CUSTODIAN OF RECORDS

I, STEVE PATTERSON, declare as follows:

1. I am the duly authorized Custodian of Records of KTVU News.  I have personal knowledge of the matters herein and, if called upon as a witness, I could and would testify thereto.

2. No copies of records are transmitted herewith because Fox Television Stations, LLC's station KTVU has, to the best of its knowledge, no materials responsive to the subpoena served upon it in connection with the case entitled USA v. Garcia, Case No. 4:21-cr-00429-YGR, seeking a copy of unbroadcast footage relating to interviews with jurors in this case.

I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 3rd day of JAN , 2023, in Oakland, California.

_____
Steve Patterson

# EXHIBIT C

1  Kevin G. Little, SBN 149818
   **LAW OFFICE OF KEVIN G. LITTLE**
2  Post Office Box 8656
   Fresno, California 93747
3  Telephone:  (559) 342-5800
   Facsimile:   (559) 242-2400
4  E-Mail: kevin@kevinglittle.com

5  Attorneys for Defendant
   Ray J. Garcia
6

7

8              IN THE UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,               CASE NO.:  4:21-CR-00429-YGR

12                        Plaintiff,        DECLARATION OF RAY J. GARCIA

13            v.

14  RAY J. GARCIA,

15                        Defendant.

16

17        The undersigned, Ray J. Garcia, hereby declares as follows:

18        1.      I am the defendant in this proceeding.

19        2.      The Attached Exhibits E and F are the flat fee agreements I had with Summit Defense.

20        3.      Despite my repeated requests of my counsel, Mr. James T. Reilly, to seek discovery and

21  interview potentially favorable witnesses, he never requested any discovery from the prosecution.  He

22  also did not follow-through with any witnesses who were willing to testify on my behalf and make the

23  necessary arrangements for them to come to court and testify.  Indeed, Mr. Reilly did not even begin

24  having an investigator attempt to contact witness until a couple of months before trial, although the

25  deadline for disclosing witnesses was September 27, 2022.

26        4.      The only substantive documents Mr. Reilly filed on my behalf were a few in limine related

27  pleadings (DN 46, 60-62).  Mr. Reilly filed no witness list, no exhibit list, and he submitted no exhibits

28  before trial.

DECLARATION OF RAY GARCIA                    1

5.    Mr. Reilly never met with me in his office to review the discovery provided by the prosecution.  He also never went over with me the information that had been extracted from my electronic devices.

6.    My interaction with Mr. Reilly was limited to relatively brief chats before, during or after court proceedings, and our conversations would take place right in the courthouse.

7.    Mr. Reilly never met with me to go over the details of my anticipated testimony.  He instead emailed me some notes early in the morning of the day I took the stand.

8.    Despite my telling him numerous times about the voluntary and inappropriate sexual-type misconduct female inmates initiate, Mr. Reilly requested no documentation of these incidents, nor did he call any witnesses who could have testified as to this matter.

9.    By the time I realized exactly how unprepared Mr. Reilly was, my case was already on the verge of trial.  Mr. Reilly typically professed to be ready to proceed and represent me well, which did not turn out to be true.

10.    The only exhibits Mr. Reilly ultimately used at trial was a diagram provided by the prosecution and a photo I brought to his attention during the trial.

11.    If called as a witness, I could truthfully incompetently testify to the foregoing under oath.

Sworn under penalty of perjury under the laws of the United States of America, this 2nd day of February 2023.

_____
/Ray Garcia

# EXHIBIT D

KEVIN G. LITTLE, SBN 149818
**LAW OFFICE OF KEVIN G. LITTLE**
Post Office Box 8656
Fresno, California 93747
Telephone: (559) 342-5800
Facsimile: (559) 242-2400
E-Mail: kevin@kevinglittle.com

Attorneys for Defendant
Ray J. Garcia

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>RAY J. GARCIA,<br><br>                    Defendant. | CASE NO.: 4:21-CR-00429-YGR<br><br>DECLARATION OF DANIEL FLINT |

The undersigned, Daniel Flint, hereby declares as follows:

1.      I am retired from the Federal Bureau of Prisons. I worked for the Bureau of Prisons for 27 years, starting out as a correctional officer, and eventually retiring as an Associate Warden in 2017. During my career, I worked several years in a women's facility, specifically the female prison camp on the campus of FCC Victorville.  I worked at several BOP facilities during my career.

