1  STEPHANIE M.  HINDS (CABN 154284)
   United States Attorney
2
   THOMAS S. COLTHURST (CABN 99493)
3  Chief, Criminal Division

4  MOLLY K. PRIEDEMAN (CABN 302096)
   ANDREW PAULSON (CABN 267095)
5  Assistant United States Attorneys

6       1301 Clay Street, Suite 340S
        Oakland, California 94612
7       Telephone: (510) 637-3680
        FAX: (510) 637-3724
8       molly.priedeman@usdoj.gov
        andrew.paulson@usdoj.gov
9

10 Attorneys for United States of America

11                 UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                      OAKLAND DIVISION

14 UNITED STATES OF AMERICA,          )  **CASE NO. 21-CR-00429 YGR**
                                      )
15           Plaintiff,               )  **UNITED STATES' SENTENCING
                                      )  MEMORANDUM AND MOTION FOR
16      v.                            )  UPWARD DEPARTURE OR UPWARD
                                      )  VARIANCE**
17 RAY J. GARCIA,                     )
                                      )  Hearing Date: March 22, 2023
18           Defendant.               )  Time:  2:00 pm
                                      )  Judge:  Hon. Yvonne Gonzalez Rogers
19 _____)

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2    I.     INTRODUCTION ...................................................................................................1

3    II.    BACKGROUND ......................................................................................................1

4           A.     Offense Conduct ..........................................................................................1

5                  1.     Garcia's Abuse of Melissa .................................................................2

6                  2.     Garcia's Abuse of Maria ....................................................................3

7                  3.     Garcia's Abuse of Rachel ...................................................................3

8                  4.     Garcia's Abuse of Katrina and Christina ...........................................4

9                  5.     Garcia's Abuse of Additional Victims................................................4

10                 6.     Garcia's Attempts to Cover Up His Abuse.........................................5

11                 7.     Garcia Created a Culture of Abuse at FCI Dublin ..............................6

12          B.     Sentencing Guidelines .................................................................................7

13   III.   DISCUSSION ..........................................................................................................7

14          A.     Applicable Law ............................................................................................7

15          B.     Recommended Sentence ...............................................................................8

16                 1.     The Nature and Circumstances of the Offense and History and
                          Characteristics of the Defendant ........................................................8
17

18                 2.     Need For the Punishment to Reflect the Seriousness of the Offense,
                          Promote Respect for the Law, and Provide Just Punishment ..............11

19                 3.     Need for the Sentence to Afford Adequate Deterrence to Criminal
                          Conduct .............................................................................................11
20

21                 4.     Need to Avoid Unwarranted Sentence Disparities Among Similarly
                          Situated Defendants ...........................................................................12

22          C.     The Guidelines Do Not Adequately Account for the Defendant's Conduct ...................13

23          D.     An Expanded Search Condition is Appropriate in This Case............................15

24   IV.    CONCLUSION .......................................................................................................16

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

Cases

3
*Mullings v. United States*, 15-cr-00538 (E.D.N.Y., May 13, 2016) ........................................................ 13

4
*United States v. Alapizco-Valenzuela*, 546 F.3d 1208 (10th Cir. 2008) .................................................. 14

5
*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) .................................................................................. 7

6
7
*United States v. Enrique Chavez*, Case No. 22-cr-00104-YGR (N.D. Cal.) ............................................ 7

8
*United States v. Franklin*, 18 F.4th 1105 (9th Cir. 2021) ............................................................................ 9

9
*United States v. Grams*, 566 F.3d 683 (6th Cir. 2009) .............................................................................. 13

10
*United States v. Grimes*, 18-cr-00069 (S.D. W. Va., Jan. 2019) .............................................................. 12

11
*United States v. Herbert*, 813 F.3d 551 (5th Cir. 2015) ............................................................................. 11

12
*United States v. Hosea Lee*, 5:21-cr-00084-DCR-MAS (E.D. Ky, August 1, 2022) ............................ 12

13
14
*United States v. James Highhouse*, 21-cr-16-HSG (N.D. Cal.) ....................................................... 7, 13, 14

15
*United States v. John Bellhouse*, 22-cr-00066-YGR (N.D. Cal.) .............................................................. 7

16
*United States v. Miller*, 479 F.3d 984 (8th Cir. 2007) ............................................................................... 14

17
*United States v. Petty*, 982 F.2d 1365 (9th Cir. 1993) .................................................................................. 9

18
*United States v. Ross Klinger*, Case No. 21-cr-00031-YGR (N.D. Cal.) ................................................. 7

19
*United States v. Thames*, 214 F.3d 608 (5th Cir. 2000) ............................................................................. 11

20
21
Statutes

22
18 U.S.C. § 1001 ....................................................................................................................................... 1, 13

23
18 U.S.C. § 2241 ........................................................................................................................................... 14

24
18 U.S.C. § 2242 ........................................................................................................................................... 14

25
26
18 U.S.C. § 2243(b) .................................................................................................................................. 1, 13

27
18 U.S.C. § 2244(a)(4) ............................................................................................................................. 1, 13

28
18 U.S.C. § 3553(a) .............................................................................................................................. 8, 14, 15

