Kevin G. Little, SBN 149818
**LAW OFFICE OF KEVIN G. LITTLE**
Post Office Box 8656
Fresno, California 93747
Telephone: (559) 342-5800
Facsimile: (559) 242-2400
E-Mail: kevin@kevinlittle.com

Attorneys for Defendant Ray J. Garcia

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No.: 4:21-cr-00429-YGR |
| Plaintiff(s), | *Assigned to: The Hon. Yvonne Gonzalez Rogers* |
| v. | **DEFENDANT RAY J. GARCIA'S OBJECTIONS TO FACTUAL ASSERTIONS IN PRESENTENCE REPORT** |
| RAY J. GARCIA | |
| Defendant(s). | Hearing:    March 22, 2023<br>Time:        2:00 PM<br>Courtroom: 1, 4th floor |

TO THE HONORABLE COURT:

Defendant Ray Jay Garcia through as undersigned counsel hereby submits these objections to the factual assertions set forth in the Presentence Investigation Report. In compliance with the Northern District Criminal Local Rules and Federal Rule of Criminal Procedure 32, these objections were all presented timely and informally to the assigned Probation Officer.

The offense and related conduct asserted in the PSIR appears on pages 4-29, paragraphs 6-175. Because these asserted facts are the subject of objections, the Court cannot rely on them for sentencing purposes without resolving the disputes. *See* Federal Rule of Criminal Procedure 32(i)(3). Defendant also relatedly requests the scheduling of an evidentiary hearing regarding these objected facts, many of which are not findings upon which his conviction was necessarily

based, pursuant to Federal Rule of Criminal Procedure 32(i)(2). Defendant also contends that relying on facts not found by a jury to triple (Probation recommendation) or nearly quadruple (Government recommendation) his Guideline sentence based on facts not found by the jury has constitutional implications and would violate his rights to have a jury make these findings. The United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), held that the Sixth Amendment was "violated by the imposition of an enhanced sentence under the U.S. Sentencing Guidelines based on the sentencing judge's determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant." *Id*. at 245.

Subject to these legal principles, Defendant's objections to the factual assertions set for the PSIR are as follows:

**Objections**

Pages 4-5, ¶8-¶9 - As the Associate Warden and Warden, the Defendant was <u>not</u> the authority of discipline. The Inmate Discipline Policy BOP Program Statement 5270.09, clearly states that the procedures for discipline of an inmate. To prevent a conflict of interest, the unit disciplinary committee works independently from the Warden and the Disciplinary Hearing Officer works for the Region, not the institution.

Page 5, ¶12 - There was no training conducted in 2020 due to the COVID-19 outbreak. Additionally, the Defendant spent most of that year in Washington DC. In 2021, limited in-person training was conducted. The Annual Training requirements were conducted on a computer-based program for tracking. In court, the prosecution presented a sign-in sheet with the Defendant's initials, which the Defendant did not sign. As the Defendant stated in court, the computer-based program will show that the Defendant had not completed any local training.

Page 5, ¶13 - Dublin was due to have a PREA inspection in April of 2020. The inspection prior to that was in 2018. Due to COVID 19, the inspection did not occur until August of 2021.

Page 5, ¶14 – The Defendant was <u>not</u> the instructor of PREA training at any time. Instruction from PREA would be conducted by the PREA Coordinator or the Chief of Psychology. At FCI Dublin the PREA Coordinator was Tamara Mitchell, PHD, from 2017-2020.

After the retirement of Dr. Mitchell the PREA Coordinator was Associate Warden Williams. The PREA Coordinators were responsible for everything listed in this paragraph.

Page 5, ¶15 - The video tapes were the responsibility of the PREA Coordinator.

Page 6, ¶17 - The Defendant never penetrated the inmate's vagina. In the initial indictment, the inmate made one allegations of digital penetration. Only after the reverse proffer did additional contrived allegations of penetration occur.

Page 6, ¶19 - The Defendant disputes all of these statements and contends they were contrived for financial gain.

Page 6, ¶20 - The Defendant never asked about this inmate's family or gave any inmate candy. The Defendant was not responsible for the authorization of transfers as the Associate Warden and never recommended or approved a transfer for any of the inmates involved in these allegations. The Defendant never told the inmates personal information. Inmates in every institution gather information on staff though eavesdropping and observation.