2.      I currently reside in the Phoenix, Arizona area.

3.      If called as a witness in Mr. Garcia's case, I could have testified that facility wardens, and other members of a facility's Executive Staff are closely monitored when they move about in the facility, since line staff make it their business to know when Executive Staff members are approaching their work areas. It is therefore unlikely that Mr. Garcia could have gone anywhere in the FCI Dublin facility without staff members being aware and, once he got to a particular housing unit, in his immediate presence.  There would also be an electronic security trail documenting the travel of

DECLARATION OF DANIEL FLINT                    1

Executive Staff through the facility.

4.      It is well-known within the Bureau of Prisons, that female inmates, like their male counterparts, engage in voluntary inappropriate displays of their bodies and other sexual-type misconduct. There can be a variety of reasons for this behavior, including attempting to manipulate staff. This practice is so widespread that it even has a nickname — gunning.  It would simply be incorrect for anyone to believe that a female inmate depicted in an inappropriate manner would necessarily have been victimized.

5.      If called is a witness, I could have testified in detail from my many years of experience in the Bureau of Prisons regarding voluntary, aggressive, sexual type, misconduct, engaged in by female inmates. Even if there may be photographs showing that a staff member depicted an inmate in a sexual tight pose, that hardly means that the staff member somehow coerced the inmate to be in that position.

6.      I could have also testified that, based on my working with Mr. Garcia conducting numerous training programs at facilities throughout the BOP nationwide for about 10 years, he was well known for trying to recruit inmates as sources.

7.      In approximately late November, I was contacted by a defense investigator, Mr. Kohler, who spoke with me for about 30 minutes, but there was no follow-up regarding whether or not I would be needed to testify.  I provided Mr. Kohler with the information outlined in the foregoing paragraphs.

8.      A week or so later, during Mr. Garcia's trial, I happened to be vacationing with my wife in the State of California. I have no reason to believe that anyone associated with Mr. Garcia's defense team knew for a fact that I was in California at the time instead of being in my home State of Arizona.

9.      Out of the blue, I received a phone call from Mr. Kohler asking me if I could be in federal court in Oakland at 8 AM the next day. At the time I was in Southern California, several hours away from the Oakland area. While I expressed a concern about never having talked with the attorney about my anticipated testimony, and not having any court-appropriate clothing with me, I nonetheless agreed to travel to Oakland and testify. However, without any explanation for the sudden change of position, I was informed in a terse follow-up call a few minutes later that I would not be needed after all.

10.      If called as a witness, I could truthfully incompetently testify to the foregoing under oath.

Sworn under penalty of perjury under the laws of the United States of America, this 2nd day of February 2023.

Daniel Flint

# EXHIBIT E



**2570 N. 1st Street, 2nd Fl ● San Jose, CA 95131**
**Phone (408) 333-9622 ● Fax (510) 439-2855**

**Offices: San Francisco, San Jose, Oakland,**
**Burlingame, Redwood City, San Rafael**

Client:     Ray Garcia                                    Cell  (_____) _____

Client retains Summit Defense, PLC, (Law Firm) for representation in Client's legal matter.  By entering into this agreement, Client agrees to pay Law Firm a flat fee retainer.  The Law Firm does not charge on an hourly basis.  The fee arrangement for representation will be:

FLAT FEE RETAINER PAYMENT.......................................... $   5000 _____     Initials > (_____RG_____)

due _____    $_____     Initials > (_____)

LEGAL SERVICES TO BE PROVIDED

Entire Case.............................................................    $_____     Initials > (_____)