18 U.S.C. § 3553(a)(2) ................................................................................................. 7

18 U.S.C. § 3553(b)(2)(A)(i) ....................................................................................... 7

Rules

U.S.S.G. § 2A3.1 ....................................................................................................... 14

U.S.S.G. § 2A3.3 ....................................................................................................... 14

U.S.S.G. § 2A3.4 ....................................................................................................... 14

U.S.S.G. § 3C1.1 ....................................................................................................... 15

U.S.S.G. § 3D1.4 ....................................................................................................... 14

U.S.S.G. § 5D1.3(7)(C) ............................................................................................. 15

U.S.S.G. § 5K2.0 ....................................................................................................... 13

U.S.S.G. § 5K2.0(a)(1)(B) ........................................................................................... 7

## I.   INTRODUCTION

As the warden at FCI Dublin, the defendant, Ray Garcia, controlled every aspect of the lives of the inmates.  He controlled where they slept, who they could talk to, and where they worked.  He had the power to help them or punish them.  He could grant their compassionate release motions or send them to solitary housing where they were confined to "little cells, like dungeons."  Trial Tr. 263.  As one victim put it, he had the ability to make the inmates' lives a "living hell."  Trial Tr. 745.  Garcia used this power to repeatedly coerce, manipulate, and sexually abuse and harass multiple inmates under his care and protection.  After abusing his victims, Garcia took steps to ensure his victims' silence by using his position of power to deter them from coming forward.  When confronted by federal agents about his abuse, Garcia lied.  At trial, Garcia doubled down.  He stood up, under oath, and denied *any* wrongdoing.  Even after his convictions in this case, Garcia has continued to show no remorse and has refused to accept any responsibility for his actions, persisting in his categorization of the victims as "felons" who wanted "personal gain."  PSR ⁋ 277.

Garcia was convicted of one count of making false statements in violation of 18 U.S.C. § 1001, three counts of sexual abuse of ward in violation of 18 U.S.C. § 2243(b), and four counts of abusive sexual contact in violation of 18 U.S.C. § 2244(a)(4), involving three different victims.  Two additional victims testified regarding their abuse at Garcia's hands and five additional non-testifying victims have come forward to detail Garcia's abuse.  Garcia's crimes were extraordinarily serious.  Because the advisory Guidelines range fails to account for the seriousness of Garcia's crimes, the government respectfully moves this Court to vary or depart upward and impose a sentence of 180 months in prison, a supervised release term of 15 years, a $20,000 fine, and $800 in special assessments.  While this is a significant upward variance or departure from the Guidelines, it is a necessary one.

## II.   BACKGROUND

### A.   Offense Conduct

As the warden at FCI Dublin, Garcia was the most powerful person in the prison.  He could help inmates by granting their compassionate release motions or transferring them to facilities closer to their families.  He also had the power to punish inmates by sending them to the Special Housing Unit (SHU), searching their cells, and restricting their access to phone calls and emails.  Garcia was well aware of the

power he had over the inmates, and he repeatedly used that power to systematically manipulate and abuse his victims.

Garcia's tactics followed a familiar pattern.  He flattered his victims, called them beautiful, made them feel special, and made them promises.  Once he had groomed them, he instructed them to strip naked for him and touched them for his own perverse sexual pleasure.

Due to the nature of Garcia's position at FCI Dublin, Garcia's victims were powerless to report his abuse.   Under Bureau of Prisons (BOP) policy, Garcia was notified when an inmate made a complaint under the Prison Rape Elimination Act (PREA), the very act designed to prevent Garcia's abuse.  Trial Tr. 677.  Garcia also had the sole authority to decide whether a PREA complaint should or should not be referred to criminal authorities.  Trial Tr. 676.

At trial, Garcia was convicted of sexually abusing three different inmates: Melissa, Maria, and Rachel.  Each of them testified in excruciating detail about Garcia's abuse.  But they weren't Garcia's only victims.  Two other inmates – Katrina and Christina – testified regarding Garcia's sexual abuse and harassment of them.  And the government has spoken with five other inmates – M.M., C.F., D.G.R., S.R.V., and T.G. – who have also alleged that Garcia abused them.  Garcia's egregious conduct with respect to each victim is discussed below.

### 1.    Garcia's Abuse of Melissa

Garcia's abuse of Melissa began with flattery and promises, but his comments quickly became "pornographic" and "vulgar."  Trial Tr. 265.  Garcia told Melissa she was beautiful and that he could protect her, encouraged her to apply for compassionate release, and promised to help her with a transfer to be closer to her family.  Trial Tr. 264, 268-69, 314.  In December 2019, shortly after her mother passed away, Garcia brought Melissa into the visitation room bathroom at FCI Dublin out of the sight of surveillance cameras, grabbed her breasts, pulled her pants down, and put his fingers in her vagina.  Trial Tr. 271-272.  Garcia then put Melissa's hand on his erect penis and used her hand to stroke his penis.  Melissa was in "shock" and described Garcia's actions as "rough."  Trial Tr. 273.  Garcia digitally penetrated Melissa on three other occasions and grabbed her breasts and vagina on another occasion.  Trial Tr. 291, 297, 302, 307.  One of these incidents occurred when outside auditors were at FCI Dublin as part of a PREA evaluation to ensure FCI Dublin was in compliance with PREA's

requirements.  PSR ⁋ 41.  While the auditors were at FCI Dublin, Garcia took Melissa into a small

changing stall out of the view of the surveillance cameras, touched her vagina, and grabbed her breast so

hard that she thought he was going to "pop her implant."  Trial Tr. 302.