Page 6, ¶21- The Defendant disputes all of these statements and contends they were contrived for financial gain.

Pages 6-7, ¶22- The Defendant never touched this inmate's breast or vagina and the Defendant never placed her hand on his penis.

Page 7, ¶23-¶24 - These are describing the same allegations as two separate incidents. There was no scheduling with this inmate or any other inmate. On this day the Defendant made rounds in Unit-B, at approximately 10:45 a.m., only because the lunch meal was delayed. Ordinarily, this is when the lunch meal begins and all management staff are required to be present at the dining hall. The dining hall is closest to Unit B.

Page 7, ¶25 - The Defendant never showed this inmate or any other inmate pictures of his penis. This inmate clearly states in her interview that she closely monitored the defendant's daily movements and actions and was able to see his phone as a result.

¶26-¶27 - The Defendant never had keys to the visiting room or warehouse where this inmate alleges incidents occurred. As such, another staff member would have been present to unlock each of the areas in question.



1      Pages 8-9, ¶¶28-33 - This is not an alleged victim to which charges were filed and this
2 inmate's concoction is disputed.
3      Page 9, ¶34 - The testimony regarding scheduling was prompted by continued questions
4 as to when the Defendant made rounds. This is a distortion.
5      Page 9, ¶35 - No single staff member has complete control or power. To place an inmate
6 in the SHU, the Lieutenant is required to create a Detention Order stating a legitimate reason for
7 the segregation. Every inmate in the SHU is reviewed by the staff at a weekly SHU to justify the
8 continued presence of an inmate in SHU. Transfers are initiated by the Unit Staff, reviewed by
9 the Case Management Coordinator, and approved the Associate Warden of Programs before a
10 Warden ever sees the transfer packet.
11      Page 9, ¶36-¶38 - No truth to any of these statements. The Defendant spoke with this
12 inmate no differently or more often than other inmates.
13      Pages 9-10, ¶39 - No such notes were recovered. Same response to ¶20, as to the alleged
14 personal information.
15      Page 10, ¶40 - The dates of the alleged act change from 12/19 - 4/20, as a result of the
16 FBI obtaining a copy of the defendant's time and attendance records. In this inmate's original
17 interviews, she made some statement regarding giving a birthday card on the defendant's
18 birthday. After reviewing the defendant's time and attendance records, the FBI realized that the
19 Defendant was in Washington D.C. and this inmate allegations were not possible. Only after this
20 realization was this inmate interviewed again given an opportunity to change the dates.
21      Pages 10-13, ¶41-¶60 - The remaining testimony from this inmate is all fabricated and
22 cannot be supported. The Defendant could not have entered the areas in question without an
23 additional staff member's presence as the Defendant did not have the keys needed. Personal
24 information is easily obtained by inmates; they are very resourceful. The Defendant never
25 showed this inmate or any other inmate the pictures on his telephone. The Defendant never gave
26 this inmate or any other inmate candy. The Defendant did not touch or allow inmates to touch
27 him. The Defendant did not complement this inmate or speak to her differently than any other
28



1  inmate. Every inmate was encouraged to apply for compassionate release if they met the
2  qualifications noted in the Cares Act.

3        Pages 13-14, ¶61-68 - This inmate's goal was to be transferred to FPC Victorville. Her
4  plot was developed to gain a transfer as it was common to move inmates out of Dublin when an
5  allegation strong enough to warrant an investigation but not substantial enough to remove the
6  staff member. This occurred in June of 2021, just days before this inmate's allegations. A
7  UNICOR staff member was seen on video touching an inmate, the inmate was immediately
8  moved to FPC Victorville. In this inmate's case the defendant was removed so this inmate
9  remained at FPC Dublin. As a result, she fabricated a story about being threatened by staff.
10 Instead of conducting an investigation into these alleged threats, this inmate was immediately
11 moved to FPC Victorville. There is no documentation to substantiate her allegations about her
12 treatment at FPC Victorville.