Misdemeanor ......................................................    $_____     Initials > (_____)

Felony, through Preliminary Hearing ......................    $_____     Initials > (_____)

Federal Court ......................................................    $_____     Initials > (_____DS_____)

Prefile………    Please see special notes section (page 2)    $   5000 _____     Initials > (_____RG_____)

Other………. .....................................................    $_____     Initials > (_____)

OUTCOME – The Law Firm shall use its best efforts for Client, who has been informed that there are no guarantees as to the ultimate outcome of the client's case.                                                                                     Initials > (_____RG_____)

~~ENTIRE CASE RETAINER~~ – If Client wishes to pay for the entirety of the case, without the possibility of additional fees, then be certain that the box "Entire Case" is initialed.   That means Client will not pay additional legal fees for Law Firm's representation unless there is a retrial or an appeal.  Other than these two exceptions, Client has paid in total for the case, excluding costs.  If the case is settled and/or resolved, the Law Firm has earned the retainer fee.                                                  ~~Initials~~ > (_____)

SETTLED CASE – The Law Firm is under a duty to use its best efforts to resolve Client's case.  Client acknowledges that Client has been informed that if the Law Firm can resolve Client's case, then the Law Firm has earned the entire retainer fee.  Even if the case is settled, dismissed, not filed or for any reason resolved prior to trial, nonetheless the Law Firm has earned the entire flat fee retainer. Likewise, if the case takes more time than the Law Firm originally estimated, Client will not be charged additional fees.     Initials > (_____RG_____)

~~PORTIONS OF TOTAL CASE~~ – In order to keep the legal fees as low as possible, Client has asked the Law Firm to provide legal services on the case in stages.  The retainer fee does not cover the entire case.  It covers only that portion of the case as stated.  The Law Firm's representation in this portion of Client's case may resolve the case.  It is also possible that Client's Firm is not bound to represent Client beyond the point in the case for which Client has paid.  If Client fails to pay the Law Firm the additional fees required for the next stage of the case, then Client agrees that the Law Firm will not be required to further represent Client.

~~Initials~~ > (_____)

OTHER ATTORNEYS – Client expressly agrees that he or she is retaining the Firm and not any particular attorney.   At no additional cost to Client the Law Firm may have more than one Attorney work on Client's case and assign attorneys as lead attorneys in client's case.                                                                                     Initials > (_____RG_____)

RETRIAL OR HUNG JURY – This agreement does not include retrials. If Client's case results in a hung jury, mistrial or other decision wherein the case must be retried, the Law Firm will require an additional retainer fee. In most instances, this fee is not as much as the first fee because the Law Firm has already prepared Client's case.

Initials > (_____)

APPEAL – This retainer does not include appeals, writs or other appellate work.

Initials > (_____)

 ADVISEMENT UNDER STATE BAR RULE 1.15 – Please be advised that funds received or held by a lawyer or law firm for the benefit of a client, including advances for fees, costs and expenses, shall be deposited in one or more identifiable bank accounts labeled "Trust Account" or words of similar import, maintained in the State of California, or, with written consent of the client, in any other jurisdiction where there is a substantial relationship between the client or the client's business and the other jurisdiction.
Client has been advised that fees paid for services will be deposited into Firm's operating account. Client acknowledges his or her right to require that flat fee funds be deposited into client trust account until portions of the fee are earned. Notwithstanding this paragraph, client is advised that any unearned fees will be refunded to client. Firm will place any payment meant to cover <u>costs</u> incurred into client's trust account. Where the flat fee exceeds $1,000, the California Rules of Professional Conduct requires that client's agreement to deposit fees in Firm's operating account is set forth in writing and signed by client.

Initials > (_____)

COSTS – The legal fees agreed to above are Attorney's fees only. They are not for the payment of any costs or expenses necessary in Client's case. Costs can include, but are not limited to: investigators, expert witnesses, evidence analysis, physical exhibits, presentation materials and other expenses related to preparation for trial. Client agrees that all costs will be paid by Client, not by the Law Firm.