Garcia's abuse of Melissa didn't stop there.  Garcia instructed Melissa to strip naked on

numerous occasions when he did his rounds in the prison and showed her pictures of his penis. Trial Tr.

281, 287.  At trial, the government admitted naked photographs Garcia took of Melissa on her hands and

knees on her bed, and photographs of Garcia's penis taken in the warden's bathroom at FCI Dublin that

were seized from Garcia's personal computer.  Garcia was keenly aware of the power dynamic, and took

full advantage of it.  On one occasion, Garcia instructed Melissa to insert a candy cane into her vagina.

PSR ⁋ 39.  On another occasion, he asked her to strip, and gave her candy after she complied with his

command.  Trial Tr. 310-311.  Melissa testified that after that incident, she felt "like a stripper."  Trial

Tr. 311.

### 2.    Garcia's Abuse of Maria

As it did with Melissa, Garcia's abuse of Maria began with flattery and promises.  He promised

he would sign her compassionate release paperwork and told her he wanted to be with her when she was

released from prison.  Trial Tr. 471-72, 479.

Garcia also instructed Maria to strip naked when he did his rounds and showed her pictures of

his penis.  Trial Tr. 474, 493.  On one occasion, Garcia took Maria's hand and placed it on his erect

penis and told her "all this is yours."  Trial Tr. 485.  On another occasion when he had instructed her to

be naked in her cell, Garcia touched Maria's bare breasts.  Trial Tr. 499.  Describing her relationship

with Garcia, Maria testified that "everything was beautiful in the beginning, but then what happened

afterwards, that was more forceful" and she "felt like [she] was against the wall."  Trial Tr. 495.  Maria

testified that she was scared that if she said no to Garcia, Garcia might become angry and refuse to sign

her compassionate release paperwork.  Trial Tr. 489-90.

### 3.    Garcia's Abuse of Rachel

Garcia first approached Rachel after her closest friend at FCI Dublin was transferred, and she

was particularly lonely.  Trial Tr. 590-591.  Garcia was friendly towards Rachel and his comments

began to get more "personal and pointed."  Trial Tr. 591.  At one point, Garcia made a comment about

1  special needs children, which struck a chord with Rachel because she has a special needs son and the

2  comment made her feel like she had a "connection" with Garcia.  Trial Tr. 594-595.  Garcia's comments

3  quickly turned sexual, and he commented on Rachel's breasts and buttocks.  Trial Tr. 592-593.  Garcia

4  also asked Rachel for naked photographs of herself, showed her pictures of his penis, and asked her to

5  strip for him.  Trial Tr. 606-608.  Rachel testified that Garcia pushed her against a wall at FCI Dublin,

6  grabbed her buttocks, and kissed her. Trial Tr. 597.  Prior to her release from FCI Dublin, Garcia gave

7  Rachel an email address she could use to contact him.  Rachel later contacted Garcia via email, and he

8  then contacted her using a prepaid phone.  Trial Tr. 616-617.  Rachel testified that she video chatted

9  with Garcia on several occasions while she was at a halfway house.  Trial Tr. 618.  During at least one

10 of those video chats, Rachel and Garcia undressed and masturbated.  *Id.*  At trial, the government

11 admitted several screenshots from that video chat that were recovered from Garcia's personal computer.

12 Rachel testified that the photographs were taken without her knowledge or consent.  Trial Tr. 621.

13                    **4.      Garcia's Abuse of Katrina and Christina**

14        At trial, Katrina and Christina testified to additional uncharged abuse that they suffered at the

15 hands of Garcia.  Katrina testified that Garcia began making sexual comments to her, and eventually

16 instructed her to strip naked for him when he did his rounds.  Trial Tr. 743, 748.  Katrina testified that

17 she didn't feel like she could say no to Garcia because he was the one person who could "ruin anything

18 for [her] during [her] time."  Trial Tr. 748.

19        Christina testified that in the summer of 2019, she was lifting weights when Garcia approached

20 her from behind and grabbed her left buttock and said, "I'm sorry, I couldn't help myself."  Trial Tr.

21 698.  A few weeks later, Christina was running on the track when Garcia asked her to "slow down," and

22 said he liked to "see it jiggle, wiggle."  Trial Tr. 702.

23                    **5.      Garcia's Abuse of Additional Victims**

24        Garcia's abuse went beyond just the victims who testified at trial.  Federal agents spoke to five

25 additional victims, M.M.,[1] C.F., D.G.R., S.R.V., and T.G., who were abused by Garcia.  C.F. and M.M.