13       Page 14, ¶69 - Inmate alleges the Defendant showed pictures in the kitchen. If this were
14 fact, it would have taken place in the presence of at least 100 inmates.

15       Page 14, ¶70 - The rose garden is maintained on the pathway to the recreation yard. The
16 inmate never received a rose or anything from the Defendant.

17       Page 14, ¶71 - All inmates were instructed to apply for compassionate release under the
18 Cares Act. As an illegal alien, she did not qualify. Her case manager worked with her to apply
19 under the compassionate release policy due to unforeseen circumstances at the time of sentence.
20 The Defendant was not part of this process other than to deny the release based on the facts
21 gathered by the Unit Team and the Clinical Director.

22       Page 15, ¶72 - Executive staff are not involved in inmate job placement.

23       Page 15, ¶73-¶77 - The Defendant never touched this inmate or placed her hand on his
24 penis. This is the same allegation as another inmate. It should be noted that these inmates had
25 ample opportunity to correspond and meet prior to and after this inmate's transfer. M.L.
26 originally declined to make any allegations to the FBI on three occasions. The inmate testified
27 that she was never fully naked as stated by another inmate. She did not testify that the Defendant
28 knelt outside her cell and no pictures of M.L. exist. Inmate M.L. cell was directly under a



DEFENDANT RAY J. GARCIA'S OBJECTIONS TO FACTUAL ASSERTIONS IN PRESENTENCE REPORT   5

camera. The FBI made no effort to obtain video footage to substantiate these allegations until the footage was overwritten.

Page 15-16, ¶78-¶81 - This inmate states that she destroyed evidence but later presented a calendar and a rose. Both alleged items of evidence were easily obtainable through normal inmate practices.

Page 16, ¶¶82-83 - The Defendant never made sexual comments toward this inmate. The Defendant did agree to have contact with her upon her release to gain information regarding an inmate she associated with who was suspected of introducing suboxone into the institution.

Pages 16-17, ¶84-¶87 - The Defendant did not have any physical contact with this inmate. During COVID-19, all inmates were locked down unless they were under escort. The area described by the inmate is flanked by a large bay window of her foreman's office. The Defendant never told the inmate the Defendant would take her to the visiting room. She testified that she knew executive staff did not have keys to the visiting room. The Defendant never gave her the Facilities Department Camera and told her to take pictures of herself. The Defendant did not show pictures of himself to this or any inmate. This inmate was shown pictures obtained from the Defendant's personal devices by the FBI.

Page 17, ¶88-¶90 - The inmates held to a common theme that the Defendant was close friends with Putnam. However, Putnam testified to the complete opposite. When the subject inmate was released, the Defendant was on TDY status in Brooklyn NY. The inmate initiated email and suggested the Defendant get a burner phone as she did not trust the internet due to her previous conviction. The inmate began sending pictures to the Defendant, both over email and text. As she testified, she sought the attention of a man and progressively sent more provocative pictures of herself. Nothing is this portion of her testimony is a violation of all and was consensual.

Pages 17-18, ¶91-¶92 - The Defendant does not recall ever seeing this inmate at the institution. Her allegations are impossible. At no time would she, or any other inmate, be alone on the recreation yard. The alleged incident would have been witnessed by both staff and inmates. The bikini allegation could be disproven by reviewing the electronic cell search records.



1    Page 18, ¶93-¶97 - This inmate was questioned by the Defendant on an occasion
2 regarding markings on her neck. The Defendant then confirmed her story in the presence of a
3 Lieutenant. The Defendant never complimented or commented on her body, specifically her
4 augmentation. On the contrary, inmate was warned and cited on several occasions for not
5 wearing a bra. The inmate was protesting that she was not allowed to purchase custom bras. She
6 wrote several electronic requests to staff regarding her breast size and the desire to not wear
7 undergarments. This inmate and every other inmate at Dublin received instruction through
8 Admissions and Orientation about the process for work, transfers and discipline. All inmates are
9 aware of the checks and balance of power in an institution.