Initials > (_____)

Special Notes Pertaining to Client's Legal Matter:

_____

Firm to utilize best efforts to prevent filing of criminal charges.

Initials > (_____)

Please read this agreement carefully. It is important that our agreement be totally complete and that Client understands everything before signing. <u>If Client has any questions regarding this agreement, now is the time to ask.</u> When Client signs this agreement, it will be concluded that Client completely understands it.

Client is advised that if the fee is paid by someone other than Client, there is a potential conflict of interest. However, such payment by a third party will not interfere with the independence of the Law Firm's professional judgment and it will not affect the confidentiality of communications from the Client to the Law Firm. By Client's signature below, Client agrees to allow the Law Firm to represent Client with the fee being paid by a third party.

Although any information that Client has shared with the Law Firm will remain confidential, the Attorney-Client relationship will not begin until an Attorney on behalf of the Law Firm indicates acceptance of Client's case by a signature below.

<u>ACCEPTED AND AGREED</u>

SUMMIT DEFENSE, PLC

Ray Garcia

Client's Printed Name

x_____     9/27/2021
Client's Signature                        Date

By: _____   9/27/2021     By:_____     _____
                                 Date              (If other than Client)           Date

# EXHIBIT F



2570 N. 1st Street, 2nd Fl  ●  San Jose, CA  95131
Phone (408) 333-9622  ●  Fax (510) 439-2855

Offices:  San Francisco, San Jose, Oakland,
Burlingame, Redwood City, San Rafael

Client: _____Ray Garcia_____     Cell   (_____) _____

Client retains Summit Defense, PLC, (Law Firm) for representation in Client's legal matter.  By entering into this agreement, Client agrees to pay Law Firm a flat fee retainer.  The Law Firm does not charge on an hourly basis.  The fee arrangement for representation will be:

FLAT FEE RETAINER PAYMENT..........................................  $_____     Initials > (___RG___)

due  see payment schedule for details for 10/25/2022     $ 30,000     Initials > (___RG___)
     by November 28th, 2022                              $ 30,000

LEGAL SERVICES TO BE PROVIDED

Entire Case.................................................................  $_____     Initials > (_____)

Misdemeanor .............................................................  $_____     Initials > (_____)

Felony, through Preliminary Hearing .........................  $_____     Initials > (_____)

Federal Court .............................................................  $_____     Initials > (_____)

Prefile……… .............................................................  $_____     Initials > (___RG___)

Other…………. trial.................................................  $___60,000_____     Initials > (___RG___)

OUTCOME – The Law Firm shall use its best efforts for Client, who has been informed that there are no guarantees as to the ultimate outcome of the client's case.                                      Initials > (___RG___)

ENTIRE CASE RETAINER – If Client wishes to pay for the entirety of the case, without the possibility of additional fees, then be certain that the box "Entire Case" is initialed.   That means Client will not pay additional legal fees for Law Firm's representation unless there is a retrial or an appeal.  Other than these two exceptions, Client has paid in total for the case, excluding costs.  If the case is settled and/or resolved, the Law Firm has earned the retainer fee.                     Initials > (___RG___)

SETTLED CASE – The Law Firm is under a duty to use its best efforts to resolve Client's case.  Client acknowledges that Client has been informed that if the Law Firm can resolve Client's case, then the Law Firm has earned the entire retainer fee.  Even if the case is settled, dismissed, not filed or for any reason resolved prior to trial, nonetheless the Law Firm has earned the entire flat fee retainer.  Likewise, if the case takes more time than the Law Firm originally estimated, Client will not be charged additional fees.
                                                          Initials > (___RG___)