26

27        [1] The government called M.M. as a witness at trial; however, she refused to testify under the
Fifth Amendment, and the government withdrew her as a witness.  M.M. has submitted a Victim Impact

28 Statement where she explained that she "froze" after seeing Garcia and was afraid to testify based on a
fear of retaliation by other officers at FCI Dublin.  M.M. Statement at 1.

UNITED STATES' SENTENCING MEMORANDUM    4
21-CR-00429 YGR

both told agents that Garcia flattered and complimented them, and eventually instructed them to strip naked for him when he did his rounds.  PSR ¶¶ 95, 109, 136, 137.  M.M. reported that she felt uncomfortable stripping for Garcia, but she was afraid that if she said no Garcia would send her to the SHU.  PSR ¶ 138.  D.G.R. told agents that Garcia offered to bring her jewelry, asked if he could take naked photographs of her, and instructed her to strip for him.  PSR ¶¶ 115-117.  Garcia engaged in multiple sexual acts with D.G.R., including oral sex, and vaginal and anal penetration.  PSR ¶¶ 123-128. S.R.V. told agents that Garcia asked if he could take a picture of her, made inappropriate comments, and instructed her to "spend time" with him in the orderly closet if she wanted his assistance with an administrative request.  PSR ¶¶ 141-142.  S.R.V. met Garcia in the orderly closet twice, and on both occasions, he groped her and she performed oral sex on him while he forcefully pushed her head down. PSR ¶¶ 144, 145, 146.  S.R.V. described Garcia's actions as "fast, rough, and aggressive."  PSR ¶ 147. T.G. told agents that on two occasions, Garcia digitally penetrated T.G., and used T.G.'s hand to touch his penis.  PSR ¶ ¶ 153, 154.

### 6.    Garcia's Attempts to Cover Up His Abuse

Garcia went to great lengths to cover his tracks.  To deter the victims from coming forward, he told them he was friends with the individual in charge of investigating sexual abuse of inmates, and that he could "never be fired" because he worked for "Washington, D.C."  Trial Tr. 305, 316.  And he instructed Maria to "get rid of any evidence" and (falsely) reported to Rachel that a different inmate was sent back to FCI Dublin after pictures of a correctional officer were found on her phone.  Trial Tr. 503, 623.  Garcia's actions had the intended effect.  Maria destroyed pages from a calendar with notes about Garcia, and each of the victims testified that they did not feel like they could report what had happened with Garcia because they were terrified of going to the SHU.  Trial Tr. 324, 491, 503, 636.

Garcia also took actions to destroy evidence himself.  Shortly after another correctional officer at FCI Dublin was charged with sexual abuse, Garcia downloaded an app to "hide photos."  Trial Tr. 829-830.  And when he was confronted by federal agents, Garcia lied through his teeth.  Despite the fact that the evidence at trial established that Garcia had sexually abused multiple inmates and instructed them to strip naked for him while he did his rounds, he told agents that he had never touched an inmate inappropriately, and he had never "schedule[d] a time" for an inmate to be undressed.  PSR ¶ 24.

Garcia's lies continued after he was indicted.  Over the course of several days on the stand at trial, Garcia perjured himself, flatly denying any wrongdoing and crafting an incredulous web of falsehoods.  In doing so, he routinely attempted to blame the victims.  While he admitted that he took naked photographs of Melissa, he testified that he took the pictures to capture *her* misconduct, and to support a nonexistent incident report that he supposedly created but did not save or share with anyone at BOP.  PSR ¶¶ 169-70.  Likewise, in obviously perjurious testimony that defied common sense, Garcia stated that it was *Rachel* who urged him to buy a burner phone, and *Rachel* who told him to take screenshots of her naked body during a video chat.  PSR ¶ 172.  Garcia's testimony was contradicted by both Melissa and Rachel's testimony, as well as the investigator from FCI Dublin who testified that it was against policy to take naked pictures of an inmate to document misconduct and for Garcia to be communicating with Rachel after her release.  PSR ¶¶ 174, 175.

Even now, despite his convictions, Garcia has persisted in his utter lack of remorse and acceptance of responsibility for his actions by continuing to insist in his interview with the Probation department that there are "no victims" in this case and that this "case is based on convicted felons conspiring to make allegations against [him]."  PSR ¶ 277.

### 7.    Garcia Created a Culture of Abuse at FCI Dublin

Not only did Garcia himself sexually abuse the inmates under his care, but in his role as warden, Garcia created and perpetuated a culture of abuse at FCI Dublin.  "Essentially, everybody" at FCI Dublin reported to Garcia.  Trial Tr. 414.  And Garcia was in charge of overseeing the very rules he was breaking.  Between April 2019 and March 2020, Garcia conducted the PREA annual training for BOP regional staff and trained newly arriving or promoting supervisors at FCI Dublin on PREA requirements.  *See* Dkt. 59 (Factual Stipulation No. 4).  He also taught all of the PREA courses at FCI Dublin during 2020, and prepared the pre-audit binder for inspectors who were scheduled to conduct a PREA inspection at FCI Dublin.  *Id.*  Given that a sexual predator administered the PREA program in the prison, it is no surprise that inmates felt like "PREA didn't exist at Dublin."  Trial Tr. 305.  It is also no surprise that the staff Garcia supervised were *themselves* abusing inmates.  Thus far, four other FCI Dublin correctional officers have been charged with sexually abusing inmates while Garcia was associate warden or warden, and three have been convicted.  Ross Klinger, Enrique Chavez,