10    Pages 18-19, ¶98-¶101 - This inmate gave a date of April 13, 2021, however video
11 footage obtained by the FBI did not support this allegation. This inmate alleges that the
12 Defendant stood at her cell up to 30 seconds while she was topless, but no inmate, staff or video
13 evidence supports this. She claims the Defendant would ask her to be naked during breakfast.
14 During this meal the Defendant would have been present in the dining hall with other staff and
15 approximately 200 inmates. She claims the Defendant made arrangements to see her the day
16 before the Defendant was walked out but again there is no inmate, staff or video evidence to
17 support this allegation. It should be noted that this inmate lost a transfer to a camp when it was
18 discovered that she had compromised a staff member. The SIS had become aware of an
19 inappropriate relationship between the staff and this inmate and had begun to gather video
20 evidence of their time together. The staff member was allowed to resign in lieu of termination or
21 prosecution when presented with the evidence against him. This inmate had contact with and
22 lives in the same housing unit as the other complainants at various times.

23    Pages 19-22, ¶102-¶122 - The Defendant has no idea who this inmate is. This is the first
24 time the Defendant have ever seen these allegations as this inmate was not at trial and trial
25 counsel never discussed this as part of discovery. Once again it should be noted that the
26 Defendant, as the warden or associate warden, did not have direct control of cell moves, jobs, or
27 transfers. The inmate claims she undressed there was no contact and then changes her story in
28 August of 2022.



DEFENDANT RAY J. GARCIA'S OBJECTIONS TO FACTUAL ASSERTIONS IN PRESENTENCE REPORT    7

1      Pages 22-24, ¶123-¶137 - Again, the Defendant has no idea who this inmate is. This is
2 the first time the Defendant has ever seen these allegations as this inmate was not at trial and trial
3 counsel never discussed this alleged incident as part of discovery. This inmate's allegations are
4 not possible as the area she spoke of are monitored by staff and have inmate workers. The staff
5 dining room she spoke of does have a rest room that is used by the Safety, Psychology and
6 Laundry departments. Additionally, inmate Duffy was assigned to that area as the staff cook and
7 would have present during normal working hours. As for the other restroom at the back of the
8 kitchen, the Defendant would not have had the keys to the area. This was a Food Service staff
9 restroom, and the key was not a common key on rings other the Food Service Staff.

10     Pages 24-26, ¶138-¶146 - This inmate was brought to the stand at trial and refused to
11 provide testimony. She was removed from the court and provided counsel. The attorney returned
12 to the court room and advised the judge that she no longer agreed to provide a statement for the
13 AUSA. This was done without the presence of the jury. Her allegations are completely false. She
14 was the cellmate of two other complaining inmates.

15     Pages 26-27, ¶147-¶155 - Again, the Defendant has no idea who this inmate is. This is
16 the first time the Defendant have ever seen these allegations as this inmate was not at trial and
17 trial counsel never discussed this as part of discovery. This inmate also was interviewed after the
18 reverse proffer. The Defendant did not force this inmate or any other inmate to perform oral sex.
19 The areas she claims the incidents occurred would have video surveillance.

20     Pages 27-28, ¶156-¶163 - Again, the Defendant has no idea who this inmate is. This is
21 the first time the Defendant have ever seen these allegations as this inmate was not at trial and
22 trial counsel never discussed this as part of discovery. The inmate claims of sexual conduct at the
23 recreation barn are impossible. The recreation has, at a minimum, two staff present. If for some
24 reason two staff cannot be present, the inside recreation is closed, and inmates are placed on the
25 yard where they are supervised by recreation staff and observed by a correctional officer in a
26 vehicle parked outside of the recreation yard. The Defendant did not possess keys to any of the
27 internal areas of recreation so access would be impossible without recreation staff presence. The
28 Defendant was never approached by this inmate to introduce K-2. It was well known that the



DEFENDANT RAY J. GARCIA'S OBJECTIONS TO FACTUAL ASSERTIONS IN PRESENTENCE REPORT     8

Defendant was searching for the staff member who was bringing in the K-2 and suboxone. If the inmate had told the SIS Lieutenant, that would have been Putnam. A report or memo to file would have been created.

Dated: March 8, 2023                                LAW OFFICE OF KEVIN G. LITTLE

*/s/ Kevin G. Little*
Kevin G. Little
Attorneys for Defendant Ray J. Garcia