~~PORTIONS OF TOTAL CASE~~ – In order to keep the legal fees as low as possible, Client has asked the Law Firm to provide legal services on the case in stages.  The retainer fee does not cover the entire case.  It covers only that portion of the case as stated.  The Law Firm's representation in this portion of Client's case may resolve the case.  It is also possible that Client's Firm is not bound to represent Client beyond the point in the case for which Client has paid.  If Client fails to pay the Law Firm the additional fees required for the next stage of the case, then Client agrees that the Law Firm will not be required to further represent Client.
                                                          ~~Initials~~ > (_____)

OTHER ATTORNEYS – Client expressly agrees that he or she is retaining the Firm and not any particular attorney.   At no additional cost to Client the Law Firm may have more than one Attorney work on Client's case and assign attorneys as lead attorneys in client's case.
                                                          Initials > (___RG___)

<u>RETRIAL OR HUNG JURY</u> – This agreement does not include retrials. If Client's case results in a hung jury, mistrial or other decision wherein the case must be retried, the Law Firm will require an additional retainer fee. In most instances, this fee is not as much as the first fee because the Law Firm has already prepared Client's case.

Initials > ( _RG_ )

<u>APPEAL</u> – This retainer does not include appeals, writs or other appellate work.

Initials > ( _RG_ )

<u>ADVISEMENT UNDER STATE BAR RULE 1.15</u> – Please be advised that funds received or held by a lawyer or law firm for the benefit of a client, including advances for fees, costs and expenses, shall be deposited in one or more identifiable bank accounts labeled "Trust Account" or words of similar import, maintained in the State of California, or, with written consent of the client, in any other jurisdiction where there is a substantial relationship between the client or the client's business and the other jurisdiction. Client has been advised that fees paid for services will be deposited into Firm's operating account. Client acknowledges his or her right to require that flat fee funds be deposited into client trust account until portions of the fee are earned. Notwithstanding this paragraph, client is advised that any unearned fees will be refunded to client. Firm will place any payment meant to cover <u>costs</u> incurred into client's trust account. Where the flat fee exceeds $1,000, the California Rules of Professional Conduct requires that client's agreement to deposit fees in Firm's operating account is set forth in writing and signed by client.

Initials > ( _RG_ )

<u>COSTS</u> – The legal fees agreed to above are Attorney's fees only. They are not for the payment of any costs or expenses necessary in Client's case. Costs can include, but are not limited to: investigators, expert witnesses, evidence analysis, physical exhibits, presentation materials and other expenses related to preparation for trial. Client agrees that all costs will be paid by Client not by the Law Firm.

Initials > ( _RG_ )

Special Notes Pertaining to Client's Legal Matter:

_____

_____

Initials > ( _____ )

Please read this agreement carefully. It is important that our agreement be totally complete and that Client understands everything before signing. <u>If Client has any questions regarding this agreement, now is the time to ask.</u> When Client signs this agreement, it will be concluded that Client completely understands it.

Client is advised that if the fee is paid by someone other than Client, there is a potential conflict of interest. However, such payment by a third party will not interfere with the independence of the Law Firm's professional judgment and it will not affect the confidentiality of communications from the Client to the Law Firm. By Client's signature below, Client agrees to allow the Law Firm to represent Client with the fee being paid by a third party.

Although any information that Client has shared with the Law Firm will remain confidential, the Attorney-Client relationship will not begin until an Attorney on behalf of the Law Firm indicates acceptance of Client's case by a signature below.

<u>**ACCEPTED AND AGREED**</u>

SUMMIT DEFENSE, PLC

Ray Garcia
Client's Printed Name

x _Ray Garcia_ _____  10/25/2022
Client's Signature                                    Date