1   and James Highhouse have all pleaded guilty, and John Bellhouse is scheduled for trial at the end of

2   May.  *See United States v. Ross Klinger*, Case No. 21-cr-00031-YGR (N.D. Cal.); *United States v.*

3   *Enrique Chavez*, Case No. 22-cr-00104-YGR (N.D. Cal.), *United States v. James Highhouse*, 21-cr-16-

4   HSG (N.D. Cal.); *United States v. John Bellhouse*, 22-cr-00066-YGR (N.D. Cal.).  Garcia is indirectly

5   responsible for the longstanding conduct by these men as well.

6           **B.       Sentencing Guidelines**

7           On March 1, 2023, Probation issued the Final PSR.  Probation determined that Garcia's advisory

8   Guidelines are 46-57 months, based on a total offense level of 23 and a criminal history of I.  The

9   government agrees with the Guidelines calculation.  The government further agrees with Probation that

10  Garcia can afford to pay a fine in this case and, for the reasons discussed below, that an upward

11  departure or variance is appropriate due to the egregious nature of Garcia's conduct.

12  **III.    DISCUSSION**

13          **A.       Applicable Law**

14          The Court should impose a sentence sufficient, but not greater than necessary, to reflect the

15  purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520

16  F.3d 984, 991 (9th Cir. 2008).  The Court should begin the process of determining an appropriate

17  sentence by calculating the correct sentencing range under the Guidelines.  *Id.*  After determining the

18  appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive

19  reasonableness in light of the factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991–93.

20          A defendant should be sentenced within the advisory sentencing Guidelines range unless "the

21  court finds that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken

22  into consideration by the Sentencing Commission in formulating the Guidelines that should result in a

23  sentence greater than that described."  18 U.S.C. § 3553(b)(2)(A)(i).  Additionally, U.S.S.G. §

24  5K2.0(a)(1)(B) provides for upward departures "in the case of child crimes and sexual offenses, [where]

25  the court finds, pursuant to 18 U.S.C. § 3553(b)(2(A)(i), that there exists an aggravating circumstance,

26  of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in

27  formulating the Guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2),

28  should result in a sentence different from that described."

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

     (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

     (2)    the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     (3)    the need for the sentence imposed to afford adequate deterrence to criminal conduct;

     (4)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

     (5)    the need to provide restitution to any victims of the offense.

**B.   Recommended Sentence**

For the reasons discussed below, the United States recommends that the Court vary or depart upwards and impose a sentence of 180 months in prison, a supervised release term of 15 years, a $20,000 fine, and $800 in special assessments.

**1.   The Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

The defendant's conduct in this case is unspeakably egregious.  Garcia relied on the inherent coercive prison environment and his unique unchecked power as warden to coerce and manipulate the victims to satisfy his own sexual desires.  By virtue of his position as associate warden and warden, Garcia knew the victims' vulnerabilities.  Garcia preyed on those vulnerabilities to manipulate the victims by targeting Melissa after her mother died, using Maria's desire to be home with her children to dangle the promise of compassionate release in front her, and using Rachel's special needs son to get closer to her.  By targeting victims who could not legally consent and who had no recourse to report his conduct, his behavior went undetected for years.

The defendant was convicted of seven different acts of sexual abuse related to three different victims, as well as lying to federal agents.  But Garcia's abuse was part of a much larger, far-reaching pattern.  In addition to the charged acts, Garcia routinely showed Melissa, Maria, and Rachel pictures of his penis taken at FCI Dublin, instructed them to strip naked, and took pictures of their naked bodies.

He also instructed Katrina to strip naked for him and grabbed Christina's buttocks without her consent. He subjected his victims to his own sexual desires, and they were powerless to protest. More than one victim described Garcia's actions as "rough" and "forceful." Trial Tr. 273, 495. As inmates in a prison that he controlled, the victims had no recourse. The Guidelines utterly fail to account for any of this additional egregious conduct.

In addition to the five victims who testified at trial, five additional victims have come forward with allegations that Garcia sexually abused them or instructed them to strip naked. Several of the victims are incarcerated in other states, and one of the victims is in Mexico. The Court can consider can and should consider M.M.'s, C.F.'s, D.G.R.'s, S.R.V.'s, and T.G's allegations as relevant conduct in this case. Although these victims did not testify at trial, the Court may consider hearsay at sentencing so long as the statements bear "some minimal indicia of reliability." *United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir.), *amended*, 992 F.2d 1015 (9th Cir. 1993). "The defendant typically has the burden to show that disputed hearsay is false or unreliable." *United States v. Franklin*, 18 F.4th 1105, 1114 (9th Cir. 2021).