By: _____   10/25/2022
Date

By: _____   _____
(If other than Client)                          Date

Page 2 of 2

# EXHIBIT G

| | | |
|---|---|---|
| | | THE WITNESS: Sorry, Your Honor.<br><br>THE COURT: Try again. |
| | 1026:9-11 | Q. So maybe November or thereabouts of 2020?<br><br>THE COURT: Again, I need to hear it from him. An open-ended question, Mr. Reilly. |
| | 1081:15-21 | MS. PRIEDEMAN: Ms. Slattery, can you please zoom in on Mr. Garcia's reflection in the window.<br><br>Q. You don't look surprised in this picture, do you?<br><br>MR. REILLY: Objection. Argumentive. Also calls for conclusion.<br><br>THE COURT: I don't know that you can answer it, but you can try if you can. You can try if you can. |
| | 1100:1-9 | Q. So this incident report, that would have been the first incident report you had ever written. It also would have been the first incident report that Melissa ever would have received; right?<br><br>MR. REILLY: Objection, Your Honor. Assumes facts not in evidence and misstates the witness' testimony.<br><br>THE COURT: Well, it's compound. I don't know that I agree with the other.<br>Rephrase. |
| | 1106:9-13 | Q. You're not answering my question.<br><br>A. I am answering your question.<br><br>**THE COURT: Answer the question. Say it again**.<br><br>THE WITNESS: Rephrase your question or ask again, please. |
| | 1110:16-25<br>1111:1-2 | Q. You didn't think it was appropriate to name Melissa at that point?<br><br>A. He asked a general question. I gave a general answer. He did not ask a specific question and did not seek a specific answer. He said, "Do you have anyone |

4

| # | MERGED PAGE:LINE-LINES | JUDGES COMMENTS |
|---|---|---|
| | 880:18-881:1 | THE COURT: Okay. Any motions?<br><br>MR. REILLY: No, Your Honor.<br><br>THE COURT: All right. Does the defense have a case?<br><br>MR. REILLY: We do intend to call Mr. Garcia.<br><br>THE COURT: All right.<br><br>MR. REILLY: Given the hour –<br><br>THE COURT: Let's get going. I'm not wasting time.<br><br>MR. REILLY: I'm sorry?<br><br>THE COURT:  On the stand. |
| | 881:9-12 | THE COURT: All right, Mr. Garcia, take off that mask so the parties -- or the jury can see your face. Good afternoon. And go ahead and state your name for the record and<br>spell it. |
| | 889:5 | THE COURT: Slow down, Mr. Garcia. |
| | 890:17 | THE COURT: Again, Mr. Garcia, slow down. |
| | 894:2-9 | Q. And how many such evaluations were done during that time?<br><br>MS. PRIEDEMAN: Objection, Your Honor. Relevance.<br><br>THE COURT: What's the relevance?<br><br>MR. REILLY: Just providing background information about Mr. Garcia, Your Honor.<br><br>THE COURT: I'll allow this question, but let's move on.<br>You can answer that one. |
| | 895:5-10 | MS. PRIEDEMAN: Objection, Your Honor. Relevance.<br><br>THE COURT: He has already said no. But, again, none of this is directly relevant, Mr. Reilly; right? |

1

| | | |
|---|---|---|
| | | MR. REILLY: Just to provide his background information, Your Honor.<br><br>THE COURT: Again, I asked you to move on. |
| | 898:8-9 | THE COURT: Mr. Reilly, this isn't cross. You need to ask open-ended questions. |
| | 899:19-21 | THE COURT: Mr. Reilly, we need to hear it from him. I know you've got a plan in place, but I want the words from<br>him, not you. |
| | 902:22-25<br>903:1-6 | Q. All right. And while you were the associate warden, I take it you would not have been involved in, say, review of a possible early release or transfer to another facility?<br><br>MS. PRIEDEMAN: Objection, Your Honor. Leading.<br><br>THE COURT: Sustained. Sustained.<br><br>MR. REILLY: I'm not suggesting the answer, Your Honor. It's a yes-or-no question.<br><br>THE COURT: You are giving him plenty of information in your question. You can ask him what he does, you can ask him his responsibilities, and we can hear from him. |
| | 906:16-22 | Q. And that requires her to go through the unit team first and then it gets passed up the line ultimately to you?<br><br>A. Absolutely.<br><br>MS. PRIEDEMAN: Objection, Your Honor. Leading.<br><br>THE COURT: All right. That one is going to go. We are going to finish up today, and we will talk about this again more. Try to keep them open-ended. Let's go. |
| | 919:11-20 | THE COURT: All right.<br>What do we -- we're in great shape, I think, in terms of having the trial finished in the length of time provided for by the jurors. I am concerned about what I told you this morning and, you know, what my |