Here, M.M.'s, C.F.'s, D.G.R.'s, S.R.V.'s, and T.G.'s statements are reliable because each of the victims was interviewed by federal agents and explained Garcia's abuse in detail, and their accounts are corroborated by the accounts of the victims who testified in this case. *See Franklin*, 18 F.4th at 1127 (hearsay statements that corroborate each other are sufficiently reliable to be admissible at sentencing). As the Court heard from witnesses under oath at trial, Garcia's sexual abuse followed a pattern, and his abuse of M.M., C.F., D.G.R., S.R.V., and T.G. was no exception. For example, as he did with Melissa, Maria, Rachel, and Katrina, M.M., C.F., and D.G.R. each told agents that Garcia instructed them to strip naked for him. Priedeman Decl., Ex. A, B, C. And S.R.V recounted an instance in which Garcia told her he would "love to have a picture of that" after seeing her on her hands and knees in her cell, the exact position that Melissa was in when he took a picture of her naked. Priedeman Decl., Ex. D. Moreover, as he did with Melissa and Rachel, Garcia promised S.R.V. he would help her with an administrative remedy if she engaged in sexual activity with him. *Id.* Finally, T.G. stated that Garcia engaged in sexual contact with T.G. in the recreation area, a location similar to where Garcia abused Christina. Priedeman Decl., Ex. E. T.G. also noticed Garcia looking at his phone during his

1   interactions, which she believed meant he may have been recording their actions, which is consistent

2   with Garcia's documented desire to photograph his victims. *Id.*

3       Garcia also used his power to try to cover his tracks. He knew that his victims would be terrified

4   to report him out of a fear of retaliation, and he took further steps to deter them from reporting him. He

5   told them he had checked the surveillance cameras, that he was friends with the investigator, and that

6   *they* could get in trouble, not him. Garcia also lied when federal agents confronted him. He told agents

7   he had never touched inmates inappropriately, when he had done exactly that, on multiple occasions.

8   He also told agents he had never asked inmates to strip naked when he had done so numerous times,

9   including the day before his interview with federal agents. And he lied again, under oath, when he took

10  the stand in this case, and denied any wrongdoing. In doing so, he had the gall to blame the victims for

11  *his* wrongdoing. He testified that he took pictures of Melissa to capture *her* misconduct, when in fact it

12  was *Garcia* who instructed Melissa to be naked for him. And he testified that Rachel asked him to buy a

13  burner phone and take screenshots of her naked body, a narrative that defies all common sense and flatly

14  contradicts Rachel's own testimony. Garcia has persisted in his refusal to accept responsibility for his

15  actions, persisting even now with his utter denial of any wrongdoing. In short, Garcia has demonstrated

16  he has no respect for the judicial process, no limits in the lengths that he will go to avoid being held

17  accountable, and no understanding of the severity of his egregious and criminal conduct.

18      Garcia's actions have had devastating and lasting consequences for his victims, several of whom

19  were already victims of sexual abuse prior to their incarceration. After Melissa reported Garcia's abuse,

20  she "liv[ed] in fear every single day." Trial Tr. 328. Melissa testified at trial that "[g]etting sentenced to

21  15 years was nothing compared to what [she's] gone through." Trial Tr. 329. She continues to have

22  fear, anxiety, and flashbacks of Garcia "popping out of bushes and stalking [her] around the facility" and

23  even now continues to be afraid of retaliation. PSR ¶ 178. Rachel likewise has "nightmares" and "will

24  be living with the effects of [this case] for the rest of [her] life." Rachel Statement at 2. Katrina has

25  suffered "mental anguish" from the flashbacks of Garcia's abuse and continues to live in fear of

26  retaliation at FCI Dublin, where she remains incarcerated. Katrina Statement at 1. M.M. "dream[s]

27  about the abuse," feels "embarrassed and ashamed," and her "life is full of fear because of [Garcia]."

28  M.M. Statement at 1-2. S.R.V. stated that she felt "used" by Garcia "like she was a[n] . . . object he

UNITED STATES' SENTENCING MEMORANDUM   10
21-CR-00429 YGR

could toy with." S.R.V. Statement at 1. Her self-esteem was "knocked down" by Garcia and she considered killing herself. *Id.* She continues to be "haunted by" Garcia. *Id.* at 2. T.G. feels "disgusted" and "violated," is depressed and has nightmares about Garcia's abuse. T.G. Statement at 1-2.

Garcia's history and characteristics also militate in favor of a significant custodial sentence. Unlike many defendants who have difficult childhoods filled with abuse or other obstacles, Garcia had strong family support and never suffered any abuse or traumatic events. PSR ¶¶ 254-256, 258. Despite these benefits, Garcia chose to repeatedly abuse vulnerable victims under his care, several of whom were previously sexually abused, and were denied the stability and opportunity he himself was afforded.

### 2. Need For the Punishment to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

As detailed above, the severity of Garcia's crime cannot be overstated. He took an oath to uphold the Constitution and fulfill his duty as a public servant, and in doing so was entrusted by the federal government with immense power over the lives of hundreds of female inmates. He repeatedly violated that oath when he abused victim after victim under his care and protection and lied about it to federal agents, to the jury under oath, and to Probation. Courts have held that offenses committed by law enforcement should be taken particularly seriously due to their position of authority. *See United States v. Herbert*, 813 F.3d 551, 563 (5th Cir. 2015) (affirming an upward variance in the sentencing of a defendant-officer based on the district court's finding that the defendant abused his position of trust); *United States v. Thames*, 214 F.3d 608, 614 (5th Cir. 2000) ("A defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor, as criminal conduct by [law enforcement] constitutes an abuse of a public position."). With that in mind, and taking into account Garcia's particular position of power as the warden of FCI Dublin, Garcia should receive a significant custodial sentence well above the Guidelines advisory range.