| | | |
|---|---|---|
| | | status is going to look like, so I will take all necessary precautions. But what are we looking at in terms of any other witnesses from the Defense? Any rebuttal case before we get to argument?<br><br>MR. REILLY: Your Honor, at this point, I don't anticipate offering any other witnesses. |
| | 921:3-12 | THE COURT: Good morning, everyone. We are back on the record. Everyone can be seated. The record will reflect that the parties are present. The jury is back. Bright sunny day today because it's Friday? Yay for Fridays. All right. Any questions before we get started? No? All right. Then we still have Mr. Garcia on the stand. Mr. Garcia, I will remind you, sir, you are still under oath. And as I mentioned to you yesterday, I do not want to interrupt your testimony, but you do have to slow down. |
| | 972:22-25 | Q. I'm going to point to part of it.<br><br>THE COURT: So you should not be directing, again, the testimony. These are interactive. He can touch that screen in response to your questions. |
| | 973:7-15 | THE COURT: And, Mr. Reilly, if you want to, after he identifies it, put something on the document, you can. You can also magnify it by using the toggle switch on the top of that -- no. At the very top —<br><br>THE CLERK: I can zoom it in.<br><br>THE COURT: Okay. So let's get that erased.<br><br>MR. REILLY: If you can —<br><br>THE COURT: Hold on. Erase the screen. All right. Now, start again. |
| | 980:25<br>981:1-3 | A. I took them, or they were texted to me.<br><br>THE COURT: Or what?<br><br>THE WITNESS: I either took the pictures myself, or they were texted by the other person to me. |
| | 1006:2-5 | THE COURT: You are going so fast, I could not understand you. |

3

| | | |
|---|---|---|
| | | THE WITNESS: Sorry, Your Honor.<br><br>THE COURT: Try again. |
| | 1026:9-11 | Q. So maybe November or thereabouts of 2020?<br><br>THE COURT: Again, I need to hear it from him. An open-ended question, Mr. Reilly. |
| | 1081:15-21 | MS. PRIEDEMAN: Ms. Slattery, can you please zoom in on Mr. Garcia's reflection in the window.<br><br>Q. You don't look surprised in this picture, do you?<br><br>MR. REILLY: Objection. Argumentive. Also calls for conclusion.<br><br>THE COURT: I don't know that you can answer it, but you can try if you can. You can try if you can. |
| | 1100:1-9 | Q. So this incident report, that would have been the first incident report you had ever written. It also would have been the first incident report that Melissa ever would have received; right?<br><br>MR. REILLY: Objection, Your Honor. Assumes facts not in evidence and misstates the witness' testimony.<br><br>THE COURT: Well, it's compound. I don't know that I agree with the other.<br>Rephrase. |
| | 1106:9-13 | Q. You're not answering my question.<br><br>A. I am answering your question.<br><br>**THE COURT: Answer the question. Say it again**.<br><br>THE WITNESS: Rephrase your question or ask again, please. |
| | 1110:16-25<br>1111:1-2 | Q. You didn't think it was appropriate to name Melissa at that point?<br><br>A. He asked a general question. I gave a general answer. He did not ask a specific question and did not seek a specific answer. He said, "Do you have anyone |

| | | in mind generally." There are 1,200 inmates at that institution, and several were under investigation for inappropriate acts. We had just finished an investigation on the previous inmate that testified here for compromising an officer. |
| | | MS. PRIEDEMAN: Objection, Your Honor. |
| | | THE COURT: **That's enough.** |
| | | Keep going. Next question. |