### 3. Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct

Garcia's abuse of his victims was systematic and brazen. Garcia used his power to abuse his victims and to ensure he wasn't caught. As warden, he had access to all of the surveillance cameras, and he made sure the inmates knew it. He also told Melissa he could never be fired and warned Maria and Rachel that *they* could be in trouble if anyone found out what had happened. By doing so, Garcia was

conveying to his victims that even though he knew what he was doing was wrong, he thought he was above the law and would never get punished.  A significant custodial sentence is necessary to tell Garcia that he was wrong, and that there are consequences for his actions.

A significant custodial sentence is also necessary to deter other federal correctional officers from abusing additional victims.  As the warden, Garcia set the tone for the rest of the institution.  By abusing inmates without any consequences for so long, Garcia's actions sent a dangerous message that sexual misconduct would be tolerated without consequences.  The prosecutions in this district demonstrate that sexual abuse at FCI Dublin while Garcia was associate warden and warden was rampant.  And the culture of abuse at federal prisons extends beyond FCI Dublin, as well.[2]  Sexual assault in prisons is notoriously difficult to detect and prosecute.  There are rarely independent witnesses, the cases often depend heavily on the credibility of the victims, and victims are frequently deterred from coming forward.  A significant custodial sentence in this case will send a much-needed message to would-be offenders that sexual abuse of inmates will not be tolerated.

### 4.   Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants

This case is unique.  The government is not aware of another case where a warden of a federal prison was convicted of sexually abusing multiple inmates under his care, in a prison where multiple other correctional officers were *also* abusing inmates as a result, in part, of the environment that the warden created.  However, several cases throughout the country in which courts have imposed upward departures or variances in sexual abuse cases in the prison context inform the United States' recommendation.  *See United States v. Hosea Lee*, 5:21-cr-00084-DCR-MAS (E.D. Ky, August 1, 2022) (imposing an 80-month sentence on a BOP corrections officers who abused four victims where advisory Guidelines range was 18-24 months); *United States v. Grimes*, 18-cr-00069 (S.D. W. Va., Jan. 2019) (imposing sentence of 120 months in prison where advisory Guidelines range was 27-33 months in

---

[2] *See e.g.,* United States Senate, Permanent Subcommittee on Investigations Committee on Homeland Security and Government Affairs Staff Report, Sexual Abuse of Female Inmates in Federal Prisons (Dec. 13, 2022), available at https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf.

1    prison for abuse of multiple victims); *Mullings v. United States*, 15-cr-00538 (E.D.N.Y., May 13, 2016)

2    (imposing sentence of 84 months where advisory Guidelines range was 12-18 months).

3         The recent sentencing of the former chaplain at FCI Dublin is particularly informative.  The

4    defendant in that case pled guilty to sexual abuse related to one victim, specifically, two counts of sexual

5    abuse of a ward in violation of 18 U.S.C. 2243(b), two counts of abusive sexual contact in violation of

6    18 U.S.C. § 2244(a)(4), and one count of making false statements to federal agents in violation of

7    18 U.S.C. § 1001, after using his position as a prison chaplain to sexually abuse the charged victim on

8    multiple occasions.  At sentencing, the government introduced evidence that the defendant had engaged

9    in vaginal intercourse with another inmate, and had made inappropriate sexual remarks to other inmates.

10   The defendant's Guidelines range in that case was 24-30 months, and he was ultimately sentenced to 84

11   months in prison.  The Court acknowledged that the sentence was almost three times the high end of the

12   Guidelines range, but justified the upward variance based on "the systematic nature of the conduct, the

13   length of time that the conduct occurred, the number of instances of abuse, sexual assault and rape, the

14   involvement of multiple victims who were also inmates at Dublin and were subjected to the same sort of

15   abuse."  *United States v. James Highhouse*, 12-cr-16-HSG (N.D. Cal., August 31, 2022) (Sentencing

16   Transcript at 43).

17        Like Highhouse, Garcia's abuse was systematic and far-ranging.  Garcia had almost limitless

18   power at FCI Dublin, and he used that power to subject the ten women who have come forward to

19   horrifying abuse.  For that reason, imposing a 180-month prison sentence, roughly three times the

20   advisory Guidelines in this case, would not create an unwarranted sentencing disparity, and is

21   substantively reasonable.

22        **C.      The Guidelines Do Not Adequately Account for the Defendant's Conduct**

23        Whether couched as a variance in consideration of the 3553(a) factors or as a departure under

24   U.S.S.C. § 5K2.0, a significant custodial sentence well above the advisory Guidelines range in this case

25   is required by the facts.[3]  The advisory Guidelines range in this case utterly fails to account for the

26   _____

27        [3] It is the United States' position that the Court should vary upwards if it believes a sentence
     above the advisory Guidelines is warranted.  Nonetheless, many of the factors that support a departure
28   grounded in the Guidelines and an upward variance are the same.  *See United States v. Grams*, 566 F.3d
     683, 686-687 (6th Cir. 2009) (per curiam) (In contrast to a departure, "a 'variance' refers to the selection
     of a sentence outside the advisory Guidelines range based upon the district court's weighing of one or

inherently coercive nature of the prison environment, the disproportionate power that Garcia had over the inmates under his care as associate warden and warden, the sheer number of victims and volume of abuse in this case, and the extent of Garcia's obstructive behavior, which continues to this day.

As the Court in *Highhouse* acknowledged, the Guidelines in this context are "radically inconsistent with the actual nature of the harm done." *United States v. James Highhouse*, 12-cr-16-HSG (N.D. Cal. August 31, 2022) (Sentencing Transcript at 12-13). The base offense level for sexual abuse of a ward in § 2A3.3 is significantly lower than the levels established by the Guidelines provision that governs the other two federal sexual abuse statutes involving adult victims in custody, 18 U.S.C. § 2241 (aggravated sexual abuse) and § 2242 (sexual abuse), where the base offense level is 30. *See* USSG § 2A3.1. While admittedly these statutes cover different conduct, the magnitude of the disparity between the Guidelines is unwarranted. The Sentencing Commission has recognized the inadequacies in the Guidelines and has proposed an amendment to U.S.S.G. § 2A3.3 that would increase the base offense level of the guideline from 14 to 22.[4]

Even with the proposed amendment to the base offense level, the Guidelines would still fail to capture the extreme imbalance of power between Garcia and his victims. U.S.S.G. §§ 2A3.3 and 2A3.4, the governing Guidelines for Counts One through Seven, expressly prohibit the applicability of the Abuse of Position of Trust Enhancement, likely because the Sentencing Commission believed that the underlying base offense level – abuse of an inmate by a correctional officer – already captures this conduct. In this case, however, the base offense level fails to capture the additional abuse of power at issue when a *warden*, the most powerful person at a federal institution, abuses that power.

The Guidelines also fail to capture Garcia's pattern of abusive behavior. Counts One through Six in this case constituted six individual units under U.S.S.G. § 3D1.4, after which point the Guidelines simply do not account for additional units, *i.e.* additional instances of sexual abuse by Garcia. Because

_____

more of the sentencing factors of § 3553(a)."); *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1220 n.4 (10th Cir. 2008) (departures and variances are analytically distinct); *United States v. Miller*, 479 F.3d 984, 986-88 (8th Cir. 2007) (holding that a district court's conflation of departure and variance analyses was error, but finding it harmless error because the sentence was not unreasonable).

[4] *See* United States Sentencing Commission, Proposed Amendments to the Sentencing Guidelines (February 2, 2023), available at https://www.ussc.gov/guidelines/amendments/proposed-2023-amendments-federal-sentencing-guidelines.

Garcia was convicted of seven different counts that do not group, the Guidelines fail to account for all of the *charged* conduct in this case alone.  For the same reason, even if the government had added counts related to Garcia's sexual contact with Christina, and his sexual acts with D.G.R., S.R.V., and T.G., it would not have affected the Guidelines range.

The Guidelines also fail to account for Garcia's dogged efforts to cover up his misconduct and obstruct justice.  To account for Garcia's false statements to federal agents, two levels were added to the defendant's offense level pursuant to U.S.S.G. § 3C1.1.  *See* PSR ¶ 201.  But those two levels fail to account for Garcia's other obstructive behavior, including the steps he took to deter each of the victims from coming forward, his attempts to "hide photos," his blatant lies under oath, and his continued lies to Probation that there are "no victims" in this case.  In sum, the advisory Guidelines utterly fail to capture Garcia's egregious conduct in this case.

### D.  An Expanded Search Condition is Appropriate in This Case

The government believes that the following expanded search condition is appropriate in this case given the nature of Garcia's crime:

> The defendant shall submit his person, residence, office, vehicle, electronic devices and their data (including cell phones, computers, and electronic storage media), and any property under the defendant's control to a search. Such a search will be conducted by a United States Probation Officer or any federal, state, or local law enforcement at any time, with or without suspicion. Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

The Sentencing Commission recommends this type of condition in the context of sex offenses like this case.  *See* U.S.S.G. §5D1.3(7)(C).  A search clause is particularly appropriate in this case given that multiple naked photos of the victims were found on Garcia's electronic devices.  The suspicionless search clause is therefore necessary to support the sentencing goals of deterrence, rehabilitation, and protection of the public.

//

//

//

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.     CONCLUSION

With full consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States respectfully recommends a sentence of 180 months in prison, a supervised release term of 15 years, a $20,000 fine, and $800 in special assessments.

DATED:  March 8, 2023

STEPHANIE M. HINDS
United States Attorney


*/s/ Molly K. Priedeman*
MOLLY K. PRIEDEMAN
ANDREW PAULSON
Assistant United States Attorneys

UNITED STATES' SENTENCING MEMORANDUM   16
21-CR-00429 YGR